**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| EDWIN H. STIER, ESQ., AS WIND DOWN TRUSTEE FOR MLS BERKOWITZ INVESTMENTS, LLC, | Case No.: |
| Plaintiff, | |
| v. | CIVIL ACTION |
| DIEGO POSSEBON; DIEGO POSSEBON – ME; LARISSA CARVALHO POSSEBON; MATHEUS POSSEBON; LUCAS GIACOMOLLI; HITS ENTERTAINMENT INTERNATIONAL LLC; HITS ENTRETENIMIENTO, LTDA; OPUS ASSESSORIA E PROMOCOES ARTISTICAS LTDA. D/B/A OPUS ENTRETENIMENTO; EGR CONCEPTS INC.; MP CAPITAL AND INVESTMENTS LLC; CHRISTIAN COSTA DOS SANTOS; C. COSTA DOS SANTOS LTDA.; RODRIGO MARTINS DE MELLO; WALTER CORDEIRO NETTO; WALTER CORDEIRO FILHO; DAKAR INDUSTRIA DE COMPONENTES INDUSTRIAIS LTDA; TW BRASIL LTDA. F/K/A TW DISTRIBUIDORA DE BEBIDA LTDA.; ADUKARGO TRANSPORTES E LOGISTICA E SERVICOS DE ARMAZENAGENS LTDA.; BR MULTISERVICOS LTDA.; BANCO MASTER S.A.; BANCO RENDIMENTO S.A.; TREVISO CORRETORA DE CAMBIO S.A.; BANCO BRADESCO S.A.; BANCO BTG PACTUAL S.A.; BANCO SAFRA S.A.; ITAU UNIBANCO S.A.; EXPOBRAZ EXPORT IMPORT E AGROPECUARIA LTDA.; FERNANDA ALVES DE SOUZA; EMPIRE STRONG INTERNATIONAL BUSINESS INTERMEDIATION, LLC A/K/A STRONG EMPIRE INTERNATIONAL BUSINESS INTERMEDIATION, LLC; EMPIRE | **COMPLAINT**<br><br>JURY DEMAND |

1

STRONG INTERNATIONAL BUSINESS
INTERMEDIATION ONE, LLC; EMPIRE
STRONG NEGOCIOS LTDA.; IARA
GALDINO DA SILVA; METALSUR
INDUSTRIA E COMERCIO DE ACOS
LTDA.; ANTONIO CARLOS FLORES
MENDES; MARCELO DE MESQUITA
DUARTE; CESALON – CENTRO DE
SERVICOS EM ACOS LONGOS LTDA.;
VINICUS OLIVEIRA MENDES;
MATHEUS DUTRA SILVA; BELOVIX
COMERCIO IMPORTACAO E
EXPORTACAO LTDA.; GLOBAL
SOLUCOES INTEGRADAS LTDA.;
A.P.N. SERVICOS LTDA.; A.R.M.
DANTAS LTDA.; A.S.R. ASSESSORIA
EMPRESARIAL LTDA.; ADRIANO DA
SILVA AMORIM; ALEXANDRE SCHUTZ
RIBAS; AYALLA MIGUEL DE
CARVALHO; CELAVI INVESTIMENTOS
E PARTICIPACOES LTDA.; CLOVIS S.
AMORIM; DANIEL POSSEBON
BARGAS; DK ASSESSORIA E
INTERMEDIACAO DE NEGOCIOS
LTDA.; JOUBERT DONINELI
KONRATH; EAGLE MAN COMERCIO
DE ARTIGOS DE VESTUARIO LTDA.;
EDINEIA PIABA ARAUJO LTDA.; ELVIS
HENRIQUE F. SILVA; ENERGISOM
SERVICOS E SONORIZACAO LTDA.;
FRANCINE POSSEBON; GABRIEL
MARIA D. CENTENO; J. CESAR
JACOBSEN; JULIO CESAR JACOBSEN;
JACQUELINE FERREIRA SIQUEIRA;
JOSE HENRIQUE MAIA GIACOMOLLI
LTDA.; LAKOCRED CONSULTORIA E
SOLUCOES LTDA.; LIDIANE LEITE
MELO; M.B. ALMEIDA; NEW SEGURA
ADMINISTRACAO DE IMOVEIS LTDA.
D/B/A T&F CONSULTORIA E GESTAO
DE IMOVEIS; NILO COUNTRY
EMPREENDIMENTOS IMOBILARIOS
SPA LTDA.; RAYNARA G.S. AMORIM;
WHESLEY SOUZA SENA; SCHUTZ
ASSESSORIA EMPRESARIAL LTDA.;
ARTS GESTORA E ADMINISTRADORA;

YIWU PRIMULA IMPORT AND EXPORT
CO. LTD.; YIWU ACORN IMPORT AND
EXPORT CO. LTD.; REAG USA LLC;
ARLEN SOOKIAS; STAR SILVER BY
PRINCESS; ASTRONAUTO ENTERPRISE
INC.; YIWU SUNTING INTERNATIONAL
TRADE CO. LTD.; YIWU ZONGHENG
IMPORT AND EXPORT CO.; TOP
SILVER; COINBASE INC; MORNING
GLORY EVERGREEN CO. LTD.;
FOSHAN WINNER FURNITURE CO.
LTD.; WENZHOU FATO MECHANICAL
ELECTRICAL; JEANNE RODRIGUES;
GLOBAL EMPIRE LTD.; MIX
ENTERPRISES LLC; NANZO
HOLDINGS, INC.; NANZO LLC; GIL
KAPLAN; ERIK KAPLAN; BRAZ
CENTER SERVICES INC.; BRAZJET
EXPRESS INC.; PAULA MARIANA
PEREIRA DA SILVA; JEAN DAVIDSON
ARAUJO; WAVE TECH CO.; FIDELITY
NATIONAL TITLE INSURANCE CO.;
MIAMI VENTURES LLC; EXPOBRAZ
USA LLC.; MDS LOGISTICA; MAERLON
DUARTE DE SOUZA; FRANCISCO
BONATES; MONIQUE LEVY;
GUILHERME RAMAO; SCHUNCK
ADVOGADOS; HEBEI JIUYE
COOKWARE CO., LTD.; QUICK
AUTOPROVIDERS, INC.; NINGBO
GENERAL UNION CO., LTD.; GETWELL
TRADING LIMITED; YIWU SUN
FLOWER IMP. AND EXP. CO.; YIWU
LOTUS IMP. AND EXP. CO. LIMITED;
HK NAGA IMPORT & EXPORT
LIMITED; RITEK CORPORATION;
JIAXING EPONT IMPORT & EXPORT
CO. LTD.; FFORWARD LLC; ASIA
YARN GROUP LIMITED; RAINBOW
SILVER CO. LTD.; PLAYFUN GAMES
CO. LTD.; SAMMI NS TRADE LIMITED;
Unitech USA-Scientific Solutions, Corp.\;
BRAGA EXPORTS INC.; ZHANGZHOU
DONGRONG MOTOR TECHNOLOGY;
AMERICA THAI JOYAS CO. LTD.;
MICHAEL PANZERI; KILOMAX

3

INTERNATIONAL LIMITED; HENGSHUI
GUANGXING SCREENS CO. LTD.;
CHINA BASE NINGBO FOREIGN
TRADE; QINGDAO QIXIANG
INTERNATIONAL; JINAN JINBAO;
LORD KRISHNA OVERSEAS; ZHEJIANG
ZHONGYU INDUSTRY; YIWU XIAWEI
IMPORT AND EXPORT CO. LTD.;
FOSHAN BESTHOUSE CERAMICS CO.,
LTD.; CHAN SHUN MING; LUCKY
GLOBAL IMPORT AND EXPORT CO.
LTD.; ELEGANT SILVER JEWELLERY;
BETTER SILVER SPA; MOMENT
KIWYQA ERP KUYUMCULUK DIS;
YUYAO FOREVER STAR SPRAYER;
FOSHAN WINCHAIN IMPORT AND
EXPORT; K13 SISTEM DANISMANLIK
LTD. STI; C.D.I.S.P.A.; INNOVISION
MULTIMEDIA LIMITED; YIWU SHENG
COMMODITY PURCHASE; TIANJIN
CUTPRINT CNC TECHNOLOGY; NICE
MATCH INTERNATIONAL CO., LTD.;
YIWU NAJIA IMPORT AND EXPORT
CO. LTD.; CHRYSOS SPA; F&B
AUTOPECAS E ACESSORIOS PARA;
SILVER LAND; PARAG DIAMONDS
INC., D/B/A PARAMOUNT; DENVER
SPA; UNVIR CO. LIMITED; WEB7
DIGITAL; YIWU PARADISE IMP. AND
EXP. CO., LIMITED; NINGBO JUMSON
INTERNATIONAL TRADE; HAINING
MINGSHUAI TECHNOLOGY; ANHUI
SHENGJIUDING AUTO PARTS CO.; P&P
SILVER FACTORY; QINGDAO SHINING
ROAD TYRE CO. LTD.; DREAM WATCH
BR LLC; SHASNXI DURSAFETY
MATERIALS CO. LTD.; ZHUJI WEIWEI
IMPORT & EXPORT CO. LTD.; LIGO
PRODUCT LIMITED; ZHEJIANG LIYA
VEHICLE CO. LTD.; XIAMEN
HONGJING INUDSTRY & TRADE;
NINGBO TOPWIN CO. LTD.; SPK
INTERNATIONAL INLIMITED;
BUBBLEGUM SHOES, INC.;
CONTINENTAL ADVANTAGE
SERVICES, INC.; MACK SCIENCE INC.;

4

LINGLONG TYRE CO. LTD.; HEFEI
DAYU FITNESS; SHANGHAI NAR
INDUSTRIAL CO. LTD.; XIAMEN
CAREFUL IMP. AND EXP. CO. LTD.; CHI
LONG ELECTRONIC CO. LIMITED;
NINGBO JIN MAO IMPORT AND
EXPORT CO.; CHANGZHOU NANTAI
GAS SPRING CO. LTD.; WENLING
JIAFENG MACHINERY CO. LTD.;
SHAOXING KEQIAO; ZHUZHOU OBT
CARBIDE TOOLS CO. LTD.; NINGBO
DINGJIA AUTO PARTS; HUI SHENG
SILVER JEWELRY CO. LTD.; L&D
FLORIDA INVESTMENTS CORP.;
CHANG YUK KING; KOEHLER
INSTRUMENT; BEACH HOUSE &
CONDOMINIUM; CORSAIR MEMORY
INC.; BRIGHT CELCOM WHOLESALE
LLC; ALBEMO TRADING AND
FINANCE UK LTD.; ELITE ELECTRIC
APPLIANCE MANUFACTURE; AIR
PLUS POWER CORPORATION; XIAMEN
SUNROY IMPORT AND EXPORT; UP
AND EIGHT CORP.; NINGBO FREE
TRADE ZONE YOUNGCOM INT.;
TAIZHOU KELE HSE INDUSTRY CO.
LTD.; WENZHOUZHONGLONG
TRADING CO. LTD.; INTCO; 1st SPORTS
CORP.; "JOHN DOES" 1-10 (names
fictitious); and "ABC COMPANIES" 1-10
(names fictitious),

       Defendants.

Plaintiff, Edwin H. Stier, Esq., as Wind Down Trustee for MLS Berkowitz Investments,

LLC ("Plaintiff"), by and through his attorneys, Daniel M. Stolz, Esq. of Genova Burns, LLC, and

Eric T. Kanefsky, Esq. of Calcagni & Kanefsky, LLP, as and for his Complaint against Defendants,

Diego Possebon, Diego Possebon–ME, Larissa Carvalho Possebon, Matheus Possebon, Lucas

Giacomolli, Hits Entertainment International LLC, Hits Entretenimiento, Ltda., Opus Assessoria

e Promocoes Artisticas Ltda. d/b/a Opus Entretenimento, EGR Concepts Inc., MP Capital and

Investments LLC, Christian Costa Dos Santos, C. Costa Dos Santos Ltda., Rodrigo Martins de Mello, Walter Cordeiro Netto, Walter Cordeiro Filho, Dakar Industria De Componentes Industriais Ltda., TW Brasil Ltda. f/k/a TW Distribuidora de Bebida Ltda., Adukargo Transportes e Logistica e Servicos de Armazenagens Ltda., BR Multiserviços Ltda., Banco Master S.A., Banco Rendimento S.A., Treviso Corretora de Cambio S.A., Banco Bradesco S.A., Banco BTG Pactual S.A., Banco Safra S.A., Itau Unibanco S.A., Expobraz Export Import e Agropecuaria Ltda., Fernanda Alves De Souza, Empire Strong International Business Intermediation, LLC a/k/a Strong Empire International Business Intermediation, LLC, Empire Strong International Business Intermediation One, LLC, Empire Strong Negocios Ltda., Iara Galdino da Silva, Metalsur Industria e Comercio De Aços Ltda., Belovix Comercio Importacao e Exportacao Ltda., Antonio Carlos Flores Mendes, Marcelo de Mesquita Duarte, Cesalon – Centro de Servicos em Acos Longos Ltda., Vinicus Oliveira Mendes, Matheus Dutra Silva, Global Solucoes Integradas Ltda., A.P.N. Servicos Ltda., A.R.M. Dantas Ltda., A.S.R. Assessoria Empresarial Ltda., Adriano da Silva Amorim, Alexandre Schutz Ribas, Ayalla Miguel de Carvalho, Celavi Investimentos e Participacoes Ltda., Clovis S. Amorim, Daniel Possebon Bargas, DK Assessoria e Intermediacao de Negocios Ltda., Joubert Donineli Konrath, Eagle Man Comercio de Artigos do Vestuario Ltda., Edineia Piaba Araujo Ltda., Elvis Henrique F. Silva, Energisom Servicos e Sonorizacao Ltda., Francine Possebon, Gabriel Maria D. Centeno, J. Cesar Jacobsen, Julio Cesar Jacobsen, Jacqueline Ferreira Siqueira, Jose Henrique Maia Giacomolli Ltda., Lakocred Consultoria e Solucoes Ltda., Lidiane Leite Melo, M.B. Almeida, New Segura Administracao de Imoveis Ltda. d/b/a T&F Consultoria e Gestao de Imoveis, Nilo Country Empreendimentos Imobilario SPE Ltda., Raynara G. S. Amorim, Whesley Souza Sena, Schutz Assessoria Empresarial Ltda., Arts Gestora E Administradora, Yiwu Primula Import and Export Co. Ltd., Yiwu Acorn Import and Export Co.

Ltd., Reag USA LLC, Arlen Sookias, Star Silver by Princess, Astronauto Enterprise Inc., Yiwu

Zongheng IMP and Exp Co., Top Silver, Coinbase Inc., Yiwu Sunting International Trade Co.

Ltd., Morning Glory Evergreen Co. Ltd., Foshan Winner Furniture Co. Ltd., Wenzhou Fato

Mechanical Electrical, Jeanne Rodrigues, Global Empire Ltd., Mix Enterprises LLC, Nanzo

Holdings, Inc., Nanzo LLC, Gil Kaplan, Erik Kaplan, Braz Center Services Inc., Brazjet Express

Inc., Paula Mariana Pereira Da Silva, Jean Davidson Araujo, Wave Tech Co., Fidelity National

Title Insurance Co., Expobraz USA LLC, MDS Logistica, Maerlon Duarte de Souza, Francisco

Bonates, Monique Levy, Guilherme Ramao, Schunck Advogados, Hebei Jiuye Cookware Co. Ltd.,

Quick Autoproviders Inc., Ningbo General Union Co. Ltd., Getwell Trading Limited, Yiwu Sun

Flower Imp. and Exp. Co., Yiwu Lotus Imp. and Exp. Co. Limited, HK Naga Import & Export

Limited, Ritek Corporation, Jiaxing Epont Import & Export Co. Ltd., FForward LLC, Asia Yarn

Group Limited, Rainbow Silver Co. Ltd., Playfun Games Co. Ltd., Sammi NS Trade Limited,

Unitech USA-Scientific Solutions, Corp., Braga Exports Inc., Zhangzhou Dongrong Motor

Technology, America Thai Joyas Co. Ltd., Michael Panzeri, Kilomax International Limited,

Hengshui Guangxing Screens Co. Ltd., China Base Ningbo Foreign Trade, Qingdao Qixiang

International, Jinan Jinbao, Lord Krishna Overseas, Zhejiang Zhongyu Industry, Yiwu Xiawei

Import and Export Co. Ltd., Foshan Besthouse Ceramics Co., Ltd., Chan Sung Ming, Lucky

Global Import and Export Co. Ltd., Elegant Silver Jewellery, Better Silver Spa, Moment Kiwyqa

Erp Kuyumculuk Dis, Yuyao Forever Star Sprayer, Foshan Winchain Import and Export, K13

Sistem Danismanlik Ltd. Sti., C.D.I.S.P.A., Innovision Multimedia Limited, Yiwu Sheng

Commodity Purchase, Tianjin Cutprint CNC Technology, Nice Match International Co., Ltd.,

Yiwu Najia Import and Export Co. Ltd., Chrysos Spa, F&B Autopecas E Acessorios Para, Silver

Land, Parag Diamonds Inc., d/b/a Paramount, Denver Spa, Unvir Co. Limited, Web7 Digital, Yiwu

Paradise Imp. and Export Co., Limited, Ningbo Jumson International Trade, Haining Mingshuai Technology, Anhui Shengjiuding Auto Parts Co., P&P Silver Factory, Qingdao Shining Road Tyre Co. Ltd., Dream Watch BR LLC, Shasnxi Dursafety Materials Co. Ltd., Zhuji Weiwei Import & Export Co. Ltd., Ligo Product Limited, Zhejiang Liya Vehicle Co. Ltd., Xiamen Hongjing Industry & Trade, Ningbo Topwin Co. Ltd., SPK International Inlimited, BubbleGum Shoes Inc., Continental Advantage Services Inc., Mack Science, Inc., Linglong Tyre Co. Ltd., Hefu Dayu Fitness, Shanghai Nar Industrial Co. Ltd., Xiamen Careful Imp. and Exp. Co. Ltd., Chi Long Electronic Co. Limited, Ningbo Jin Mao Import and Export Co., Changzhou Nantai Gas Spring Co. Ltd., Wenling Jiafeng Machinery Co. Ltd., Shaoxing Keqiao, Zhuzhou OBT Carbide Tools Co. Ltd., Ningbo Dingjia Auto Parts, Hui Sheng Silver Jewelry Co. Ltd., L&D Florida Investments Corp., Chang Yuk King, Koehler Instrument, Beach House & Condominium, Corsair Memory Inc., Bright Celcom Wholesale LLC, Albemo Trading and Finance U.K. Ltd., Elite Electric Appliance Manufacture, Air Plus Power Corporation, Xiamen Sunroy Import and Export, Up and Eight Corp., Ningbo Free Trade Zone Youngcom Int., Taizhou Kele Hse Industry Co. Ltd., Wenzhouzhonglong Trading Co. Ltd., INTCO, 1st Sports Corp., John Does 1-10, and ABC Companies 1-10 (collectively, "Defendants"), alleges as follows:

## **INTRODUCTION**

1.     This action arises from a massive fraud in which MLS Berkowitz, LLC ("MLS"), a New Jersey-based company engaged in the business of trading raw metals and other commodities, and its customer and principal creditor, Gerald Metals SARL ("Gerald"), were victimized by a sophisticated, well-organized conspiracy involving over 100 individuals and entities based in the United States, Brazil, and elsewhere, and defrauded out of nearly $50 million.

2.     The foundation for the scheme was laid in 2022, when Diego Possebon ("Possebon"), a Brazilian businessman with whom MLS had prior successful dealings, convinced

MLS to purchase several containers of tin concentrate sourced from Brazil that were, in turn, sold to Gerald (the "2022 Transaction"). Possebon and his Brazilian-based connections delivered what MLS had bargained for—tin with concentration levels above 75%—and led MLS to believe that they were a trusted source for future purchases.

3.      Over the course of the first half of 2023, however, Possebon and his co-conspirators used the success of the 2022 Transaction to induce MLS to engage in a much larger transaction involving the purchase and sale to Gerald of 129 separate containers of what they purported to be tin concentrate but—as MLS and Gerald learned when the shipments began to arrive at their ports of discharge many months later—was, in fact, worthless gravel dust (the "2023 Transaction").

4.      The scheme was carefully planned and executed with precision. *First*, Possebon and his co-conspirators coaxed MLS to enter the 2023 Transaction by repeatedly assuring MLS and, in turn, Gerald that it would be conducted in the same manner as the 2022 Transaction. That is, the materials would be sourced from licensed mines, sampled, and inspected at both the mine site and the port of exportation, chemically tested by an independent lab to ensure minimum concentration levels, and stuffed first into sealed bags and then into sealed export containers before being loaded onto the ships.

5.      *Second*, upon each shipment, but prior to the end-user's receipt of the tin concentrate, Possebon and his co-conspirators induced MLS to issue payment by providing them with documents—including bills of lading, invoices, certificates of origin, inspection reports, packing lists, international road cargo manifests, and export declarations—falsely confirming that the materials in each shipment had been lawfully produced, sampled and inspected, contained the requisite concentration level of tin, and were in transit to Gerald's customers. *Third*, Possebon and his co-conspirators worked together to facilitate and further conceal the scheme. Among other

deceitful and purposeful acts, they arranged for the purchase of 129 containers of gravel dust to be used as a decoy for the tin concentrate; departed from industry standards and transported the gravel dust in sealed bags rather than in bulk so as to hide the contents; provided the lab performing the chemical testing with samples of tin concentrate in place of the gravel dust that was actually being shipped; and prevented MLS and Gerald from observing their operations.

6.       Adukargo Transportes e Logistica e Servicos de Armazenagens Ltda. ("Adukargo") played a particularly prominent role.  Adukargo (i) was contracted by Dakar and TW Brasil to warehouse the material, (ii) purported to be a bonded warehouse when, in fact, it was not, (iii) created false pretenses to enable, facilitate, and host a fictitious display of the inspection, sampling, and stuffing of tin concentrate in a supposed export container that was never shipped to Gerald's customers and prevented a Gerald representative from fully inspecting Adukargo's operations by representing that it was a bonded warehouse under the control of Brazilian customs agents, when, in fact, it was not, and (iv) prepared and/or participated in the preparation of false documents to induce payment from MLS, all while being aware that it was warehousing gravel dust and not tin concentrate.

7.       *Fourth,* Possebon   and   his   co-conspirators   engaged   two   so-called "intermediaries"—Empire Strong and Metalsur—to receive purposely structured wires from the United States, bypass regulatory detection and reporting requirements, launder the monies, and distribute them to Possebon's family, friends, business associates, and dozens upon dozens of other undeserving recipients, including nearly $6 million for the purchase of a luxury, beachfront condominium in Miami in the name of his wife, no less than $7 million in cash to his personal driver, and large sums of cash to his sister.  Empire Strong and Metalsur not only knew that they

10

were engaging in an illicit scheme but also drafted and executed phony agreements to cover up their direct participation in it.

8.      The fallout has been catastrophic. As a direct result of the concerted acts and omissions of the Defendants, MLS is bankrupt and has paid nearly $50 million in funds for no valuable consideration.

9.      The purpose of this action is to hold the perpetrators of the fraud accountable for the extraordinary harm they have caused and use the bankruptcy code and all other legal and equitable means available to recover the nearly $50 million in funds that have been stolen.

## THE APPOINTMENT OF TRUSTEE

10.      This action is brought by Edwin H. Stier Esq., as Wind Down Trustee of MLS Berkowitz Investments, LLC (the "Trustee"), who, pursuant to the September 9, 2023 Order of the Bankruptcy Court, has been granted all powers of a bankruptcy trustee, including the authority to seek recovery of the nearly $50 million dollars paid by MLS for tin concentrate that was never delivered to Gerald's customers, plus related damages.

11.      Pursuant to 11 U.S.C. §544(a), the Trustee stands in the shoes of all MLS' creditors, including Gerald.

12.      Section 544, entitled "Trustee as lien creditor and as successor to certain and purchasers," establishes and sets forth the Trustee's powers.

13.      Among those powers, the Trustee may avoid and set aside any transfers of MLS that are voidable, including fraudulent transfers. Pursuant to 11 U.S.C. § 550(a), the Trustee may seek recovery from the initial transferee of any such transfer, the entity for whose benefit such transfer was made, and/or any immediate or mediate transferee of such initial transferee.

## THE PARTIES

A.   **The Victims**

14.   Plaintiff MLS Berkowitz Investments, LLC ("MLS") is a New Jersey limited liability company with its principal business address at 17 Country Club Lane, Marlboro, New Jersey 07746.

15.   MLS is an investment vehicle for the Berkowitz family. Seth Berkowitz ("Berkowitz") and his father, Mark Jay Berkowitz, are the sole members/managers of MLS and they each own 50% of the company. Seth Berkowitz's mother, Lois Berkowitz, is also involved in the family investment business. MLS stands for "Mark," "Lois," and "Seth."

16.   Before forming MLS in 2016, Berkowitz was employed by China Direct Industries Incorporated ("China Direct"), a company in the business of trading, sourcing, purchasing, and reselling raw materials. Berkowitz was hired and appointed as Vice President of International Sales for China Direct. In that capacity, he handled the trading of commodities, including tin concentrate, copper concentrate, manganese, and magnesium. It was in this role that Berkowitz developed industry contacts in Brazil, including Possebon and Possebon's brother-in-law, James Levy. At all relevant times, MLS was an independent company formed to, among other things, purchase commodities from various sources and resell them to its customers.

17.   Gerald Metals ("Gerald") is a Swiss corporation that operates as a worldwide commodity trading company. Gerald was incorporated over sixty (60) years ago and is one of the world's largest companies specializing in metals trading. Gerald offers physical merchanting, trade, and structured financing of non-ferrous, ferrous, and precious metals, as well as related concentrates and raw materials. Gerald has an international network of offices and has built a global reputation for its high standards and integrity in the commodities trading market.

**B.     The Perpetrators of the Fraud and Their Co-Conspirators**

18.     Upon information and belief, Diego Possebon ("Possebon") is an individual with an address at Rua Germano Peterson Junior, 433, ap. 1001, Auxiliadora, Porto Alegre/RS, CEP 90540-140 in Brazil.  Possebon orchestrated, directed, facilitated, concealed, and directly benefited from the fraudulent scheme that is the centerpiece of this litigation.

19.     Upon information and belief, Diego Possebon–ME ("Possebon ME"), is a Brazilian-based company owned solely by Diego Possebon with its principal business address at Rua Dr. Barcelos, 600, apto. 401, Centro, Canoas/RS, CEP 92310-200 in Brazil.  Upon further information and belief, Possebon ME serves no legitimate business function or purpose and was used by Possebon as a vehicle to facilitate the fraud and insulate himself from personal liability.  Possebon ME does not observe any corporate formalities and, at all relevant times, acted as the alter ego of Possebon.

20.     Upon information and belief, C. Costa Dos Santos Ltda. ("Costa Company") is a business entity with an address at Rua Itacoatiara, 2437, Uniao, Manacapuru/AM, CEP 69.401-092 in Brazil.  Costa Company was the purported supplier of tin concentrate for the entire 2022 Transaction and the bulk of the 2023 Transaction.

21.     Upon information and belief, Christian Costa Dos Santos ("Costa") is the sole owner of Costa Company.  He principally resides at Rua Dom Diogo de Souza, 320, Cond. Vilas Boas, Bl4, Ap. 201, Parque 10 de Novembro, Manaus/AM, CEP 69054-250 in Brazil.  Costa, directly and through Costa Company, worked with Possebon to create the appearance of legitimacy and induce MLS to pay nearly $50 million for tin concentrate that was never delivered.  Costa and Costa Company participated in and facilitated the scheme by, among other acts, (i) placing the orders for the gravel dust that was substituted for the tin concentrate, and (ii) paying for and

13

delivering or procuring the delivery of samples of tin concentrate to be chemically tested in place of the gravel dust being shipped so that the assay certificates would falsely confirm that the material being shipped was tin concentrate with the requisite concentration level.

22.     Upon information and belief, Rodrigo Martins de Mello ("Mello") is an individual who principally resides in Brazil.  Mello was the purported supplier of tin concentrate for some of the materials exported as part of the 2023 Transaction.

23.     Upon information and belief, Dakar Industria De Componentes Industriais Ltda. ("Dakar") is a business entity with its principal business address at Rua Palmeira do Miriti, 484, Terreo – Galpao A, Distrito Industrial II, Manaus/AM, CEP 69.007-400 in Brazil.

24.     Upon information and belief, Walter Cordeiro Filho ("Filho") is a representative of Dakar, who principally resides at Av. Coronel Teixeira, 1759, Apto 104, Bairro Ponta Negra, Manaus/AM, CEP 69037-000 in Brazil.  Filho's father is the record owner of Dakar.

25.     Upon information and belief, TW Brasil Ltda. f/k/a TW Distribuidora de Bebida Ltda. ("TW Brasil") is a business entity with its principal address at Rua Libertador, 585, Terreo A, Nossa Senhora Aparecida, Manaus/AM, CEP 69.053-090 in Brazil.

26.     Upon information and belief, Walter Cordeiro Netto ("Netto") is a representative of Dakar and TW Brasil.  He principally resides in Brazil and has prior business connections with Possebon.

27.     Dakar and TW Brasil were the exporters of record for the 2023 Transaction.  As the exporters of record, Dakar and TW Brasil were responsible for arranging and overseeing each step of the export process, including, but not limited to, overseeing the transport of tin concentrate from the mines, the delivery of the tin concentrate to Adukargo at the Port of Manaus, the transfer of the materials from the bags in which the materials were placed at the mines into new bags and the

14

"stuffing" of such bags into containers suitable for international export and organizing the sampling of each bag, and acting as the exporter for the export of the material from Brazil. Given the nature and extent of their role, Dakar and TW Brasil knew that the material being exported to Gerald's customers was supposed to be tin concentrate but was, in fact, gravel dust, and played a critical role in perpetuating and concealing the scheme, including orchestrating the fictitious display detailed in paragraph 280.

28.     Upon information and belief, Adukargo is a business entity with its principal business address at Av. Autaz Mirim, 1225, Distrito Industrial, Manaus/AM, CEP 69075-155 in Brazil. As detailed above, Adukargo participated in the scheme by purporting to warehouse and arrange for the packaging, transport, and shipment of tin concentrate when, in fact, it was warehousing and arranging for the packaging, transport, and shipment of gravel dust. Adukargo also worked with Possebon and other co-conspirators to conceal the scheme by, among other acts, (i) creating or participating in the creation of false documents to induce payment by MLS, and (ii) obstructing and preventing Gerald's inspection of the warehouse and enabling, facilitating, and hosting a fictitious display of the inspection, sampling, and stuffing of tin concentrate rather than the gravel dust that it knew was being packaged and shipped.

29.     Francisco Bonates ("Bonates") is an individual who principally resides in Brazil. At all relevant times, Bonates was Adukargo's Director of Operations and acted as an authorized agent of Adukargo. Bonates perpetuated and concealed the scheme as an agent of Adukargo by, among other acts, preventing Gerald from inspecting the exportation process at Adukargo's warehouse and enabling, facilitating, and hosting a fictitious display of the inspection, sampling, and stuffing of tin concentrate rather than the gravel dust that was being packaged and shipped.

30.    Upon information and belief, Expobraz Export Import e Agropecuaria Ltds. (and together with its US entity, Expobraz USA LLC, a business entity with its principal address at 1390 Hammondville Rd STE C, Pompano Beach, Florida 33069 in the United States of America, "Expobraz") is a business entity with its principal address at Av. Joaquim Alves Correa, 4431, Sala 03, Parque Nova Suíça, Valinhos/SP, CEP 13271-430 in Brazil.  Expobraz was responsible for providing logistics services and acting as the freight agent in respect of the 2023 Transaction, including allocating the export containers and arranging for the bills of lading with the shipping carrier.

31.    Upon information and belief, M. Duarte de Souza a/k/a MDS Trade Solutions and MDS Logistica ("MDS") is a business entity with its principal business address at Av. Eduardo Ribeiro, 520, SL 1708, Centro, Manaus/AM 69.101-901 in Brazil.

32.    Upon information and belief, Marlon Duarte de Souza is an individual who principally resides in Brazil.  Marlon Duarte de Souza is the principal of MDS.

33.    MDS and Marlon Duarte de Souza assisted Expobraz in providing the foregoing logistical services.

34.    Upon information and belief, BR Multiserviços Ltda. ("Multiservicos") is a fictitious entity created by, or at the direction of, Possebon and his co-conspirators to create the false impression that a reputable company had been engaged to inspect and sample the materials being exported.  Multiservicos is named as a defendant in the event it proves to be a real legal entity and because it participated in the scheme by creating the false impression that the material being exported was sampled and confirmed to be tin concentrate.

35.    Upon information and belief, Empire Strong International Business Intermediation, LLC, a/k/a "Strong Empire International Business Intermediation, LLC" ("Empire Strong US I")

is a Delaware limited liability company with its principal place of business address at 7950 NW 53rd Street, Suite 337, Miami, Florida 33166.

36.     Upon information and belief, Empire Strong International Business Intermediation One LLC ("Empire Strong US II") is a Delaware limited liability company with an address at 7950 NW 53rd Street, Suite 337, Miami, Florida, 33166.

37.     Upon information and belief, Empire Strong Negocios Ltda. ("Empire Strong Brazil") is a business entity with an address at Rua Fidencio Ramos, 223, Conjunto 114, Edificio Palladio, Vila Olimpia, Sao Paulo/SP, CEP 04.551-010 in Brazil.  For the purpose of this pleading, Empire Strong US I and Empire Strong US II may collectively be referred to as "Empire Strong US" and all the foregoing entities may be collectively referred to as "Empire Strong."

38.     Upon information and belief, Fernanda Alves de Souza ("Fernanda") is the principal of Empire Strong US I and II.  She principally resides at 851 NE 1st Avenue, Unit 3408, Miami, Florida 33132.

39.     Upon information and belief, Iara Galdino da Silva ("Iara") is Fernanda's business partner, who principally resides at Rua Antonio Pires, 91, ap. 32, Vila Albertina (SP) in Brazil. Iara is the principal of Empire Strong Brazil.

40.     Upon information and belief, Metalsur Comercial De Acos Eireli ("Metalsur") is a business entity with its principal business address at Rua Sete de Setembro, 269 Nossa Senhora das Gracas, Canoas/RS, CEP 92025-420 in Brazil.

41.     Upon information and belief, Antonio Carlos Flores Mendes ("Mendes") is the managing partner of Metalsur and an individual who resides at Rua Sete de Setembro, 269, ap., 302, Nossa Senhora das Gracas, Canoas/RS, CEP 92025-420 in Brazil.  Mendes has been identified as Possebon's best friend.

42.     Empire Strong and Metalsur participated in the scheme by, among other acts, receiving structured wires from the United States, facilitating, and laundering the fraudulent transfer of nearly $50 million to recipients designated by Possebon and their co-conspirators, and preparing and executing phony agreements to conceal the scheme.

43.     Upon information and belief, Schunck Advogados is a law firm based in Sao Paulo, Brazil.

44.     Upon information and belief, Guilherme Romao ("Romao") is an individual who principally resides in Brazil and an attorney with Schunck Advogados.  At all relevant times, Romao acted as an agent of Schunck Advogados.

45.     Schunck Advogados, directly and through its agent, Romao, assisted Fernanda and Empire Strong in laundering the proceeds of the fraud and creating false documents to facilitate the transfer of the funds.  Schuck Advogados and Romao received a portion of the illicit proceeds for their participation in the scheme.

**C.      The Other Recipients of the Fraudulent Transfers**

46.     The nearly $50 million in funds that were paid by MLS and funneled through Empire Strong, Metalsur, and other channels were ultimately disbursed (directly or indirectly) to the following recipients.  Upon information and belief, the recipients identified in Paragraphs 47 through 206, in addition to Empire Strong and Metalsur (collectively, "Recipient Defendants"), knew, or should have known, that the funds they received were the product of an unlawful scheme.  At the very least, they knew for certain that they did not provide any goods, services, or other forms of remuneration for the benefit of MLS or Gerald as consideration for the funds they received.

47.     Upon information and belief, Larissa Carvalho Possebon ("Mrs. Possebon") is Possebon's wife who also principally resides at Rua Germano Peterson Junior, 433, ap. 1001, Auxiliadora, Porto Alegre/RS, CEP 90540-140 in Brazil.

48.     Upon information and belief, A.P.N. Servicos Ltda. is a business entity with its principal business address at Av. Rondon Pacheco, 4600, Andar Torre UBT Sl 193/194, Tibery, Uberlândia/MG, CEP 38405-142 in Brazil.

49.     Upon information and belief, Celavi Investimentos e Participacoes Ltda. is a business entity with its principal business address at Av. Senador Tarso Dutra, 565, Petropolis, Porto Alegre/RS in Brazil.   Possebon and Mrs. Possebon are the managing partners of the company.

50.     Upon information and belief, Daniel Possebon Bargas is an individual who principally resides at Rua Domingos Martins, 644, ap. 803, Centro, Canoas/RS, CEP 92310-190 in Brazil.

51.     Upon information and belief, DK Assessoria e Intermediacao de Negocios is a business entity with its principal business address at Rua Luiz Cezar Leal, 225, Rubem Berta, Porto Alegre/RS in Brazil.

52.     Upon information and belief, Joubert Donineli Konrath is the managing partner of DK Assessoria e Intermediacao de Negocios and an individual who principally resides at Av. Santos Ferreira, 1180, Casa 112, Mal. Rondon, Canoas/RS, CEP 92025-728 in Brazil.

53.     Upon information and belief, Francine Possebon is an individual who principally resides at Rua Domingos Martins, 644, ap. 903, Centro, Canoas/RS, CEP 92310-190 in Brazil.

54.     Upon information and belief, J. Cesar Jacobsen is a business entity with its principal business address at Avenida Carlos Gomes, 777, Sala 702, Auxiliadora, Porto Alegre/RS, CEP 90480-003 in Brazil.

55.     Upon information and belief, Energisom Servicos e Sonorizacao Ltda. is a business entity with its principal business address at Av. Carlos Gomes, 222, Sala 802, Boa Vista, Porto Alegre/RS, CEP 90480-000 in Brazil.

56.     Upon information and belief, Julio Cesar Jacobsen is an individual who principally resides at Rua José Jannarelli, 81, ap. 91, Vila Progredidor, São Paulo/SP, CEP 05615-000 in Brazil.

57.     Upon information and belief, Adriano da Silva Amorim is an individual who principally resides in Brazil.

58.     Upon information and belief, Alexandre Schutz Ribas is an individual who principally resides at Rua Professor Brasílio Ovídio da Costa, 1314, Santa Quitéria, Curitiba/PR, CEP- 80.310-130 in Brazil.

59.     Upon information and belief, A.S.R. Assessoria Empresarial Ltda. is a business entity with its principal business address at Av. Sete de Setembro, 5388, Conj. 1304, Andar 13, Seminario, Curitiba/PR, CEP 80.240-000 in Brazil.

60.     Upon information and belief, Schutz Assessoria Empresarial Ltda. is a business entity with its principal business address at Rua Professor Brazilio Ovidio da Costa, 1314, Santa Quiteria, Curitiba/PR, CEP 80.310-130 in Brazil, and, together with A.S.R Assessoria Empresarial Ltda, is owned and operated by Alexandre Schutz Ribas.

61.     Upon information and belief, Clovis S. Amorim is an individual who principally resides in Brazil.

62.     Upon information and belief, Eagle Man Comercio de Artigos do Vestuario Ltda. is a business entity with its principal business address at Av. Brasil, 1695, Loja 88 AB, Centro, Balneario Camboriu/SC, CEP 88.330-050 in Brazil.

63.     Upon information and belief, Elvis Henrique F. Silva is an individual who principally resides in Brazil.

64.     Upon information and belief, Gabriel Maria D. Centeno is an individual who principally resides in Brazil.

65.     Upon information and belief, Jacqueline Ferreira Siqueira is an individual who principally resides in Brazil.

66.     Upon information and belief, Jose Henrique Maia Giacomolli Ltda. is a business entity with its principal business address at Av. Getúlio Vargas, 5765, Sala 09, Marechal Rondon, Canoas/RS, CEP 92020-513 in Brazil.

67.     Upon information and belief, M.B. Almeida is an individual and/or business entity with an address at Av. Mario Homem de Melo, 535, Centro, Boa Vista/RR, CEP 69.301-200 in Brazil.

68.     Upon information and belief, New Segura Administracao de Imoveis Ltda. d/b/a T&F Consultoria e Gestao de Imoveis is a business entity with its principal business address at Rua Mostardeiro, 366, Sala 501, Rio Branco, Porto Alegre/RS, CEP 90430-001 in Brazil.

69.     Upon information and belief, Nilo Country Empreendimentos Imobilario is a business entity with its principal business address at Av. Doutor Nilo Pecanha, 2825, conjunto 1008, Chacara das Pedras, Porto Alegre/RS, CEP 91.330-001 in Brazil.

70.     Upon information and belief, Raynara G. S. Amorim is an individual who principally resides in Brazil.

71.     Upon information and belief, Whesley Souza Sena is an individual who principally resides in Brazil.

72.     Upon information and belief, Ayalla Miguel de Carvalho is an individual who principally resides at Rua Jango Menezes, 28, Buritis, Boa Vista/RR, CEP 69309-183 in Brazil.

73.     Upon information and belief, Star Silver by Princess is a business entity with its principal business address at 1229-2325 Charoenkroung 47/2, Bangrak, Bangkok 10500, Thailand.

74.     Upon information and belief, Monique P. Levy is an individual who principally resides at 2831 South Bayshore Drive, Unit 701, Miami, Florida 33133.

75.     Upon information and belief, Miami Waterfront Ventures, LLC ("Miami Waterfront Ventures") is a Florida limited liability company with its principal business address at 4100 Northeast Second Avenue, Suite 307, Miami, Florida 33137.

76.     Upon information and belief, Fidelity National Title Insurance Co. ("Fidelity") is a Florida corporation with its principal business address at 601 Riverside Avenue, Jacksonville, Florida 32204.

77.     Upon information and belief, A.R.M. Dantas Ltda. is a business entity with its principal business address at Rod. BR-174, km 751, s/n, Água Boa, Mucajaí/direita, Área Rural, Boa Vista/RR, CEP 69339-899 in Brazil, owned by Ana Raquel Marques Dantas, the wife of Costa.

78.     Upon information and belief, Lidiane Leite Melo is an individual who principally resides at Av. Obedy Candido Vieira, 801, Casa 247, Cachoerinha in Brazil.  Upon further information and belief, Lidiane Leite Melo is the wife of Antonio Melo.

79.     Upon information and belief, Braz Center Services Inc. is a Florida corporation with its principal business address at 900 E. Atlantic Blvd., Suite 7, Pompano Beach, Florida 33060.

80.     Upon information and belief, Braz Express Inc. is a Florida corporation with its principal business address at 577 E. Sample Road, Deerfield Beach, Florida 33064.

81.     Upon information and belief, Paula Mariana Pereira Da Silva is an individual who principally resides at 4061 NW 9th Avenue, Unit 201, Pompano Beach, Florida 33064.

82.     Upon information and belief, Jean Davidson Araujo is an individual who principally resides at 21705 Juego Circle #2B, Boca Raton, Florida 33433.

83.     Upon information and belief, Edineia Piaba Araujo Ltda. is a business entity with its principal business address at Rua Francisco Araujo, 03, Letra B, Cidade Nova, Bonfim/RR, CEP 69.380-000 in Brazil.

84.     Upon information and belief, Lakocred Consultoria e Solucoes Ltda. is a business entity with its principal business address at Rua Tomas Acioli, 721, Joaquim Tavora, Fortaleza/CE, CEP 60.135-180 in Brazil.

85..    Upon information and belief, Yiwu Primula Import and Export Co. Ltd. is a business entity with its principal business address at Room 202, Building 1, No. 31, Wuhua Road, Heyetang, Futian Street, Yiwu City, Zhejiang, China.

86.     Upon information and belief, Yiwu Acorn Import and Export Co. Ltd. is a business entity with its principal business address at 206 Building 1, No. 31, Wuhua Road, Heyetang Industrial Zone, Futian Street, Yiwu City, Zhejiang, China.

87.     Upon information and belief, Reag USA LLC is a Florida limited liability company with its principal business address at 5401 S Kirkman Road, Suite 135, Orlando, Florida 32819.

88.     Upon information and belief, Arlen Sookias is the owner of Sookias Watch Trading Group and an individual who principally resides at 12220 Whitley Street, Whittier, California 90601.

23

89.     Upon information and belief, Astronauto Enterprise Inc. is a Florida corporation with its principal business address at 10101 W Sample Road, Suite 315, Coral Springs, Florida 33065.

90.     Upon information and belief, Yiwu Zongheng Import and Export Co. is a business entity with its principal business address at Flat/RM2, 16/F, Lucky Centre 4838, N). 165-171, Wan Chai Road, Wan Chai, Hong Kong.

91.     Upon information and belief, Top Silver is a business entity with its principal business address at 107 Tnow Road, Taladyod, Phanakorn, Thailand.

92.     Upon information and belief, Coinbase Inc. is a Delaware corporation with its principal business address at 100 Pine Street, Suite 1250, San Francisco, California 94111.

93.     Upon information and belief, Yiwu Sunting International Trade Co. Ltd. is a business entity with its principal business address at Room 201, Building 1, No. 31, Wuhua Road, Heyetang, Futian Street, Yiwu City, Zhejiang, China.

94.     Upon information and belief, Morning Glory Evergreen Co. Ltd. is a business entity with its principal business address at 479/120, D Building, Soi Ladprao 94, Ladprao Road, Plubpila, Ladprao Bankog 10310, Thailand.

95.     Upon information and belief, Foshan Winner Furniture Co. Ltd. is a business entity with its principal business address at 10 Collyer Quay, Number 10-01, Ocean Financial Centre, Singapore.

96.     Upon information and belief, Wenzhou Fato Mechanical Electrical is a business entity with its principal business address at Fato Mansion, Industrial Zone, Luishi Yueqing, Zhejiang, China.

97.     Upon information and belief, Wave Tech Corp. is a Florida corporation with its principal business address at 17570 Atlantic Blvd., Unit 119, Sunny Isles Beach, Florida 33160.

98.     Upon information and belief, Mix Enterprises, LLC is a Florida limited liability company with its principal business address at 5728 Major Blvd., Suite 609, Orlando, Florida 32819.

99.     Upon information and belief, Jeanne Rodrigues (a/k/a Jeanne Kim) is an individual who principally resides at 9302 Skyline Ranch Circle, Las Vegas, Nevada 89139.

100.    Upon information and belief, Banco Rendimento S.A. is a business entity with its principal business address at Av. Reboucas, 3970, 10º andar, Eldorado Business Tower, Pinheiros, Sao Paulo/SP, CEP 05423-110 in Brazil.

101.    Upon information and belief, Treviso Corretora de Cambio S.A. is a business entity with its principal business address at Rua Doutor Edurardo de Souza Aranha, 387, 4º andar, conj. 41 Ed. Juscelino Piaza, Vila Nova Conceicao, Sao Paulo/SP, CEP 04543-121 in Brazil.

102.    Upon information and belief, Banco BTG Pactual S.A. is a business entity with its principal business address at Av. Brigadeiro Faria Lima, 3477, Itaim Bibi, Sao Paulo/SP, CEP 04538-133 in Brazil.

103.    Upon information and belief, Banco Master S.A. is a business entity with its principal business address at Av. Brigadeiro Faria Lima, 3477, Torre B, 5º andar, Cj. 51, Itaim Bibi, Sao Paulo/SP, CEP 04538-133 in Brazil.

104.    Upon information and belief, Belovix Comercio Importacao e Exportacao Ltda. is a business entity with its principal business address at Rua Matilde Neves Martins, 38, Vera Cruz, Contagem/MG, CEP 32260-57 in Brazil.

105.    Upon information and belief, Global Solucoes Integradas Ltda. is a business entity with its principal business address at Rua Fidêncio Ramos, 223, conj. 114, Ed. Palladio, Vila Olímpia, São Paulo/SP, CEP 04551-010 in Brazil.

106.    Upon information and belief, Marcelo de Mesquita Duarte is an individual who principally resides at Rua Flórida, 1901, ap. 11, Cidade Monções, São Paulo/SP, CEP 04565-001 in Brazil.

107.    Upon information and belief, Banco Bradesco S.A. is a business entity with its principal business address at Nucleo Cidade De Deus S/N, Vila Yara, Osasco, CEP 06.029-900 in Brazil.

108.    Upon information and belief, Banco Safra S.A. is a business entity with its principal business address at Av. Paulista, 2100, Bela Vista, Sao Paulo/SP, CEP 01310-930 in Brazil.

109.    Upon information and belief, Itau Unibanco S.A. is a business entity with its principal business address at Praca Alfredo Egydio de Souza Aranha, 100, Torre Olavo Setubal, Pargue Jabaqiara, Sao Paulo/SP, CEP 04334-902 in Brazil.

110.    Upon information and belief, Cesalon–Centro de Servicos em Acos Longos Ltda. is a business entity with its principal business address at Rua Joao Goulart, 1180, Sao Jose, Canoas/RS, CEP 92420-530 in Brazil.

111.    Upon information and belief, Vinicus Oliveira Mendes is an individual who principally resides at Rua Guilherme Morsch, 26, ap. 802, Centro, Canoas/RS, CEP 92310-080 in Brazil.

112.    Upon information and belief, Matheus Dutra Silva is an individual who principally resides at Rua Artur Rocha, 800, ap. 701, Bairro Auxiliadora, Porto Alegre/RS, CEP 90450-170 in Brazil.

113.    Upon information and belief, Global Empire Ltd. is a Bahamas corporation with its principal business address at Suite 205A - Saffery Square Bank Lane & Bay Street, New Providence, New Providence, Nassau, P.O Box: N-9934, of which Possebon is the sole director and secretary.  Upon information and belief, the accounting records of Global Empire Ltd are held by Possebon at Rua Jose Jannarelli, no 81 Apto. 91, Vila Progredior, Sao Paulo/SP, Brazil, the principal residence of Julio Cesar Jacobsen.

114.    Upon information and belief, Global Empire Holding Ltd. is a Bahamas corporation with is principal business address at Suite 205A - Saffery Square Bank Lane & Bay Street, New Providence, New Providence, Nassau, P.O Box: N-9934.   Upon information and belief, Global Empire Holding Ltd. is the sole shareholder of Global Empire Ltd.

115.    Upon information and belief, Hebei Jiuye Cookwear Co., Ltd., is an entity that received proceeds from the scheme.[1]

116.    Upon information and belief, Quick Autoproviders Inc. Miami is a business entity with its principal business address at1820 SW 100th Avenue, Miramar, Florida 33025.

117.    Upon information and belief, Ningbo General Union Co., Ltd. is a business entity with its principal business address at 5F, MU Group, Building B16 (West Area), No.2560 Yongjiang Avenue, Yinzhou District, Ningbo, China. 315048.

118.    Upon information and belief, Getwell Trading Limited is a is a business entity with its principal business address at Room 2902,29/F, Ho King Commercial Centre, 2-16 FA Yuen Street, Mongkok, KLN Hong Kong.

---

[1] There are numerous entities and individuals named as defendants because they were recipients of proceeds from the scheme for which or whom Plaintiff has been unable able to obtain a current address. Plaintiff intends to seek expedited discovery for the purpose of obtaining this information.

119.    Upon information and belief, Yiwu Sun Flower Imp. and Exp. Co. is a business entity with its principal business address at Rm 401, 4F, No.7 Building, Xinhuoxianquan, Beiyuan Jinhua, Zhejian, China.

120.    Upon information and belief, Yiwu Lotus Imp. and Exp. Co. Limited is a business entity with its principal business address at 201, Unit 1, Building 22, ChngChun 3 Area, Yiwu, China

121.    Upon information and belief, HK Naga Import & Export Limited is a business entity with its principal business address at Shop T20, 3/F, Cathay Pacific 88 Malls, No. 125, Wanchai Road, Wanchai Hong Kong.

122.    Upon information and belief, Ritek Corporation is a Taiwan corporation with its principal business at No.42, Kuangfu N. Road, Hsin Chu Industrial Park, Taiwan 30351.

123.    Upon information and belief, Jiaxing Epont Import & Export Co. Ltd. is a business entity with its principal business address at Lianhua Road, Fengqiao Town, Nanhu District, Jiaxing, Zhejiang China.

124.    Upon information and belief, Forward LLC is a Florida limited liability company with its principal business address at 2246 W 80th St Ste 1, Hialeah, Florida 33016.

125.    Upon information and belief, Asia Yarn Group Limited is a business entity with its principal business address at Room 1203, 12/F, Tower 3, China Kong City, 33 Canton Road, Tsimshatsui, Kowloon, Hong Kong.

126.    Upon information and belief, Rainbow Silver Co. Ltd. is a business entity with its principal business address at 269 Khaosarn Road., Phranakorn, Bangkok 10200, Thailand.

127.    Upon information and belief, Playfun Games Co. Ltd. is a business entity with its principal business address at Building 1, No. 55, Zhushan Industrial Road, Dalong Street, Pan Yu District, Guangzhou City, China.

128.    Upon information and belief, Sammi NS Trade Limited is a business entity with its principal business address at Room 83, 3/F, Lee Lee Centre, 45 Hoi Yuen Road, Kwun Tong, Kowloon, Hong Kong.

129.    Upon information and belief, Unitech USA-Scientific Solutions, Corp. ("Unitech USA") is a business entity with its principal business address at 5575 NW 74th Avenue, Medley, Florida 33166.

130.    Upon information and belief, Braga Exports Inc. is a Florida corporation with its principal business address at 1600 NE 1st Ave Apt 2110, Miami, Florida 33132-1263.

131.    Upon information and belief, Zhangzhou Dongrong Motor Technology is a business entity that received proceeds from the scheme.

132.    Upon information and belief, America Thai Joyas Co. Ltd. is a business entity with its principal business address at 1159 Charoen Krung Road, Si Phraya Subdistrict, Bang Rak District, Bangkok 10500, Thailand.

133.    Upon information and belief, Michael Panzeri is an individual who received proceeds from the scheme.

134.    Upon information and belief, Kilomax International Limited is a business entity with its principal business address at Industry Town Of The Liu's, No. 2 Village Of Gongming, Bao'an, Shenzhen, Guangdong, China.

135.     Upon information and belief, Hengshui Guangxing Screens Co. Ltd. is a business entity with its principal business address at Tianyuan Building, Weiming Street, Hengshui City, China.

136.     Upon information and belief, China Base Ningbo Foreign Trade is a business entity with its principal business address at No. 1 Youngor Avenue, Ningbo, Zhejiang, China and No. 666, Tiantong South Road, Ningbo City (Zhongji Building) 315199.

137.     Upon information and belief, Qingdao Qixiang International is a business entity with its principal business address at Flat C23/F, Lucky Plaza, 315-321 Lockhart Rd., Wan Chai, Hong Kong.

138.     Upon information and belief, Jinan Jinbao is an individual who received proceeds from the scheme.

139.     Upon information and belief, Lord Krishna Overseas is a business entity that received proceeds from the scheme.

140.     Upon information and belief, Zhejiang Zhongyu Industry is a business entity with its principal business address at South of Sanhaoqiao, Changshan, Xinjie Sub-District, Xiaoshan District Hangzhou, Zhejiang, 311215 China.

141.     Upon information and belief, Yiwu Xiawei Import and Export Co. Ltd. is a business entity with its principal business address at Rm.1001, Building A, Yiwu Port, 266 Chengxin Avenue, Futian Street, Yiwu, Zhejiang, China.

142.     Upon information and belief, Foshan Besthouse Ceramics Co., Ltd. is a business entity with its principal business address at 6th Blg 4th Huan Road, Huaxia Ceramic City, Foshan City, Guangdong Province, China.

143.   Upon information and belief, Chan Shun Ming is an individual who received proceeds from the scheme.

144.   Upon information and belief, Lucky Global Import and Export Co. Ltd. is a business entity with its principal business address at 392 Chakphet Road, Wang Burapha Phirom Subdistrict, Phra Nakhon District, Bangkok, Thailand.

145.   Upon information and belief, Elegant Silver Jewelry is a business entity with its principal business address at G1-40 EPIP Jewelry Zone, Industrial Area Sitapura, Jaipur-302022 (Rajasthan) India Factory Address and/or Shop no. 9, Keshav Path, Ahinsa Circle, Ashok Marg, Jaipur-302001 (Rajasthan) India.

146.   Upon information and belief, Better Silver Spa is a business entity with its principal business address at Via Dell'Artigianato 25, Bressanvido (VI) CAP 36050, Italy.

147.   Upon information and belief, Moment Kiwyqa Erp Kuyumculuk D is a business entity with its principal business address at Binbirdirek, Boyaci Ahmet SK. No: 101, 34122 Fatih/Istanbul, Turkey.

148.   Upon information and belief, Yuyao Forever Star Sprayer is a business entity with its principal business address at Siquan Wang Village, Zhangting Town, Yuyao City, Yuyao, China 315410.

149.   Upon information and belief, Foshan Winchain Import and Export is a business entity with its principal business address at Company Limited RM.9F, Nanfang Building, No.2, Nan Liu Road, Guicheng, Nanhai, Foshan, Guangdong, China.

150.   Upon information and belief, K13 Sistem Danismanlik Ltd. Sti is a business entity that received proceeds from the scheme.

151. Upon information and belief, C.D.I.S.P.A. is a business entity that received proceeds from the scheme.

152. Upon information and belief, Innovision Multimedia Limited is a business entity with its principal business address at 28/F, NCB Innovation Centre, 888 Lai Chi Kok Road, KLN Hong Kong.

153. Upon information and belief, Yiwu Sheng Commodity Purchase is a business entity with its principal business address at No. 7, Danxi Road, Choucheng Street, Yiwu City, Zhejian, China 322000.

154. Upon information and belief, Tianjin Cutprint CNC Technology is a business entity with its principal business address at 4010 and 4011, No. 2 Huatian Road, Huayuan Industrial Zone, Binhai High-tech Zone, Tianjin, China.

155. Upon information and belief, Nice Match International Co., Ltd. is a business entity with its principal business address at 3F, 129, Chien Kuo N. Rd., Sec. 2, Zhongshan Dist., Taipei City, Taiwan.

156. Upon information and belief, Yiwu Najia Import and Export Co. Ltd. is a business entity with its principal business address at No.316 Tianbao Road, Heyetang Industrial Zone, Yiwu City, Zhejiang, China.

157. Upon information and belief, F&B Autopecas E Acessorios Para is a business entity with its principal business address at 7131 Gran National Drive Suite 103, Orlando, Florida 32819.

158. Upon information and belief, Silver Land is a business entity that received proceeds from the scheme.

159.    Upon information and belief, Parag Diamonds Inc., d/b/a Paramount is a business entity with its principal business address at 36 W. 44th Street Suite 801, New York, New York 10036.

160.    Upon information and belief, Denver Spa is a business entity that received proceeds from the scheme.

161.    Upon information and belief, Unvir Co. Limited is a business entity that received proceeds from the scheme.

162.    Upon information and belief, Web7 Digital is a business entity with its principal business address at Avenida Amintas Barros 3700 Edif Ctc - Trade Sala 504 Bloco A, Lagoa Nova, Natal RN, Brazil.

163.    Upon information and belief, Yiwu Paradise Imp. and Export Co., Limited is a business entity with its principal business address at Room 8620, Sunguang International, No. 1399 North Road, Futian Street, Yiwu City, Zhejiang.

164.    Upon information and belief, Ningbo Jumson International Trade is a business entity with its principal business address at No. 413, D, Business Department Building, East Lake Garden Ii, Yinzhou District, Ningbo, Zhejiang, China.

165.    Upon information and belief, Haining Mingshuai Technology is a business entity with its principal business address at Tingai Road 18#, Xucun Town, Jiaxing, Zhejiang, China.

166.    Upon information and belief, Anhui Shengjiuding Auto Parts Co. is a business entity with its principal business address at No. 28 Yunshan Middle Road, Sanqi Town, Yuyao City, Zhejiang Province.

167.    Upon information and belief, P&P Silver Factory is a business entity with its principal business address at Gems Tower, 1249/13, Suriya Wong, Bang Rak, Bangkok 10500, Thailand.

168.    Upon information and belief, Qingdao Shining Road Tyre Co., Ltd. is a business entity with its principal business address at RM18, 27/F, Ho King Commerce Center, 2-16 Fayuen Street, Mongkok KLN, Hong Kong.

169.    Upon information and belief, Dream Watch BR LLC is a Florida limited liability company with its principal business address at 6965 Piazza Grande Ave. Ste 307, Orlando, Florida 32835.

170.    Upon information and belief, Shasnxi Dursafety Materials Co. Ltd. is a business entity with its principal business address at No.7 Huoju Road, Beilin Science & Technology Industrial Park, Xi'an Shaanxi, China.

171.    Upon information and belief, Ligo Product Limited is a business entity with its principal business address at Room 1112, 11/F, Wing on Plaza, 62 Mody Road, Tsim Sha Tsui, Hong Kong.

172.    Upon information and belief, Zhejiang Liya Vehicle Co. Ltd. is a business entity with its principal business address at Jinyanshan Industrial Area, Quanxi Town, Wuyi, Zhejiang, China.

173.    Upon information and belief, Xiamen Hongjing Industry & Trade is a business entity with its principal business address at Room 1502, 884 Xiahe Rd., Siming District, Xiamen, China 361000.

174.    Upon information and belief, Ningbo Topwin Co. Ltd. is a business entity with its principal business address at 1-5 No.15, Science and Technology Square, Hi-Tech Zone, Ningbo, Zhejiang 315112 China.

175.    Upon information and belief, SPK International Inlimited is a business entity with its principal business address at Room No. 25, Unit 1201, 12/F Harbour Center Tower 2, 8 Hoi Cheung Street, Hung Hom, KLN Hong Kong.

176.    Upon information and belief, BubbleGum Shoes Inc. is a business entity with its principal business address at 815 S. Shenandoah Street Apt. 10, Los Angeles, California 90035 and/or 1518 South Wooster Street #3, Los Angeles, California 90035.

177.    Upon information and belief, Continental Advantage Services Inc. is a New Jersey corporation with its principal business address at 301 Route 17 North, Suite 800, Rutherford, New Jersey 07070.

178.    Upon information and belief, Mack Science Inc. is a Florida corporation with its principal business at 6073 NW 167th Street, Unit C-21, Miami, Florida 33015.

179.    Upon information and belief, Linglong Tyre Co. Ltd. is a business entity with its principal business address at No. 777, Jinlong Road, Zhaoyuan City, Shandong, China and/or 1484 Medina Road Suite 118, Medina, Ohio 44256.

180.    Upon information and belief, Hefu Dayu Fitness is a business entity that received proceeds from the scheme.

181.    Upon information and belief, Shanghai Nar Industrial Co. Ltd. is a business entity with its principal business address at No.26 Xinhan Rd, Pudong District, Shanghai, China.

182.    Upon information and belief, Xiamen Careful Imp. and Exp. Co. Ltd. is a business entity with its principal business address at Rm. 403 No. 998 Angling Road, Huli District, Xiamen, China 361000.

183.    Upon information and belief, Chi Long Electronic Co. Limited is a business entity with its principal business address at No. 12 Lane 12, Longmei Village, Shiqiao Twon, Panyu District, Guangzhou, Guangdong, China.

184.    Upon information and belief, Ningbo Jin Mao Import and Export Co. is a business entity with its principal business address at Room (13-1)(13-2)(13-3), No. 47 Yiduwenhua Plaza, 1349 Liyuan North Road, Zhe Jiang, Ningbo, Zhejiang, China.

185.    Upon information and belief, Changzhou Nantai Gas Spring Co. Ltd. is a business entity with its principal business address at No.166 Houqiao, Zhaiqiao Industrial Zone, Wujin, Changzhou, Jiangsu, China.

186.    Upon information and belief, Wenling Jiafeng Machinery Co. Ltd. is a business entity with its principal business address at Southeast Industrial Zone, Songmen Town, Wenling City, Zhejiang, China 317511.

187.    Upon information and belief, Shaoxing Keqiao is a business entity that received proceeds from the scheme.

188.    Upon information and belief, Zhuzhou OBT Carbide Tools Co. Ltd. is a business entity with its principal business address at 199th, Yuehu Industry Area, Zhujiang North Road, Tianyuan District, Zhuzhou City, Hunan Province, China.

189.    Upon information and belief, Ningbo Dingjia Auto Parts is a business entity with its principal business address at 2/F, Lixin Road, Xiaogang Industrial Zone, Ningbo, Zhejiang, China.

190. Upon information and belief, Hui Sheng Silver Jewelry Co. Ltd. is a business entity with its principal business address at Room 1602, 16/F, Lucky Centre, No. 165-171 Wan Chai Road, Wan Chai Hong Kong.

191. Upon information and belief, L&D Florida Investments Corp. is a Florida corporation with its principal business address at 6236 Kingspointe Pkwy. 2, Orlando, Florida 32819.

192. Upon information and belief, Chang Yuk King is an individual who received proceeds from the scheme.

193. Upon information and belief, Koehler Instrument is a business entity with its principal business address at 1595 Sycamore Avenue, Bohemia, New York 11716.

194. Upon information and belief, Beach House & Condominium is a business entity that received proceeds from the scheme.

195. Upon information and belief, Corsair Memory Inc. is a California corporation with its principal business address at 115 N. McCarthy Boulevard, Milpitas, California 95035.

196. Upon information and belief, Bright Celcom Wholesale LLC is a California limited liability company with its principal business address at 1900 Winrow Road, El Cajon, California 92021.

197. Upon information and belief, Albemo Trading and Finance U.K. Ltd. is a business entity with its principal business address at 71-75 Shelton Street, Covent Garden, London, United Kingdom, WC2H 9JQ.

198. Upon information and belief, Elite Electric Appliance Manufacture is a business entity with its principal business address at 01 0f No.8 Nashanbian Zimian Industrial Zone, Duruan Town, Pengjiang District, Jiangmen City, Guangdong Province, China.

199.    Upon information and belief, Air Plus Power Corporation is a Taiwan corporation with its principal business address at 92, Bao-An 3rd Street, Nan-Tun District, Taichung, Taiwan, R.O.C. Taichung TW.

200.    Upon information and belief, Xiamen Sunroy Import and Export is a business entity that received proceeds from the scheme.

201.    Upon information and belief, Up and Eight Corp. is a Florida corporation with its principal business address at 954 Northwest 106 Avenue Cir, Miami, Florida 33172.

202.    Upon information and belief, Ningbo Free Trade Zone Youngcom Int. is a business entity with its principal business address at Rm.11405-1408, 14/F, Building B, Liyua No. 158 West Huancheng Road, Ningbo, Zhejiang, China.

203.    Upon information and belief, Taizhou Kele Hse Industry Co. Ltd. is a business entity with its principal business address at Hexin Industrial Zone, Chumen Town, Yuhuan City, Zhejiang Province, China.

204.    Upon information and belief, Wenzhouzhonglong Trading Co. Ltd. is a business entity with its principal business address at Room 216, Building A, No. 88, Tianrui Road, Ruian Economic Development Zone, Zhejiang, China (OS) and/or Room 201, Building 2-3, Yindu Garden Ruian Economic Development Zone, Ruian Wenzhou, Zhejiang, China 325299 (DNB).

205.    Upon information and belief, Intco is a business entity that received proceeds from the scheme.

206.    Upon information and belief, 1st Sports Corp. is a Taiwan corporation with its principal business address at Room A 6F, No.6, Lane 345, Yang Kuang St., Nei Hu, Taipei, Taiwan, 11491.

207.    Defendants "John Does" 1-10, these names being fictitious, are individuals whose identities cannot be ascertained as of the filing of this Complaint to whom Metalsur distributed a portion of the $50 million in funds paid by MLS.

208.    Defendants "ABC Companies 1-10," these names being fictitious, are entities with identities that cannot be ascertained as of the filing of this Complaint to which Metalsur distributed a portion of the $50 million in funds paid by MLS.

**D.    Additional Defendants**

209.    Upon information and belief, Nanzo Holdings, Inc. is a Florida corporation with its principal business address at 1900 Tyler Street, Suite 200, Hollywood, Florida 33020.

210.    Upon information and belief, Nanzo LLC is a Delaware limited liability company with its principal business address at 16192 Coastal Highway, Lewes, Delaware 19958.

211.    Upon information and belief, Gil Kaplan is an individual who principally resides at 115 Venetian Way, Miami-Beach, Florida 33139.

212.    Upon information and belief, Erik Kaplan is an individual who principally resides at 110 Holiday Drive, Hallandale Beach, Florida 33009.

213.    Upon information and belief, Matheus Possebon ("M. Possebon") is Possebon's brother.  He principally resides at Rua Lopes de Azevedo, 579, Jardim Guedala, Sao Paulo/SP, CEP 05603-000 in Brazil.  Upon further information and belief, on or about December 3, 2023, M. Possebon was arrested in Brazil on charges for money laundering and the illegal mining and sale of metal concentrate.

214.    Upon information and belief, Hits Entertainment International LLC ("Hits") is a Florida limited liability company with its principal business address at 17301 Biscayne Blvd., Unit 806, North Miami Beach, Florida 33160.

215.    Upon information and belief, Hits Entretenimiento, Ltda. is a business entity with its principal business address at 777 Av. Carlos Gomes, Porto Alegre, Rio Grande do Sul, 90480-003 in Brazil.

216.    Upon information and belief, Opus Assessoria e Promocoes Artisticas Ltda. d/b/a Opus Entretenimento is a business entity with its principal business address at 1492 Av. Carlos Gomes, Porto Alegre, Rio Grande do Sul, 90480-002 in Brazil.

217.    Upon information and belief, EGR Concepts Inc. is a Florida corporation with its principal business address at 7575 Dr. Phillips Blvd., Orlando, Florida 32819.

218.    Upon information and belief, MP Capital and Investments LLC is a Florida limited liability company with its principal business address at 17301 Biscayne Blvd., Unit 806, North Miami Beach, Florida 33160.

## JURISDICTION & VENUE

219.    Jurisdiction is proper in this Court because federal courts have original and exclusive jurisdiction over all cases arising under the bankruptcy code. *See* 28 U.S.C. §1334(a) ("Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.")

220.    This matter arises from a pending case in the United States Bankruptcy Court, District of New Jersey, captioned *In re: MLS Berkowitz Investments, LLC* and bearing Case No.: 23-15334-CMG (the "Bankruptcy Action").

221.    Venue in this Court is proper because, among other reasons, the underlying Bankruptcy Action is venued in the United States District Court for the District of New Jersey, the debtor is a citizen of New Jersey, many of the alleged acts occurred in or were directed at New Jersey, and the ultimate harm resulted in New Jersey.

## FACTS COMMON TO ALL COUNTS

**A.    The 2022 Transaction**

222.    In or about the end of 2021, MLS began making efforts to procure tin concentrate from Brazil.

223.    Berkowitz had connections in Brazil through which he could purchase tin concentrate. Those connections included Possebon, a Brazilian national, who, as previously noted, Berkowitz knew from his time with China Direct and had access to miners, distributors, and other business partners in Brazil. Possebon and Berkowitz previously collaborated on a Venezuelan tin concentrate deal.

224.    Possebon suggested to MLS that it should acquire tin concentrate from a mine owned and operated by Costa Company.

225.    MLS had minimal contact with Costa Company. Possebon was responsible for the negotiations and intermediation on behalf of Costa and by and between Costa Company and MLS. Possebon did not disclose that he and/or Costa Company had been previously implicated in illegal mining and smuggling in Brazil.

226.    A due diligence process was conducted prior to the purchase of the tin concentrate to determine whether Costa Company had operational licenses to extract tin concentrate.

227.    Upon such due diligence being completed, MLS scheduled a shipment of two (2) containers from Costa Company, each totaling twenty-seven (27) metric tons of tin concentrate. As is custom in the industry, the tin concentrate was shipped in 27 separate one-ton sealed bags.

228.    Because the test shipment contained concentration levels above 75%, MLS was comfortable using Costa Company to supply the tin concentrate.

41

229.    The concentration level of the material is a critical component of such a transaction. Most notably, it dictates the fair market value of the materials being purchased and shipped.  It also dictates whether and the extent to which the materials must be refined to remove unwanted elements and debris before they can be used for their intended purpose.  There is a concentration below which tin concentrate is not desirable or marketable at all.

230.    On January 20, 2022, MLS entered a contract to supply tin concentrate to Gerald (the "2022 Gerald-MLS Contract").

231.    To satisfy the 2022 Gerald-MLS Contract, MLS, in turn, entered a contract with Costa Company to purchase tin concentrate (the "Costa Contract") on February 1, 2022.

232.    Because MLS had minimal contact with Costa Company, Possebon negotiated the Costa Contract on behalf of Costa Company.

233.    Possebon also managed the supply of tin concentrate from Brazil for the 2022 Transaction, from contract negotiations between the miners and MLS through the export of the tin concentrate from Brazil.

234.    Throughout the 2022 Transaction, internationally recognized independent surveyors, including Intertek Group, PLC and Alfred H. Knight, acted as the loadport inspectors. Their role was to test and certify, prior to shipment, that the product contained a minimum required percentage of tin concentrates.  A local surveying company, Multivista, was supposed to inspect and sample the material at the mine site in Brazil.

235.    To the extent the 2022 Costa Contract was performed and MLS received tin concentrate, Costa Company issued invoices to MLS for the purchase of tin concentrate, which were paid in full.  MLS then sold the tin concentrate to Gerald who, in turn, sold it to its customers.

236.    The performance of the 2022 Transaction created the impression that Possebon and his co-conspirators were trustworthy sources for tin concentrate and paved the way for the 2023 Transaction.

**B.    Possebon and his Co-Conspirators Induce MLS and Gerald to Engage in the Fraudulent Transaction and Issue Nearly $50 Million in Payments**

237.    In late January 2023, Berkowitz and two Gerald representatives—Nicholas Servi ("Servi") and Jonathan Narunsky ("Narunsky")—traveled to Brazil to meet with Possebon and discuss the prospect of another tin concentrate purchase.

238.    Prior to and at that meeting, Possebon assured Berkowitz, Servi, and Narunsky that his contacts and connections were trusted business partners that would deliver on their promises.

239.    Possebon also assured Berkowitz, Servi, and Narunsky that he and his trusted business partners would take the following steps to ensure that the requisite grade of tin concentrate was procured and delivered to Gerald's customers.

240.    *First*, Costa Company would mine the tin concentrate and seal the product in one-ton bags.

241.    *Second*, Dakar and TW Brasil would be the exporters of record and responsible for the exportation process.  Dakar and TW Brasil would, in turn, contract with Adukargo to pick up the tin concentrate from the mines and deliver the materials to Adukargo's warehouse, where each bag would be stored until it was prepared for shipment.

242.    Possebon told Berkowitz, Servi, and Narunsky that he had a long-standing relationship with Dakar, TW Brasil, and Adukargo, and their reputations were impeccable.

243.    Possebon also represented that Adukargo was a bonded warehouse and that using a bonded warehouse was advantageous because it allowed for storage of the materials without having to pay duties.

244.   *Third*, once at Adukargo, the tin concentrate would be removed from its original large bags for weighing and sample collection by Multivista.

245.   *Fourth*, samples of each shipment would be sent to the Software Technology Development and Research Center Institute ("ICTS") lab at the local university in Manaus, where they would undergo chemical testing to confirm the concentration levels of tin concentrate.

246.   *Fifth*, once the product was weighed, inspected, and chemically tested, and determined to be satisfactory, the product would be placed into new one-ton bags and "stuffed" into international export containers.  Both the new bags and the export containers would be sealed with uniquely numbered seals.

247.   *Sixth*, Adukargo would deliver the containers to the Port of Manaus.  Dakar and TW Brasil would obtain some of the documentation that would be sent to MLS prior to procuring payment, including the DU-E-Single Export Document, which was needed for customs clearance, while Expobraz and MDS would book freight and arrange for the issuance of the bills of lading by the relevant shipping line by inputting the relevant details in respect of each shipment, including the type of material being shipped.

248.   *Seventh*, Possebon would provide MLS with assays and other documentation necessary to confirm that, among other things, the tin had been lawfully produced, adequately tested, contained the minimum concentration level of 65%, and was in transit to Gerald's customers before payment for each shipment was made.  The documents would include inspection and test reports, pictures of the sealed bags and export containers, invoices for the purchase of the materials, and bills of lading.

249.   Relying on the fact that MLS, Possebon, and Costa Company had fulfilled their obligations with respect to the 2022 Transaction, as well as further assurances concerning the

precise and rigorous manner in which the product would be mined and exported, and the representation that Adukargo was a bonded warehouse, Gerald entered a new contract with MLS to purchase tin concentrates from Brazil (the "2023 Gerald-MLS Contract").

250.    The 2023 Gerald-MLS Contract was entered on January 31, 2023, and amended on April 12, 2023 to increase the total number of containers of tin concentrate being purchased.

251.    The 2023 Gerald-MLS Contract provided that MLS was to purchase and deliver to Gerald's customers between 166 and 195 containers, each containing 27 tons of tin concentrate with a minimum concentration level of 65%.

252.    Like the 2022 Transaction, Possebon managed the supply of tin concentrate from Brazil for the 2023 Transaction, from the sourcing of the purported tin from the miners all the way to the export of product from Brazil.

253.    Pursuant to the 2023 Gerald-MLS Contract, MLS was to receive provisional payments from Gerald in the amount of no less than 75% of the overall global price of each tin concentrates order, subject to receiving certain assays, inspection reports, and shipping documents establishing, among other things, that the tin concentrate was lawfully produced, the tin concentrate was adequately tested, the tin contained the minimum concentration level of 65%, and the tin concentrate had left the Port of Manaus and was in transit to Gerald's customers.

254.    After the 2023 Gerald-MLS Contract was fully executed, Possebon advised MLS that Rodrigo Mello Mineracao ("Rodrigo Mello"), who Possebon described as "one of the biggest [tin concentrate] suppliers in Brazil," would be an additional supplier of tin concentrates.

255.    Ultimately, Mello purported to supply the materials for the first 21 or so containers and Costa Company purported to provide the materials for the balance of the containers.

256.    Possebon led MLS to believe that Alfred H. Knight was not able to provide inspection services at Adukargo and that Multivista would be the company responsible for weighing, sampling, and inspecting the product at Adukargo.

257.    MLS was comfortable with the substitution of Multivista because Multivista had provided satisfactory inspection services with respect to the 2022 Transaction.

258.    But it was ultimately Multiservicos, not Multivista, that purportedly undertook the process of allegedly weighing, sampling, and inspecting the product at Adukargo.

259.    When MLS inquired as to why MultiServiços was purportedly providing those services instead of Multivista, Possebon advised MLS that the partners of Multivista had separated and that one of the partners created MultiServiços.  That is why MultiServiços was named in the April 12, 2023, amendment to the 2023 Gerald-MLS Contract.

260.    As explained in further detail below, Plaintiff now knows that MultiServicos is a fake company set up by or at the direction of Diego Possebon and his co-conspirators to deceive MLS.

261.    For each shipment, Possebon provided documentation to MLS and Gerald purporting to confirm, among other things, that the tin had been lawfully produced, adequately tested, contained the minimum concentration level of 65%, and was in transit to Gerald's customers.

262.    MLS then issued invoices to Gerald for the provisional payments corresponding to each shipment.  The documents provided by Possebon and his co-conspirators included, but were not limited to, the following.

### (1)    The Multiservicos Inspection Report

263.    Through its inspection report, Multiservicos certified that "it ha[d] performed the sealing of the big bags, the filling of [the export containers], as well as collected material for sampling" at Adukargo's warehouse and confirmed that the containers contained 27 one-ton bags of "tin concentrates."

264.    More specifically, the inspection report: (i) identified the dates and precise times at which the materials were purportedly weighed, sampled, and stuffed into the export containers; (ii) confirmed that samples were sealed and sent to ICTS "for chemical analysis"; (iii) set forth the specifications for the weighing scale; (iv) listed the exact weight for each of the bags; (v) identified the Adukargo seal number placed on the export container; and (vi) included pictures of the export container, the bags as loaded in the export containers, the materials in each of the sample bags, the seal and seal number on each individual bag, and the seal and seal number on the export container.

### (2)    The Dakar/TW Brasil Packing List

265.    The Dakar/TW Brasil Packing List confirmed that 27 one-ton bags of "tin minerals (cassiterite)—tin concentrate" had been loaded into the container and that Adukargo was the "transporter" of the container.

### (3)    The Bill of Lading

266.    The bill of lading issued by the shipping company identified Dakar and/or TW Brasil as the "shipper," set forth the name and location of Gerald's customers and the ports of discharge, referenced the seal number for each container, and confirmed that each container contained 27 one-ton bags of "tin concentrate."

### (4)     The International Road Cargo Manifest

267.    The International Road Cargo Manifest (the "Manifest") identified Dakar/TW Brasil as the exporter of record and Adukargo as the "transporter," confirmed that the export container contained "tin minerals (cassiterite)," and contained an "official" seal purportedly applied by Brazil's Ministry of Commerce.

### (5)     The ICTS Inspection Report

268.    The ICTS Inspection Report indicated that the applicant for the test was "C. Costa," identified when the sample was received and the report was issued, contained pictures of the sample bag provided by Possebon and the co-conspirators, set forth the test methods and equipment used, and confirmed that the sample had a tin concentration level of more than 75%.

### (6)     The Certificate of Origin

269.    The Certificate of Origin purportedly issued by the Para Commercial Association of Brazil "certif[ied], to whom it may concern, that the merchandise described below"—i.e., "tin concentrate"—"is of Brazilian origin."

### (7)     The Road Way—Bill of Lading

270.    The Road Way—Bill of Lading identified Dakar/TW Brasil as the exporter of record and confirmed that "tin minerals (cassiterite)" were being transported to Adukargo.

271.    The same process was implemented for each container of tin concentrate that was purportedly shipped to Gerald's customers. That is, Possebon provided the foregoing assays and supporting documentation to MLS to demonstrate that the product had been weighed, inspected, tested, transported, and shipped. MLS, in turn, provided these documents and issued invoices for provisional payments to Gerald, and Gerald issued provisional payments to MLS.

272.     Due to the end destination of the containers, it would take approximately three or more months for the containers to arrive at their destinations.

273.     In the meantime, Possebon and his co-conspirators continued to provide Gerald and MLS with assurances that everything was proceeding as promised and planned.

274.     For example, in early April 2023, Servi returned to Brazil to meet with Possebon, who, in turn, arranged for a meeting with a gentleman who purported to be a representative of Multivista named Leonardo and subsequently a meeting with Costa.

275.     During the initial meeting, Leonardo explained, as translated by Possebon, that he had been working with Multivista for the last five years.  He also provided Servi with a detailed explanation of the process by which Multivista had been sampling and testing the materials for each shipment.  Subsequently, over the course of several hours, Possebon and Costa walked Servi through each step of the transaction from purchase to shipment, answering all Servi's questions and allaying all his concerns.

276.     At or about the same, Servi visited Adukargo's warehouse to observe the ground-level operations and loading of tin concentrate into the containers for export.

277.     Servi was met at the gate of Adukargo's facility by Possebon, Possebon's associate, Antonio Melo Jr., and Adukargo's Director of Operations Manager, Bonates, and taken to an area that he was led to believe was the storage yard and customs warehouse for containers.

278.     Bonates denied Servi access to any of the areas of the warehouse where he could physically witness tin concentrate being removed from its original bags, sampled, and placed into new bags and international export containers.

279.     Bonates assured Servi that this process was taking place at the Adukargo warehouse but claimed that Servi could not enter the area where the tin concentrate was being sampled and

transferred into export containers because Adukargo was a bonded warehouse and the area where the tin concentrate was situated was controlled by Brazilian customs agents. As is now known, Adukargo is not a bonded warehouse and it was not bagging tin concentrate at all, but rather gravel dust.

280.    Bonates insisted that Servi observe the operations from a distance and provided Servi with what Bonates purported to be tin concentrate from the one-ton bags which were being sampled and stuffed into export containers.  It has since been discovered that the operation Servi was witnessing was not, as he was led to believe, tin concentrate purchased by MLS for sale to Gerald being sampled and stuffed into export containers.  Rather, Servi was witnessing an elaborate and entirely fictitious display.  Bonates was taking the samples from three bags of tin concentrates that had been delivered to Adukargo by Dakar the previous day.  These tin concentrates were then stuffed into an export container that was never shipped. Instead, the conspirators removed the tin concentrate from Adukargo following Servi's departure.

281.    Relying on the documents purportedly confirming the quality and shipment of the tin concentrate, the representations made by Possebon and his co-conspirators, and Adukargo's fictitious display of tin concentrate purportedly being warehoused, sampled, and transferred into containers for shipping, Gerald and, in turn, MLS ultimately paid a total of $48,805,374.24 for 129 containers over a period of months.

C.    **The Discovery of the Fraud**

282.    On or about May 16, 2023, the first two (2) containers exported from Brazil were opened at their destination port in Thailand.

283.    Upon opening the containers, it was discovered, as part of the normal inspection process conducted by the end customer, that the product inside of the containers was not tin

concentrate.  Rather, as subsequent chemical testing confirmed, it was what is known, in Brazil, as Po De Brita ("gravel dust"), being nothing more than silica-like material.

284.    Gravel dust generally comes from different forms of crushed stones and is commonly used to level out flat areas in preparation for paving or for agricultural purposes to increase plant fertility.   Unlike tin concentrate, gravel dust is inexpensive, readily available throughout the world, and rarely, if ever, shipped internationally.

285.    Because gravel dust is so inexpensive and readily available, it was an ideal material for creating the false impression that the tin concentrate had been shipped and allowing Possebon and his co-conspirators to retain the full financial benefit of their fraudulent scheme.

286.    To date, chemical testing has confirmed that every one of the 109 containers that were shipped to Asia contained only gravel dust.

287.    The remaining twenty (20) containers have been disposed of by Thailand's customs authorities and, upon information and belief, also contained only gravel dust.

**D.      The Key Components of the Scheme**

288.    It is now known—and discovery will further prove—that Possebon and his co-conspirators each played a critical role in facilitating, effectuating, and concealing the scheme.

**1.      The Set Up**

289.    Costa and Costa Company, in coordination with their co-conspirators, set the stage for the scheme by showing MLS their licenses to mine tin, providing the tin concentrate for the 2022 Transaction, and serving as the supplier for the bulk of what was supposed to be tin concentrate for the 2023 Transaction.

290.    Costa and Costa Company, in coordination with their co-conspirators, also helped create a false sense of legitimacy by attending the April 2023 meeting at which he explained the

process of dredging for tin concentrate to a representative of Gerald and subsequently provided him with photographs of what they purported to be the dredging of tin concentrate at their mines. Possebon, to further create such a false sense of legitimacy, confirmed to the Gerald representative that he had visited the dredging operation himself. However, when the Gerald representative pushed for a trip to be arranged, Possebon demurred, suggesting that it would be difficult to arrange due to the remote location of the site.

291.   Meanwhile, it was Costa and Costa Company, in coordination with their co-conspirators, that ultimately placed the orders for over three thousand tons of gravel dust used as a decoy for the tin concentrate and that delivered samples of tin concentrate to ICTS to facilitate the preparation of false test reports indicating that the materials in each shipment had a tin concentration of at least 65% when, in fact, they had nearly no tin at all.

292.   As detailed below, Costa directly and indirectly received at least $230,000 from the proceeds of the fraudulent transaction for his participation in the scheme.

**2.    The False Documentation**

293.   The phony documents provided by Possebon and prepared by and/or with the assistance of his co-conspirators induced MLS to make provisional payments and transfer additional funds.

294.   For example, while the Brazilian customs documents and invoices provided by Possebon represented that tin concentrate was purchased from Rodrigo Mello or Costa Company and that the tin concentrate was transported from Adukargo to the Port of Manaus under the direction of Dakar and TW Brasil, Gerald and MLS have since confirmed that tin concentrate was never purchased from any source, including Rodrigo Mello or Costa Company.

52

295.     In fact, official Brazilian customs documents, specifically "Nota Fiscals," since obtained by Gerald and MLS confirm that the only material procured by Possebon and his co-conspirators was gravel dust.

296.     Thus, all the other documents supplied or procured by Possebon and prepared by him and his co-conspirators—including the Multiservicos Inspection Reports, the ICTS Inspection Reports, the Dakar/TW Brasil Packing List, the Certificates of Origin, the Bills of Lading, the Manifests, and the Road Way Bills of Lading—were false and/or contained false information.

297.     Upon information and belief, Possebon, Costa, Costa Company, Rodrigo Mello, Adukargo, Multiservicos, Dakar, and TW Brasil, as well as their owners and representatives named as defendants herein, prepared, and/or assisted in the preparation of, the false documentation to induce Gerald and MLS to issue provisional payments for the tin concentrate, as well as the payments for the export services purportedly provided by Dakar and TW Brasil.

**3.      The False Warehousing and Active Concealment**

298.     While Adukargo purported to be warehousing and overseeing the storing, transfer, inspection, testing, and packaging of tin concentrate, the official customs documents confirm that the only material transported by Adukargo and stored, loaded, sampled, and packaged at the Adukargo facility was gravel dust.

299.     Adukargo has since claimed that it had stopped warehousing and arranging for the export of tin concentrate long before the 2023 Transaction was even consummated.

300.     Moreover, Adukargo has since admitted that they were contracted by Dakar to collect the gravel dust from a local supplier called Britamazon at a private river port terminal and transfer the material to the export containers at Adukargo's warehouse.

301.    It is common knowledge in the transportation industry that gravel dust is never shipped internationally.  There is no meaningful demand for the international transport of gravel dust.  More importantly, even if there was, the cost of shipping such heavy loads to international destinations would greatly exceed any revenue earned on such commercially invaluable materials and would serve absolutely no business purpose.

302.    For the same economic reasons, gravel dust is never shipped in sealed bags or containers but rather always in bulk.  In fact, MLS and Gerald have since learned that Britamazon questioned Costa's instructions to place the gravel dust into bags because it was such a marked departure from industry practice.

303.    In addition, the export of tin concentrate would have required certain licenses issued by the Brazilian Institute of Environment and Renewable Natural Resources ("IBAMA"), which, upon information and belief, Adukargo no longer had.

304.    Thus, Adukargo had to have known that the warehousing, testing, and packaging of gravel dust for shipment to China and Thailand was not economically viable and served no legitimate business purpose.

305.    Adukargo also actively concealed the scheme.

306.    Adukargo departed from industry norms and transferred the gravel dust from one sealed bag to another to prevent MLS, Gerald, customs agents, and others from discovering the fact that the co-conspirators were shipping essentially worthless materials in lieu of tin concentrate.

307.    Adukargo prevented Gerald's representative (Servi) from conducting an inspection of its facility and forced him to observe the loading of what Adukargo purported to be tin concentrate from a distance under the guise that its facility was a bonded warehouse under the control of Brazilian customs agents when, in fact, it was not bonded at all.

308.    Adukargo facilitated an entirely fictitious display of high-grade tin concentrate being sampled and stuffed into a container in Servi's presence (albeit from a distance), despite being aware that (i) such tin concentrate would never be shipped; (ii) Adukargo was not in the practice of warehousing tin concentrate at the time; and (iii) it was, at the very same time, arranging for high quantities of gravel dust to be stuffed into containers to be shipped internationally, in contravention of usual business practice, for the very same people it was arranging the aforementioned fictitious display with.

309.    And Adukargo created and/or participated in the creation of the false documents used to induce MLS to issue payment.

310.    Possebon insisted from the very beginning of the 2023 Transaction that Adukargo had to be involved in the process, and Dakar and TW Brasil contracted with Adukargo to assist with the exportation of the product, because they knew that Adukargo was prepared to do whatever was necessary to aid their efforts.

### 4.    The False Inspections and Reports

311.    As previously detailed, the inspection and chemical testing was a crucial component of the transaction because MLS was paying for—and its customer, Gerald was expecting—concentration levels of at least 65%.  Simply put, if the inspections and chemical testing indicated that the concentration levels were anything less than 65%, neither Gerald nor MLS would have issued payment.

### a.    The Inspection Reports

312.    When Gerald and MLS spoke with the owner of Multivista regarding this issue, the owner of Multivista confirmed that Multiserviços is not a real company, that Multiserviços has no

55

affiliation with Multivista, and that a CCIC investigation determined that someone was copying Multivista's information and using the name Multiserviços.

313.    Thus, Possebon and his co-conspirators used "Multiserviços" to create the false impression that they had engaged a reputable company with whom MLS and, in turn, its customer Gerald, were already familiar from the 2022 Transaction, to inspect the materials being exported and issue reports falsely confirming that the materials in each container loaded at the Adukargo warehouse contained tin concentrate when, in fact, they all contained gravel dust.

### b.    The Testing Reports

314.    The testing reports issued by ICTS and provided by Possebon were also deceptively false.

315.    For each shipment, Costa and/or Costa Company and/or Dakar and/or TW Brasil delivered or arranged to be delivered to ICTS a sample of tin concentrate with the requisite concentration levels in place of the gravel dust that was being placed into export containers and shipped to Gerald's customers.

316.    As a result, ICTS issued test reports falsely verifying that the material being shipped contained at least 65% tin concentrate.

### 5.    The False Exporting

317.    Given that (i) the official custom documents confirm that only gravel dust was supplied, warehouse, transported, and shipped, (ii) the international shipment of gravel dust (let alone a shipment halfway around the world) is something that rarely, if ever, occurs and is economically unjustifiable, and (iii) gravel dust would have been shipped in bulk rather than in bags, Dakar and TW Brasil knew, as the exporters of record, that they were facilitating a fraud.

318.    For the same reasons, Expobraz and MDS, which provided logistical services, allocated the export containers, and prepared the bills of lading for the carriers, also knew that they were perpetuating an illicit scheme.

319.    In fact, Adukargo has since admitted that it was Dakar that contracted Adukargo to collect the gravel dust that had been ordered by Costa Company from Britamazon and transfer it into the sealed export containers at Adukargo's facility.

320.    MLS ultimately paid Dakar and TW Brasil the sum of $1,776,000 for their exporting services.

### Wires from MLS to TW Brasil

| Date | Amount |
|---|---|
| February 1, 2023 | $130,000 |
| February 24, 2023 | $300,000 |
| February 28, 2023 | $300,000 |
| March 6, 2023 | $130,000 |
| March 8, 2023 | $130,000 |
| **Total** | **$990,000** |

### Wires from MLS to Dakar

| Date | Amount |
|---|---|
| March 27, 2023 | $156,000 |
| March 28, 2023 | $130,000 |
| April 5, 2023 | $130,000 |
| April 14, 2023 | $170,000 |
| April 20, 2023 | $200,000 |
| **Total** | **$786,000** |

E.    **The Laundering and Fraudulent Transfer of the Illicit Proceeds**

321.    Once the provisional payments were issued by Gerald to MLS, Possebon directed MLS where to send the funds.

322. Initially, Possebon directed MLS to wire funds directly to certain individuals and entities, many of whom were located internationally. But because of the size, frequency, and volume of the transfers, MLS' bank, Chase Bank, placed a hold on MLS' operating account.

323. To circumvent Chase Bank and its hold on MLS' operating account, Possebon introduced Empire Strong and Metalsur into the equation.

324. Empire Strong and Metalsur served no legitimate business purpose and were engaged by Possebon and his co-conspirators for the sole purpose of laundering the proceeds from the scheme by providing false justification for the payments being made and making it nearly impossible to trace and recoup the funds.

**1. Metalsur**

325. Metalsur is nothing more than a shell company. It was formed by or at the direction of Possebon and its recorded owner, Mendes, in Possebon's hometown of Canoas/RS to receive and immediately disburse a large share of the monies. Mendes has been identified as a close friend of Possebon.

326. To justify the payments from MLS to Metalsur, Possebon sent MLS a phony "Convertible Loan Agreement" (the "Metalsur Loan Agreement") which portrayed that MLS was granting Metalsur a loan of more than $20 million.

327. Upon information and belief, the Metalsur Loan Agreement was structured as a debt instrument to provide a legal justification for the flow of monies, allow large sums of money to enter Brazil more quickly, and direct the funds to a shell company over which Possebon had complete control.

328. MLS had no reason whatsoever to grant a loan of any kind to Metalsur.

329.    Under the guise of the Metalsur Loan Agreement, Possebon directed MLS to transfer a total of $19,986,748.01 to Metalsur in purposely structured payments.

| Date | Amount |
| --- | --- |
| March 16, 2023 | $1,000,000 |
| March 17, 2023 | $2,000,000 |
| March 20, 2023 | $1,500,000 |
| March 21, 2023 | $1,500,000 |
| March 23, 2023 | $1,000,000 |
| March 24, 2023 | $1,550,000 |
| April 5, 2023 | $2,350,000 |
| April 10, 2023 | $1,000,000 |
| April 20, 2023 | $3,300,000 |
| May 2, 2023 | $1,000,000 |
| May 4, 2023 | $1,236,748.01 |
| May 12, 2023 | $2,550,000 |
| **Total** | **$19,986,748.01** |

330.    MLS issued these payments from its U.S.-based bank account to Metalsur with the understanding that Metalsur would, in turn and at Possebon's direction, disburse the funds to the appropriate parties that were involved in the transaction and deserved to be paid for the services they purportedly performed.

331.    The payments made by MLS to Metalsur were made through remittances from abroad on the order of Banco Master S.A. ("Banco Master").

332.    It has since been discovered that Banco Master provided foreign exchange services enabling the immediate forwarding of the funds to an undisclosed bank and bank account to hide the ultimate destination of the monies.

333.    Upon information and belief, the initial destination for some or all the funds is an account held by Metalsur at BTG Pactual.

334.    It has also since been discovered that Metalsur delegated to Marcelo de Mesquita Duarte (an employee and confidant of Possebon's brother, M. Possebon, at Opus Entreteniemiento)

the legal authority and power to negotiate and contract the foreign exchange with Banco Master. Duarte, therefore, was also complicit in the laundering component of the scheme.

335.    Metalsur shares the same address with Cesalon -- Centro de Servicos em Acos Longos Ltda. ("Cesalon"), whose principals are Vinicius Oliveira Mendes (the son of Mendes of Metalsur) and Matheus Dutra Silva.

336.    Upon information and belief, Mendes, together with his son Vinicius Oliveria Mendes, played an integral role in forming Metalsur and accomplishing the objectives of the scheme.

### 2.    Empire Strong

337.    Empire Strong is a company that, upon information and belief, operates solely as an intermediary company that provides unlicensed currency transfers and foreign exchange mainly between the United States, Brazil, and possibly some Asian destinations.  Fernanda is the managing member of Empire Strong US I and II.

338.    Using sister companies in Brazil under Fernanda's direction, Empire Strong takes deposits in US currency from its US clients who wish to make remittances to foreign destinations, including Brazil.  The Brazilian sister companies then issue payments to the Brazil-based beneficiaries in Brazilian reals ("BRL").

339.    This system allows for the exchange of funds without any actual remittances between the United States and Brazil.  US dollars are accumulated in the United States and BRL are disbursed in Brazil.  In other words, Empire Strong enables wrongdoers, such as Possebon and his co-conspirators, to bypass official financial channels and the scrutiny of regulatory authorities.

340.    In this instance, the Brazilian sister company was Empire Strong Brazil, which is managed by Fernanda's business partner, Iara.  Iara was responsible for making BRL funds

available in Brazil and the distribution of those funds to recipients designated by Possebon and Fernanda.

341.    In March 2023, Possebon directed MLS to execute a phony consulting agreement with Empire Strong (the "Empire Strong Services Agreement").

342.    The Empire Strong Services Agreement was crafted by Possebon and Empire Strong to create the impression that the impending transfers from MLS to Empire Strong represented payment for labor and other professional services provided by Empire Strong in connection with the tin concentrate transaction.

343.    In fact, in contemporaneous communications between Fernanda and Possebon, Fernanda openly acknowledged that she and Possebon had drafted the Empire Strong Services Agreement to include certain clauses to "justify the movement" of monies from MLS to Empire Strong:

> I am dealing with our contract, in it I specified that the reason for receiving the amounts will come from a contract between the paying company and ours, with a view to intermediating negotiations between your company and my clients, who are in the credit industry fashion and jewelry, *I put several clauses of services rendered to justify the movement.*
>
> [...]
>
> Therefore, in our contract, I mention that I will indicate you as a supplier of noble metals for the jewelry industry in Brazil and Europe. And that I will mediate negotiations between the parties. And to *justify the movements*, I mentioned that our intermediary company also outsourced services, labor and other companies that may be necessary in the development of products as there will be numerous services provided, which my company [sic] already does as an accessory and intermediary, *the movement is justified.*

344.    Fernanda has since admitted that she refused to effectuate the disbursement of any funds to the designated recipients until Empire Strong was provided with a fully executed copy of the Empire Strong Services Agreement so that she and her entities had adequate cover for their

participation in the fraud and a "business" justification for the tens of millions of dollars they received.

345.   Contemporaneous communications also confirm that Ramao and Schunck Advogados helped prepare the Empire Strong Services Agreement, advised Fernanda and Empire Strong as to how to structure and disburse the payments to avoid detection and reporting requirements, and received a portion of their proceeds for their assistance in facilitating the scheme.

346.   Empire Strong has never provided labor or services of any kind to MLS, or, upon information belief, any other person or entity.  Thus, there was no justification for any payment to have been issued from MLS to Empire Strong.

347.   Nevertheless, on Possebon's instructions and under the guise of the Empire Strong Services Agreement, MLS wired a total of $21.7 million to Empire Strong in carefully structured payments across a multitude of many (and, in some cases, consecutive) days.

**Wires from MLS to Empire Strong**

| Date | Amount |
| --- | --- |
| March 1, 2023 | $500,000 |
| March 3, 2023 | $500,000 |
| March 3, 2023 | $500,000 |
| March 9, 2023 | $500,000 |
| March 10, 2023 | $510,000 |
| March 13, 2023 | $495,000 |
| March 15, 2023 | $410,000 |
| March 16, 2023 | $505,000 |
| March 20, 2023 | $500,000 |
| March 21, 2023 | $500,000 |
| March 22, 2023 | $500,000 |
| March 24, 2023 | $450,000 |
| March 27, 2023 | $743,000 |
| March 29, 2023 | $370,000 |
| April 4, 2023 | $500,000 |
| April 5, 2023 | $510,000 |
| April 6, 2023 | $750,000 |

| April 12, 2023 | $1,000,000 |
|---|---|
| April 14, 2023 | $380,000 |
| April 18, 2023 | $1,500,000 |
| April 26, 2023 | $1,500,000 |
| April 28, 2023 | $3,413,732.79 |
| May 4, 2023 | $2,500,000.00 |
| May 11, 2023 | $1,500,000.00 |
| May 12, 2023 | $120,000 |
| May 12, 2023 | $1,086,841.24 |
| **Total** | **$21,743,574** |

*Payments to Possebon's Friends, Families, and Businesses*

348.    A large portion of the funds were disbursed to and/or for the direct benefit of Possebon and his friends and family.

349.    Empire Strong, through partners in Brazil (Belovix Comercio Importaço e Exportaça Ltda., Empire Strong Negocios Ltda., and Global Soluçoes Integradas Ltda.), by way of unlicensed currency transfers and foreign exchange transferred the following approximate amounts for the direct benefit of Possebon and his family members with no benefit to either MLS or Gerald:

(a)    $874,394.66 was wired to A.P.N. Servicos Ltda., an artistic company owned by Singer Alexandre Pires Nasimentio and managed by Possebon's brother, M. Possebon via his company Opus Entretenimento;

(b)    $47,525.20 was wired to Celavi Investimentos e Participacoes Ltda., a company owned by Possebon and Mrs. Possebon;

(c)    $60,146.00 was wired to Possebon's brother-in-law, Daniel Possebon Bargas;

(d)    $1,040,542.05 was wired to DK Assessoria e Intermediacao de Negocios ("DK"), a company owned by Possebon's uncle, Joubert Donineli Konrath[2];

---

[2] DK and Konrath both made payments to ICTS for its preparation of the misleading assay certificates based on fake samples of tin concentrate.

(e)   $63,104.00 was wired to Possebon's sister, Francine Possebon;

(f)   $6,430,160.90 was wired to J. Cesar Jacobsen, a company owned by Possebon's personal driver, Julio Cesar Jacobsen[3];

(g)   $3,329,722.00 was wired to Energisom Servicos e Sonorizacao Ltda., a company operating in the business of entertainment, sound and lighting owned by a close friend of Possebon, Alexandre Martins;

(h)   $29,160.00 was wired to A.S.R. Assessoria Empresarial Ltda.;

(i)   $39,440.00 was wired to Alexandre Schutz Ribas;

(j)   $9,860.00 was wired to Adriano da Silva Amorim;

(k)   $15,578.80 was wired to Clovis S. Amorim;

(l)   $10,125.41 was wired to Raynara G. S. Amorim;

(m)   $43,384.00 was wired to Eagle Man Comercio de Artigos do Vestuario;

(n)   $25,636.00 was wired to Elvis Henrique F. Silva;

(o)   $3,944.00 was wired to Gabriel Maria D. Centeno;

(p)   $2,958.00 was wired to Jacqueline Ferreira Siqueira;

(q)   $818,380.00 was wired to Jose Henrique Maia Giacomolli Ltda., the brother of Lucas Giacomolli, and executive director of Opus, a company owned by Possebon's brother, M. Possebon;

(r)   $120,903.32 was wired to M.B. Almeida;

---

[3] Like DK, Konrath and Antonio Melo Jr, J. Cesar Jacobsen made to payments to ICTS for its preparation of misleading assay certificates based on fake samples of tin concentrate.

(s)     the sums of $19,720.00 and $63,104.00 were wired to New Segura Administracao de Imoveis Ltda., a company owned by Possebon's sister, Francine Possebon, and Francine Possebon, respectively;

(t)     $98,600.00 was wired to Nilo Country Empreendimentos Imobilario;

(u)     $8,282.40 was wired to Whesley Souza Sena;

(v)     $59,160.00 was wired to Schutz Assessoria Empresarial Ltda.; and

(w)     $5,916.00 was wired to Ayalla Miguel de Carvalho.

### *Wire for Possebon's Mother's 70th Birthday Cruise*

350.    On Possebon's instructions, Empire Strong wired a total of $26,800 to Silversea Cruises Ltd. On or about May 17, 2023.

351.    Upon information and belief, the payment to Silversea Cruises Ltd. was for the chartering of a vessel for a 70th birthday voyage for Possebon's mother.

### *Payments for the Possebon's Luxury Condominium*

352.    In February 2023, Mrs. Possebon executed an agreement with Miami Waterfront Ventures to purchase a pre-construction condominium unit (Unit 2601) at the Una Condominium located at 175 SE 25th Road, Miami, Florida 33129 (the "Condominium").

353.    Upon information and belief, Global Empire Ltd., a company ultimately owned by Possebon and of which Possebon was the sole director, was set up to become the ultimate contract purchaser of the Condominium but the contract was never assigned to Global Empire Ltd.  Upon information and belief, the Condominium is currently owed in the name of Mrs. Possebon.

354.    The purchase price was $5,875,000 and the purchase agreement required the payment of several deposits totaling $2,400,000.

355.    Possebon's sister, Monique P. Levy, was the purchasing agent for Mrs. Possebon.

356.    Fidelity was the title company and escrow agent for the transaction.

357.    On Possebon's instructions, MLS and Empire Strong wired a total of more than $6.5 million to Monique Levy and Fidelity to fund the deposits and purchase of the Condominium.

358.    On Possebon's instructions, MLS wired a total of $1,135,322.30 to Monique Levy:

| Date | Amount |
|---|---|
| September 7, 2022 | $25,000 |
| September 14, 2022 | $10,000 |
| September 29, 2022 | $11,000 |
| October 11, 2022 | $60,000 |
| February 22, 2023 | $393,500 |
| February 28, 2023 | $85,822.30 |
| March 8, 2023 | $300,000 |
| March 13, 2023 | $100,000 |
| March 16, 2023 | $150,000 |

and Empire Strong wired an additional $1,119,841.24 to Monique Levy:

| Date | Amount |
|---|---|
| March 27, 2023 | $243,000 |
| April 11, 2023 | $165,000 |
| April 12, 2023 | $285,000 |
| April 19, 2023 | $75,000 |
| May 4, 2023 | $75,000 |
| May 11, 2023 | $170,000 |
| May 12, 2023 | $106,841.24 |

359.    Monique Levy, in turn, wired a total of $1,500,000 to Fidelity.

| Date | Amount |
|---|---|
| February 24, 2023 | $350,000 |
| March 10, 2023 | $350,000 |
| April 13, 2023 | $700,000 |
| April 27, 2023 | $100,000 |

360.    On Possebon's instructions, Empire Strong separately wired a total of $2,750,000 to Fidelity:

company owned by Costa's wife, Ana Raquel Marques Dantas; and (ii) $27,268.82 directly to Costa Company.

366.    Upon information and belief, these payments were made in exchange for Costa's direct participation in the scheme, including serving as the supplier for the 2022 Transaction and 2023 Transaction, meeting with Servi to create the appearance of legitimacy, placing the order for the gravel dust, and delivering or procuring the delivery of false samples to ICTS.

367.    Empire Strong also wired $66,062.00 to Lidiane Leite Melo, the wife of Possebon's associate, Antonio Melo.

368.    Upon information and belief, numerous cash payments were made to Fernanda and/or transferred to bank accounts held by her and/or Empire Strong.

369.    Upon information and belief, Brazjet Express Inc., and its former president and secretary, Jean Davidson Araujo, were the targets of an organized crime action in the Superior Court of Justice in Brazil.  These parties were investigated in connection with a scheme similar to the one at issue here in which they used real and fictitious companies and individuals located in Brazil and the United States to launder and conceal funds that were transferred in structured payments through various intermediaries.

370.    Braz Center Services, Inc. is the corporate trustee of Brazjet Express Inc.

371.    Paula Mariana Pereira Da Silva is the sole officer of Braz Center Services, Inc. and Brazjet Express Inc.

372.    On Possebon's instructions, MLS and Empire Strong wired substantial funds to and/or for the benefit of Brazjet Express, Inc., Braz Center Services, Inc., Araujo, and Da Silva.

373.   On March 8, 2023 and March 13, 2023, Empire Strong wired a total of BRL 102,149.60 to Edineia Piaba Araujo Ltda., which is associated with Brazjet Express Inc. and Jean Davidson Araujo.

374.   On March 22, 2023, Empire Strong wired $41,412.00 to Lakocred Consultoria e Solucoes Ltda., which is owed by Raynara Amorim, the wife of Adriano da Silva Amorim and affiliated with Brazjet Express Inc.

375.   On March 14, 2023, MLS wired a total of $150,000 to Braz Center Services, Inc.

***Payments to Other Recipients***

376.   Between March and May of 2023, Empire Strong issued wire transfers in the total amounts reflected below to the identified recipients who or which provided no services or benefit to Gerald or MLS.  Upon information and belief, these wires were for the direct or indirect benefit of Possebon and his co-conspirators.

| Recipient | Total Amount |
| --- | --- |
| Yiwu Primula Import Export Co. Ltd. | $173,888.80 |
| Yiwu Acorn Import and Export Co. Limited | $1,048,626.76 |
| Reag USA LLC | $83,061 |
| Alren Sookias/Sookias Watch Trading Group | $15,000 |
| Star Silver by Princess | $84,161.50 |
| Astronauto Enterprise Inc. | $3,899,971.98 |
| Yiwu Sunting International Trade Co. | $436,292.58 |
| Yiwu Zongheng Import and Export Co. | $40,002.10 |
| Coinbase, Inc. | $790,300.00 |
| Morning Glory Evergreen Co. Ltd. | $123,608.89 |
| Foshan Winner Furniture Co. Ltd. | $10,243.50 |
| Wenzhou Fato Mechanical Electrical | $80,012.19 |
| Hebei Jiuye Cookware Co. Ltd. | $116,431.80 |
| Quick Autoproviders Inc. | $48,641.36 |
| Ningbo General Union Co. Ltd. | $22,001.50 |
| Getwell Trading Limited | $624,648.16 |
| Yiwu Sunflower Imp. and Exp. Co. Ltd. | $357,442.73 |
| Yiwu Lotus Imp. and Exp. Co. Ltd. | $318,680.67 |
| Top Silver | $70,026.57 |
| HK Naga Import and Export Limited | $110,253.90 |
| Fernanda Alves de Souza | $196,012.80 |

| | |
|---|---|
| Ritek Corporation | $34,200.00 |
| Jiang Epont Import & Export Co. Ltd. | $22,973.20 |
| FForward LLC | $100,000.00 |
| Asia Yarn Group Limited | $100,012.10 |
| Rainbow Silver Co. Ltd. | $16,400.00 |
| Playfun Games Co. Ltd. | $80,367.79 |
| Sammi NS Trade Limited | $318,414.70 |
| Unitech USA | $83,718.25 |
| Braga Exports Inc. | $1,910,000.00 |
| Zhangzhou Dongrong Motor Technology | $16,382.62 |
| American Thai Joyas Co. Ltd. | $246,119.27 |
| Michael Panzeri | $25,650.00 |
| Kilomax International Limited | $13,300.00 |
| Hengshui Guangxing Screens Co. Ltd. | $19,069.00 |
| China Base Ningbo Foreign Trade | $30,022.24 |
| Qingdao Qixiang International | $43,821.00 |
| Jinan Jibao | $22,750.00 |
| Lord Krishna Overseas | $30,000.00 |
| Zhejiang Zhongyu Industry | $27,400.00 |
| Yiwu Xiawei Import and Export Co. Ltd. | $70,001.10 |
| Foshan Besthouse Ceramics Co. Ltd. | $30,022.20 |
| Chan Shun Ming | $30,000.00 |
| Lucky Global Import and Export Co. Ltd. | $50,010.00 |
| Elegant Silver Jewellery | $10,000.00 |
| Better Silver Spa | $477,301.70 |
| Moment Kiwyqa Erp Kuyumculuk Dis | $92,011.25 |
| Yuyao Forever Star Sprayer | $13,288.00 |
| Foshan Winchain Import and Export | $26,658.51 |
| K13 Sistem Danismanlik Ltd. SI | $47,000.00 |
| C.D.I.S.P.A. | $550,452.53 |
| Innovision Multimedia Limited | $60,000.00 |
| Yiwu Sheng Commodity Purchase | $27,000.00 |
| Tianjin Cutprint CNC Technology | $55,400.00 |
| Nice Match International Co., Ltd. | $15,001.10 |
| Yiwu Najia Import and Export Co. Ltd. | $351,970.93 |
| Chrysos Spa | $80,001.80 |
| F&B Autopecas E Acessorios Para | $24,292.50 |
| Silver Land | $38,236.00 |
| Monique P. Levy | $1,119,841.24 |
| Parag Diamonds Inc., d/b/a Paramount | $121,730.15 |
| Denver Spa | $17,571.40 |
| Mack Science Inc. | $46,638.64 |
| Unvir Co. Limited | $10,580.00 |
| Web7 Digital | $35,000.00 |
| Yiwu Paradise Imp. and Export Co. Limited | $309,779.81 |

| | |
|---|---|
| Ningbo Jumson International Trade | $22,167.82 |
| Haining Mingshuai Technology | $12,190.50 |
| Anhui Shengjiuding Auto Parts Co. | $24,768.50 |
| P&P Silver Factory | $50,012.70 |
| Qingdao Shining Road Tyre Co. Ltd. | $17,308.91 |
| Dream Watch BR LLC | $100,000.00 |
| Shasnxi Dursafety Materials Co. Ltd. | $12,704.00 |
| Zhuji Weiwei Import & Export Co. Ltd. | $15,010.80 |
| Ligo Product Limited | $200,200.00 |
| Zhejiang Liya Vehicle Co. Ltd. | $23,393.99 |
| Xiamen Hongjing Industry & Trade | $20,002.88 |
| Ningbo Topwin Co. Ltd. | $21,010.99 |
| SPK International Limited | $56,718.00 |
| BubbleGum Shoes Inc. | $10,019.90 |
| Continental Advantages Services Inc. | $10,008.90 |
| Linglong Tyre Co. Ltd. | $130,001.10 |
| Diego Possebon | $250,000.00 |
| Hefei Dayu Fitness | $20,000.00 |
| Shanghai Nar Industrial Co. Ltd. | $40,000.00 |
| Xiamen Careful Imp. and Exp. Co. Ltd. | $30,001.20 |
| Chi Long Electronic Co. Ltd. | $15,618.00 |
| Ningbo Jin Mao Import and Export Co. | $16,035.00 |
| Changzhou Nantai Gas Spring Co. Ltd. | $17,710.00 |
| Wenling Jiafeng Machinery Co. Ltd. | $41,230.00 |
| Shaoxing Keqiao | $20,001.80 |
| Zhuzhou OBT Carbide Tools Co. Ltd. | $50,002.79 |
| Ningbo Dingjia Auto Parts | $52,642.00 |
| Hui Sheng Silver Jewelry Co. Ltd. | $205,015.78 |
| L&D Florida Investments Corp. | $15,000.00 |
| Chang Yuk King | $30,009.99 |
| Koehler Instrument | $90,004.52 |
| Beach House & Condominium | $89,581.50 |
| Corsair Memory Inc. | $48,983.00 |
| Bright Celcom Wholesale LLC | $200,273.00 |
| Albemo Trading and Finance U.K. Ltd. | $25,003.20 |
| Elite Electric Appliance Manufacture | $11,155.50 |
| Air Plus Power Corporation | $22,734.50 |
| Xiamen Sunroy Import and Export | $23,810.00 |
| Fidelity National Title Ins. Co. | $2,750,000.00 |
| Up and Eight Corp. | $19,000.00 |
| Ningbo Free Trade Zone Youngcom Int. | $101,200.00 |
| Taizhou Kele Hse Industry Co. Ltd. | $13,428.60 |
| Wenzhouzhonglong Trading Co. Ltd. | $17,484.00 |
| INTCO | $12,690.79 |
| 1st Sports Corp. | $11,626.32 |

377.    On Diego Possebon's instructions, MLS wired a total of $500,000.00 to Wave Tech Corporation on or about March 8, 2023.

378.    On Possebon's instructions, MLS wired Mix Enterprises LLC a total of $820,000 as follows:

| Date | Amount |
|---|---|
| August 30, 2022 | $200,000 |
| September 6, 2022 | $100,000 |
| September 8, 2022 | $150,000 |
| September 12, 2022 | $45,000 |
| September 14, 2022 | $65,000 |
| September 15, 2022 | $60,000 |
| September 16, 2022 | $200,000 |

## FIRST COUNT
### (Fraud)
**(Against Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, Adukargo, Bonates, Multiservicos, Empire Strong, Fernanda, Iara, Metalsur, Mendes, Schunck Advogados, Ramao, and Julio Cesar Jacobsen)**

379.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

380.    Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, Adukargo, Bonates, Multiservicos, Empire Strong, Fernanda, Iara, Metalsur, Mendes, Schunck Advogados, Ramao, and Julio Cesar Jacobsen (the "Fraud Defendants") each played an integral role in devising, implementing, facilitating, and/or concealing the scheme.

381.    As previously detailed, the Fraud Defendants knowingly and intentionally made false and fraudulent statements of material facts, directly and indirectly, to MLS and/or Gerald. By way of summary, but not limitation:

(a)    Possebon, the mastermind and head of the scheme, repeatedly and consistently mispresented that he and the co-conspirators would procure and export tin concentrate with a

72

concentration level of no less than 65% when, in fact, he and his co-conspirators had always intended to and did procure and export gravel dust. Possebon made countless other false representations including, but not limited to, that Adukargo owns and operates a bonded warehouse, the tin concentrate would be tested by reputable, independent testing companies, Alfred H. Knight was not able to provide inspection services, Multivista would be providing inspection services at Adukargo, Multiservicos was an entity formed by a former partner of Multivista, and the funds wired from MLS to Empire Strong and Metalsur would be disbursed to the persons who, and entities which, provided goods and services in connection with 2023 Transaction.

(b)      Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, Adukargo, and Julio Cesar Jacobsen prepared and/or participated in the preparation of the false documents or documents containing false information used to induce Gerald to issue payment to MLS and, in turn, MLS to transfer those funds to Dakar, TW Brasil, Empire Strong, and Metalsur, including, but not limited to, the invoices for purported purchases of tin concentrate, the Bills of Lading, the ICTS Inspection Reports, the Multiservicos Inspection Reports, the customs documents, the Packing Lists, the International Road Cargo Manifests, the shipping labels, and the Certificates of Origin (collectively, the "False Export Documents").

(c)      Adukargo, through its agent, Bonates, and in concert with Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, and Netto, misrepresented that tin concentrate was being stored, sampled, inspected, and exported from Adukargo's warehouse and facilitated an entirely fictitious display of the sampling and subsequent stuffing of tin concentrate into a container in Servi's presence, despite being aware that the tin concentrate would not be shipped and while, at the very same time, arranging for high quantities of gravel dust to be loaded into containers and

shipped internationally, in contravention of usual business practice, for the very same people it acted in concert with to arrange the display.

(d)     Possebon, Empire Strong, Fernanda, Iara, Metalsur, and Mendes directly and indirectly represented to MLS that Empire Strong and Metalsur were "licensed" intermediaries for the trade of noble metals that could assist in facilitating the transfer of the provisional payments from MLS to persons who, and entities which, provided goods and services in connection with the 2023 Transaction.  In reality, however, Empire Strong and Metalsur were just conduits to launder the proceeds of Possebon's fraud, circumvent protective measures put into place by banks and governments, and funnel the proceeds of the fraud scheme to the Recipient Defendants.

(e)     Schunck Advogados and Ramao helped prepare the Empire Strong Services Agreement and advised Fernanda and Empire Strong on what steps should be taken to conceal the scheme.

382.    As previously detailed, the Fraud Defendants failed to disclose and/or actively concealed material facts from MLS and Gerald, including, most notably, the fact that gravel dust had been substituted for the tin concentrate that MLS and Gerald were led to believe they were purchasing.  By way of summary, but not limitation:

(a)     Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, and Adukargo created and/or facilitated the creation of the False Export Documents;

(b)     Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto Antonio Melo Jr, DK, Konrath, Adukargo, and Julio Cesar Jacobsen presented and/or arranged for the presentation of false samples to ICTS so that the testing reports would indicate that they were exporting tin concentrate of the requisite concentration level;

(c)     contrary to industry practice, Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, and Adukargo used sealed bags and sealed containers to transport, store, and export the gravel dust to conceal their true contents;

(d)     Adukargo, through its agent, Bonates, and in concert with Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, and Netto, enabled, facilitated and hosted the fictious display of the inspection, sampling, and stuffing of tin concentrate that was purportedly being exported and prevented a Gerald representative from inspecting Adukargo's operations by representing that Adukargo was a bonded warehouse under the control of Brazilian customs agents when, in fact, it was not;

(e)     Possebon, Empire Strong, Fernanda and Iara prepared and/or participated in the preparation of the fake Empire Strong Services Agreement to create the appearance of legitimacy and avoid regulatory scrutiny;

(f)     Possebon, Metalsur, and Mendes prepared and/or participated in the preparation of the fake Metalsur Loan Agreement to also create the appearance of legitimacy and avoid regulatory scrutiny;

(g)     Possebon, Empire Strong, Fernanda, Iara, Metalsur, and Mendes structured the incoming and outgoing wires to avoid detection by banking and other regulatory authorities;

(h)     Possebon, Empire Strong, Fernanda, Iara, Metalsur, and Mendes also disbursed funds paid by MLS for the purchase and exportation of tin concentrate to individuals and sources that had nothing to do with this intended purpose; and

(i)     Possebon, Empire Strong, Fernanda, Iara, Metalsur, and Mendes disbursed and converted the funds to the recipients in a form and manner designed to make the funds extremely difficult to trace and recoup.

75

383.   The Fraud Defendants knew, or recklessly disregarded, that the misrepresentations were false at the time they were made to MLS and/or Gerald.

384.   The Fraud Defendants each had superior knowledge of the facts that they mispresented, concealed, and/or failed to disclose.

385.   The Fraud Defendants intentionally made these false and fraudulent statements, and concealed these material facts, to induce MLS and Gerald to enter the 2023 Transaction and issue payments for what MLS and Gerald were led to believe was tin concentrate.

386.   MLS and Gerald reasonably, justifiably, and detrimentally relied on the misrepresentations and omissions in, among other things, entering the 2023 Transaction and issuing nearly $50 million in payments for what MLS and Gerald believed to be tin concentrate.

387.   Had the truth about these material facts been accurately disclosed and represented, MLS and Gerald would not have entered the 2023 Transaction or issued any of the nearly $50 million in payments.

388.   As a direct and proximate result of these intentional and deliberate acts, MLS and Gerald have suffered, and will continue to suffer, significant damages.

**WHEREFORE,** Plaintiff demands judgment against the Fraud Defendants, jointly and severally, for (i) compensatory, special, consequential, and incidental damages, plus interest, (ii) punitive damages, (iii) pre-judgment and post-judgment interest as allowed by law, (iv) reasonable counsel fees and costs, and (v) such further relief as the Court finds to be fair and just.

**SECOND COUNT**
**(Aiding and Abetting Fraud)**
**(Against Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, Adukargo, Bonates,**
**Multiservicos, Expobraz, MDS, Maerlon Duarte de Souza, Empire Strong, Fernanda, Iara,**
**Metalsur, Mendes, Banco Redimento, Treviso Corretora de Cambio, Banco Master, BTG**
**Pactual, Belovix Comercio Importacao e Exportacao Ltda., Empire Strong Negocios Ltda.,**
**Global Solucoes Integradas Ltda., Schunck Advogados, Ramao, and Julio Cesar Jacobsen)**

389.     Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

390.     Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, Adukargo, Bonates Multiservicos, Expobraz, MDS, Maerlon Duarte de Souza, Empire Strong, Fernanda, Iara, Metalsur, Mendes, Banco Rendimento, Treviso Corretora de Cambio, Banco Master, BTG Pactual, Belovix Comercio Importacao e Exportacao Ltda., Empire Strong Negocios Ltda., Global Solucoes Integradas Ltda., Schunck Advogados, Ramao, and Julio Cesar Jacobsen (the "Aiding and Abetting Defendants") each engaged in acts or omissions that aided, abetted, or otherwise furthered the fraudulent scheme.

391.     As previously detailed, the Aiding and Abetting Defendants substantially assisted Possebon in carrying out the scheme.  By way of summary, but not limitation:

(a)     Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, and Adukargo created and/or facilitated the creation of the False Export Documents.

(b)     Costa and Costa Company (i) helped to create a false sense of legitimacy by appearing at the April 2023 meeting in Brazil and providing a Gerald representative with purported photos of their mining operation, (ii) placed the orders for the gravel dust used as a decoy for the tin concentrate, and (iii) presented false samples for testing to ICTS.

(c)     Adukargo, directly and through its agent, Bonates, (i) pretended to transport, store, transfer, pack, and deliver to the shipping companies tin concentrate, (ii) instructed the supplier of

the gravel dust to depart from industry practice and stuff the gravel dust into sealed bags to conceal the scheme, (iii) pretended to be a bonded warehouse when it was not, (iv) prevented a representative of Gerald from inspecting its operations, and (v) facilitated a fictitious display of the inspection, sampling and stuffing of a container with tin concentrate that was never shipped and which it knew would never be shipped.

(d)     Dakar and TW Brasil, directly and through their agents/principals, Filho and Netto, (i) purported to serve as the "exporters of record," (ii) engaged and directed Adukargo's participation in each step of the process, (iii) facilitated the presentation of false samples and the preparation of false inspection reports and (iv) orchestrated the fictitious display of the inspection, sampling and stuffing of a container of tin concentrate at Adukargo in front of a Gerald representative by delivering three bags of tin concentrate prior to the display and removing them immediately afterwards.

(e)     Exprobraz and MDS provided substantial assistance with respect to the logistical aspects of the export process, including, but not limited to, allocating the export containers in which the gravel dust was shipped and preparing the bills of lading and other documents containing false information ultimately used to dupe MLS and, in turn, Gerald.

(f)     Julio Cesar Jacobsen paid for the false inspection reports issued by ICTS.

(g)     Multiservicos pretended to be an affiliate of Multivista and to sample and inspect what it represented in inspection reports to be tin concentrate as it was being packaged and prepared for shipment, when, in fact, no tin concentrate existed.

(h)     Metalsur and Mendes (i) received and disbursed the illicit funds in structured payments to avoid detection, (ii) collaborated with Possebon in the creation and execution of the

Metalsur Loan Agreement to create a false sense of legitimacy and circumvent regulatory scrutiny, and (iii) disbursed the funds in a form and manner to make them impossible to trace and recoup.

(i)     Empire Strong, Fernanda, and Iara (i) were engaged for the sole purpose of laundering monies from the United States to undeserving recipients in Brazil and other international locations, (ii) received and disbursed the illicit funds in structured payments to avoid detection, (iii) collaborated with Possebon in the creation and execution of the Empire Strong Services Agreement to create a false sense of legitimacy and circumvent regulatory scrutiny, and (iv) disbursed the funds in a form and manner to make them extremely difficult to trace and recoup.

(j)     Schunck Advogados and Ramao substantially assisted the scheme by helping to prepare the Empire Strong Services Agreement and advising Fernanda and Empire Strong as to how to facilitate and conceal the scheme.

(k)     Banco Rendimento, Treviso Corretora de Cambio, Banco Master, BTG Pactual, Belovix Comercio Importacao e Exportacao Ltda., Empire Strong Negocios Ltda., and Global Solucoes Integradas Ltda. substantially assisted the scheme by holding, concealing, and facilitating the transfer of the illicit proceeds.

392.    The Aiding and Abetting Defendants had knowledge of the fraud by virtue of, among other things, their long-standing business and personal relationships with Possebon, their direct participation in the fraud, and glaringly obvious indicia of illicit conduct, including, but not limited to, the creation of false documents, affirmative acts of concealment, inexplicable departures from industry norms and standards, and the criminal and/or troubled histories of their co-conspirators.

393.    The fraudulent scheme could not have been perpetrated, in whole or in part, without the substantial assistance provided by the Aiding and Abetting Defendants.

394.   Through these and other intentional and knowing acts, the Aiding and Abetting Defendants caused direct and substantial harm to MLS and, in turn, Gerald.

**WHEREFORE,** Plaintiff demands judgment against the Aiding and Abetting Defendants, jointly and severally, for (i) compensatory, special, consequential, and incidental damages, (ii) punitive damages, (iii) pre-judgment and post-judgment interest as allowed by law, (iv) reasonable counsel fees and costs, and (v) such further relief as the Court finds to be fair and just.

**THIRD COUNT**
**(Federal RICO, 18 U.S.C. § 1962(c))**
**(Against Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, Adukargo, Bonates, Multiservicos, Empire Strong, Fernanda, Iara, Metalsur, and Mendes)**

395.   Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

396.   Plaintiff is a "person" under 18 U.S.C. § 1961(3).

397.   Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, Adukargo, Bonates, Multiservicos, Empire Strong, Fernanda, Iara, Metalsur, and Mendes are each a "person" under 18 U.S.C. § 1961(3).

398.   Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, Adukargo, Bonates, Multiservicos, Empire Strong, Fernanda, Iara, Metalsur, and Mendes (collectively, the "Enterprise Defendants") formed and were engaged in an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

399.   At all relevant times, the Enterprise was engaged in activities affecting interstate and foreign commerce.

400.   The Enterprise had an existence separate and apart from the pattern of racketeering and functioned as a continuing unit with a hierarchical decision-making structure led by Possebon.

80

For example, the Enterprise substantially performed and fulfilled the terms of the 2022 Transaction.

401.    The pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5) includes multiple, repeated, and continuous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. As set out more fully above, the Enterprise Defendants have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information concerning the purported exportation of tin concentrate when, in fact, the Enterprise Defendants were responsible for exporting worthless gravel dust.

402.    The pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5) also includes multiple, repeated, and continuous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957. As set out more fully above, the Enterprise Defendants engaged in a coordinated scheme to conduct tens of millions of dollars in financial transactions from the United States to places in and outside of the United States that they knew to involve the proceeds of unlawful activity and structured those transactions in such way so as to conceal or disguise the nature, location, source, ownership and/or control of the proceeds, and/or to avoid state and federal reporting requirements.

403.    The Enterprise Defendants have engaged in this scheme with the specific intent to defraud MLS and induce MLS to wire and/or transfer nearly $50 million for what they believed to be tin concentrate but was, in fact, worthless gravel dust.

404.    The Enterprise Defendants have disseminated this false and misleading information, as well as sent, transferred, and/or received the illicit proceeds of the scheme, through wires (for example, by facsimile, by e-mail, via the Internet) and the U.S. mail sent to and from the United States.

405.    As a direct and proximate result of the Enterprise Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of their unlawful conspiracy, MLS and, in turn, Gerald, have suffered, and will continue to suffer, injury to their business and property and substantial economic harm.

**WHEREFORE**, Plaintiff demands judgment against Enterprise Defendants, jointly and severally, for (i) compensatory damages, (ii) consequential damages, (iii) punitive damages, (iv) treble damages, (v) attorney's fees and costs of suit, (vi) prejudgment and post-judgment interest, and (vii) such other and further relief as the Court may deem just and equitable.

**FOURTH COUNT**
**(Conspiracy to Violate Federal RICO, 18 U.S.C. § 1962(d))**
**(Against Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, Adukargo, Bonates, Multiservicos, Empire Strong, Fernanda, Iara, Metalsur, and Mendes)**

406.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

407.    18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

408.    Plaintiff is a "person" under 18 U.S.C. § 1961(3).

409.    The Enterprise Defendants are each a "person" under 18 U.S.C. § 1961(3).

410.    The Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

411.    At all relevant times, the Enterprise was engaged in activities affecting interstate and foreign commerce.

412.    The Enterprise had an existence separate and apart from the pattern of racketeering and functioned as a continuing unit with a hierarchical decision-making structure led by Possebon.

For example, the Enterprise substantially performed and fulfilled the terms of the 2022 Transactions.

413.    The Enterprise Defendants conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).  Specifically, each of the Enterprise Defendants agreed and intended, and/or adopted the goal of furthering or facilitating a plan to acquire, launder, and conceal substantial sums of money through a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

414.    As more fully set forth above, the Enterprise Defendants have engaged in numerous overt and predicate racketeering acts, including mail and wire fraud and money laundering, in furtherance of the conspiracy.

415.    The nature of the co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also that they were aware that their ongoing acts have been and are part of an overall pattern of racketeering activity.

416.    As a direct result of the Enterprise Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of their unlawful conspiracy, MLS and, in turn, Gerald, have suffered, and will continue to suffer, injury to their business and property and substantial economic harm.

**WHEREFORE**, Plaintiff demands judgment against the Enterprise Defendants, jointly and severally, for (i) compensatory damages, (ii) consequential damages, (iii) punitive damages, (iv) treble damages, (v) attorney's fees and costs of suit, (vi) prejudgment and post-judgment interest, and (vii) such other and further relief as the Court may deem just and equitable.

**FIFTH COUNT**
**(New Jersey RICO, N.J.S.A. 2C:41-1, *et seq.*)**
**(Against Possebon, Costa, Costa Company, Dakar, Filho, TW Brasil, Netto, Adukargo,**
**Bonates, Multiservicos, Empire Strong, Fernanda, Iara, Metalsur, and Mendes)**

417.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

418.    Plaintiff is a "person" under N.J.S.A. 2C:41-1(b).

419.    The Enterprise Defendants are each a "person" under N.J.S.A. 2C:41-1(b).

420.    The Enterprise is an "enterprise" under N.J.S.A. 2C:41-1(c).

421.    At all relevant times, the Enterprise was engaged in activities affecting interstate and foreign commerce.

422.    The Enterprise had an existence separate and apart from the pattern of racketeering and functioned as a continuing unit with a hierarchical decision-making structure led by Possebon. For example, the Enterprise substantially performed and fulfilled the terms of the 2022 Transactions.

423.    The Enterprise engaged in activities that affected trade or commerce in New Jersey.

424.    Each of the Enterprise Defendants agreed and intended, and/or adopted, the goal of furthering or facilitating, a plan to acquire, launder, and conceal substantial sums of money through a pattern of racketeering activity.

425.    The Enterprise Defendants each agreed to, and did, in fact, commit at least two predicate acts, and the incidents of racketeering activity embrace unlawful conduct that has the same or similar purposes, results, participants, or victims, and/or the methods of commission are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

426.    The Enterprise Defendants' activities include, but are not limited to, multiple, repeated, and continuous acts of fraud. As set out more fully above, the Enterprise Defendants

have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information concerning the purported exportation of tin concentrate when, in fact, the Enterprise Defendants were responsible for exporting worthless gravel dust.

427.    The Enterprise Defendants' activities include, but are not limited to, multiple, repeated, and continuous acts of money laundering in violation of N.J.S.A. 2C:21-25. As set out more fully above, the Enterprise Defendants engaged in repeated financial transactions to and from New Jersey with the intent to facilitate or promote criminal activity, and/or knowing that the transactions were designed to either (i) conceal or disguise the nature, location, source, ownership or control of the illicit proceeds, or (ii) avoid state and/or federal reporting requirements.

428.    The Enterprise Defendants' activities include, but are not limited to, multiple, repeated, and continuous acts of theft by deception in violation of N.J.S.A. 2C:20-4. As set out more fully above, the Enterprise Defendants purposely obtained nearly $50 million in payments from MLS by, among other deceptive acts designed to create or reinforce false impressions, providing false documentation and assurances regarding the exportation process, and inducing MLS to direct the monies to Metalsur and Empire Strong so that the funds could be laundered, concealed, and transferred without regulatory detection or reporting.

429.    The Enterprise Defendants' activities include, but are not limited to, multiple, repeated, and continuous acts of falsifying or tampering with records in violation of N.J.S.A. 2C:21-4. As set out more fully above, the Enterprise Defendants falsified documents to deceive MLS and, in turn, Gerald, and conceal the underlying scheme to defraud them.

430.    The Enterprise Defendants' activities include, but are not limited to, multiple, repeated, and continuous acts of deceptive business practices in violation of N.J.S.A. 2C:21-7. As set out more fully above, the Enterprise Defendants violated N.J.S.A. 2C:21-7(c) by failing to

deliver any quantity of the commodity (tin concentrate) that was sold to MLS and, in turn, Gerald. The Enterprise Defendants also violated N.J.S.A. 2C:21-7(d) by selling to MLS (and, in turn, Gerald) gravel dust that was purposely mislabeled as tin concentrate.

431.    The Enterprise Defendants have engaged in these activities with the specific intent to defraud MLS and induce MLS to wire and/or transfer nearly $50 million for what they believed to be tin concentrate but was, in fact, worthless gravel dust.

432.    As a direct result of the Enterprise Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of their unlawful conspiracy, MLS and, in turn, Gerald have suffered, and will continue to suffer, substantial economic harm.

**WHEREFORE**, Plaintiff demands judgment against the Enterprise Defendants, jointly and severally, for (i) compensatory damages, (ii) consequential damages, (iii) treble damages, (iv) punitive damages, (v) attorney's fees and costs of suit, (vi) prejudgment and post-judgment interest, and (vii) such other and further relief as the Court may deem just and equitable.

### SIXTH COUNT
#### (Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. § 550(a))
#### (Against the Recipient Defendants)

433.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

434.    Pursuant to 11 U.S.C. § 550(a), the Trustee may seek recovery of any fraudulent transfer from the initial transferee, the entity for whose benefit the transfer was made, and/or any immediate or mediate transferee.

435.    As detailed above, the following Recipient Defendants received funds or proceeds associated with the fraudulent scheme:

| Recipient | Total Amount |
|---|---|
| A.P.N. Servicos Ltda. | $874,394.66 |
| Celavi Investimentos e Participacoes Ltda. | $47,525.20 |
| Daniel Possebon Bargas | $60,146.00 |
| DK Assessoria e Intermediacao de Negocios | $1,040,542.05 |
| Francine Possebon | $63,104.00 |
| J. Cesar Jacobsen | $6,430,160.90 |
| Energisom Servicos e Sonorizacao Ltda. | $3,329,722.00 |
| A.S.R. Assessoria Empresarial Ltda. | $29,160.00 |
| Alexandre Schutz Ribas | $39,440.00 |
| Adriano da Silva Amorim | $9,860.00 |
| Clovis S. Amorim | $15,578.80 |
| Raynara G.S. Amorim | $10,125.41 |
| Eagle Man Comercio de Artigos de Vestuario | $43,834.00 |
| Elvis Henrique F. Silva | $25,636.00 |
| Gabriel Maria D. Centeno | $3,944.00 |
| Jacqueline Ferreira Siqueira | $2,958.00 |
| Jose Henrique Maia Giacomolli | $818,380.00 |
| M.B. Almeida | $120,903.32 |
| New Segura Administracao de Imoveis Ltda. | $19,720.00 |
| Francine Possebon | $63,104.00 |
| Nilo Country Empreendimentos Imobilario | $98,600.00 |
| Whesley Souza Sena | $8,282.40 |
| Schutz Assessoria Empresarial Ltda. | $59,160.00 |
| Ayalla Miguel de Carvalho | $5,916.00 |
| Silversea Cruises Ltd. | $26,800.00 |
| Monique P. Levy | $2,255,163.54 |
| Fidelity National Title Ins. Co. | $4,250,000.00 |
| Miami Waterfront | $912,500.00 |
| A.R.M. Dantas Ltda. | $109,446.00 |
| Costa Company | $27,268.82 |
| Lidiane Leite Melo | $66,062.00 |
| Edineia Piaba Araujo Ltda. | BRL 102,149.60 |
| Lakocred Consultoria e Solucoes Ltda. | $41,412.00 |
| Braz Center Services | $150,000.00 |
| Wave Tech Corporation | $500,000.00 |
| Mix Enterprises LLC | $820,000.00 |
| Yiwu Primula Import Export Co. Ltd. | $173,888.80 |
| Yiwu Acorn Import and Export Co. Limited | $1,048,626.76 |
| Reag USA LLC | $83,061 |
| Alren Sookias/Sookias Watch Trading Group | $15,000 |
| Star Silver by Princess | $84,161.50 |
| Astronauto Enterprise Inc. | $3,899,971.98 |
| Yiwu Sunting International Trade Co. | $436,292.58 |

| | |
|---|---|
| Yiwu Zongheng Import and Export Co. | $40,002.10 |
| Coinbase, Inc. | $790,300.00 |
| Morning Glory Evergreen Co. Ltd. | $123,608.89 |
| Foshan Winner Furniture Co. Ltd. | $10,243.50 |
| Wenzhou Fato Mechanical Electrical | $80,012.19 |
| Hebei Jiuye Cookware Co. Ltd. | $116,431.80 |
| Quick Autoproviders Inc. | $48,641.36 |
| Ningbo General Union Co. Ltd. | $22,001.50 |
| Getwell Trading Limited | $624,648.16 |
| Yiwu Sunflower Imp. and Exp. Co. Ltd. | $357,442.73 |
| Yiwu Lotus Imp. and Exp. Co. Ltd. | $318,680.67 |
| Top Silver | $70,026.57 |
| HK Naga Import and Export Limited | $110,253.90 |
| Fernanda Alves de Souza | $196,012.80 |
| Ritek Corporation | $34,200.00 |
| Jiang Epont Import & Export Co. Ltd. | $22,973.20 |
| FForward LLC | $100,000.00 |
| Asia Yarn Group Limited | $100,012.10 |
| Rainbow Silver Co. Ltd. | $16,400.00 |
| Playfun Games Co. Ltd. | $80,367.79 |
| Sammi NS Trade Limited | $318,414.70 |
| Unitech USA | $83,718.25 |
| Braga Exports Inc. | $1,910,000.00 |
| Zhangzhou Dongrong Motor Technology | $16,382.62 |
| American Thai Joyas Co. Ltd. | $246,119.27 |
| Michael Panzeri | $25,650.00 |
| Kilomax International Limited | $13,300.00 |
| Hengshui Guangxing Screens Co. Ltd. | $19,069.00 |
| China Base Ningbo Foreign Trade | $30,022.24 |
| Qingdao Qixiang International | $43,821.00 |
| Jinan Jibao | $22,750.00 |
| Lord Krishna Overseas | $30,000.00 |
| Zhejiang Zhongyu Industry | $27,400.00 |
| Yiwu Xiawei Import and Export Co. Ltd. | $70,001.10 |
| Foshan Besthouse Ceramics Co. Ltd. | $30,022.20 |
| Chan Shun Ming | $30,000.00 |
| Lucky Global Import and Export Co. Ltd. | $50,010.00 |
| Elegant Silver Jewellery | $10,000.00 |
| Better Silver Spa | $477,301.70 |
| Moment Kiwyqa Erp Kuyumculuk Dis | $92,011.25 |
| Yuyao Forever Star Sprayer | $13,288.00 |
| Foshan Winchain Import and Export | $26,658.51 |
| K13 Sistem Danismanlik Ltd. SI | $47,000.00 |
| C.D.I.S.P.A. | $550,452.53 |
| Innovision Multimedia Limited | $60,000.00 |

| | |
|---|---|
| Yiwu Sheng Commodity Purchase | $27,000.00 |
| Tianjin Cutprint CNC Technology | $55,400.00 |
| Nice Match International Co., Ltd. | $15,001.10 |
| Yiwu Najia Import and Export Co. Ltd. | $351,970.93 |
| Chrysos Spa | $80,001.80 |
| F&B Autopecas E Acessorios Para | $24,292.50 |
| Silver Land | $38,236.00 |
| Parag Diamonds Inc., d/b/a Paramount | $121,730.15 |
| Denver Spa | $17,571.40 |
| Mack Science Inc. | $46,638.64 |
| Unvir Co. Limited | $10,580.00 |
| Web7 Digital | $35,000.00 |
| Yiwu Paradise Imp. and Export Co. Limited | $309,779.81 |
| Ningbo Jumson International Trade | $22,167.82 |
| Haining Mingshuai Technology | $12,190.50 |
| Anhui Shengjiuding Auto Parts Co. | $24,768.50 |
| P&P Silver Factory | $50,012.70 |
| Qingdao Shining Road Tyre Co. Ltd. | $17,308.91 |
| Dream Watch BR LLC | $100,000.00 |
| Shasnxi Dursafety Materials Co. Ltd. | $12,704.00 |
| Zhuji Weiwei Import & Export Co. Ltd. | $15,010.80 |
| Ligo Product Limited | $200,200.00 |
| Zhejiang Liya Vehicle Co. Ltd. | $23,393.99 |
| Xiamen Hongjing Industry & Trade | $20,002.88 |
| Ningbo Topwin Co. Ltd. | $21,010.99 |
| SPK International Limited | $56,718.00 |
| BubbleGum Shoes Inc. | $10,019.90 |
| Continental Advantages Services Inc. | $10,008.90 |
| Linglong Tyre Co. Ltd. | $130,001.10 |
| Diego Possebon | $250,000.00 |
| Hefei Dayu Fitness | $20,000.00 |
| Shanghai Nar Industrial Co. Ltd. | $40,000.00 |
| Xiamen Careful Imp. and Exp. Co. Ltd. | $30,001.20 |
| Chi Long Electronic Co. Ltd. | $15,618.00 |
| Ningbo Jin Mao Import and Export Co. | $16,035.00 |
| Changzhou Nantai Gas Spring Co. Ltd. | $17,710.00 |
| Wenling Jiafeng Machinery Co. Ltd. | $41,230.00 |
| Shaoxing Keqiao | $20,001.80 |
| Zhuzhou OBT Carbide Tools Co. Ltd. | $50,002.79 |
| Ningbo Dingjia Auto Parts | $52,642.00 |
| Hui Sheng Silver Jewelry Co. Ltd. | $205,015.78 |
| L&D Florida Investments Corp. | $15,000.00 |
| Chang Yuk King | $30,009.99 |
| Koehler Instrument | $90,004.52 |
| Beach House & Condominium | $89,581.50 |

| | |
|---|---|
| Corsair Memory Inc. | $48,983.00 |
| Bright Celcom Wholesale LLC | $200,273.00 |
| Albemo Trading and Finance U.K. Ltd. | $25,003.20 |
| Elite Electric Appliance Manufacture | $11,155.50 |
| Air Plus Power Corporation | $22,734.50 |
| Xiamen Sunroy Import and Export | $23,810.00 |
| Up and Eight Corp. | $19,000.00 |
| Ningbo Free Trade Zone Youngcom Int. | $101,200.00 |
| Taizhou Kele Hse Industry Co. Ltd. | $13,428.60 |
| Wenzhouzhonglong Trading Co. Ltd. | $17,484.00 |
| INTCO | $12,690.79 |
| 1st Sports Corp. | $11,626.32 |

436.    Upon information and belief, the Recipient Defendants knew, or should have known, that the funds they received were the product of an unlawful scheme.

437.    The Recipient Defendants did not provide any goods, services, or other form of remuneration for the benefit of MLS or Gerald in exchange for the funds they received.

438.    Pursuant to 11 U.S.C. § 550(a), Plaintiffs are entitled to an order nullifying the transfers to the Recipient Defendants and compelling the immediate return of the monies they each received.

**WHEREFORE,** Plaintiff demands judgment against the Recipient Defendants, jointly and severally, (i) declaring that the transfers to each of them are void *ab initio*, (ii) imposing a constructive trust for all monies received,  (iii) compelling the immediate return of the monies they each received, (iv) awarding pre-judgment and post-judgment interest as allowed by law, (v) awarding reasonable counsel fees and costs, and (vi) such further relief as the Court finds to be fair and just.

**SEVENTH COUNT**
**(Aiding and Abetting Fraud)**
**(Against the Recipient Defendants)**

439.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

440.    Each of the Recipient Defendants substantially assisted Possebon and his co-conspirators in perpetuating and facilitating the scheme by, among other acts, receiving funds originating from the United States for which they provided no consideration or benefit and concealing and/or transferring them to Possebon or other recipients designated by him.

441.    The Recipient Defendants had knowledge of the fraudulent scheme.

442.    The fraudulent scheme could not have been perpetrated, in whole or in part, without the substantial assistance provided by the Recipient Defendants.

443.    Through these and other intentional and knowing acts, the Recipient Defendants caused direct and substantial harm to MLS.

**WHEREFORE,** Plaintiff demands judgment against the Recipients Defendants, jointly and severally, for (i) compensatory, special, consequential, and incidental damages, (ii) punitive damages, (iii) pre-judgment and post-judgment interest as allowed by law, (iv) reasonable counsel fees and costs, and (v) such further relief as the Court finds to be fair and just.

**EIGHTH COUNT**
**(Unjust Enrichment)**
**(Against the Recipient Defendants)**

444.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

445.    As set forth above, all the funds received by the Recipient Defendants from MLS were wrongfully obtained and a product of the fraudulent scheme.

91

446.    None of the Recipient Defendants provided a benefit or any form of consideration to MLS for the monies received.

447.    To permit the Recipient Defendants to retain the monies they received under these circumstances would be manifestly unjust.

448.    The Recipient Defendants have no right in law or equity to retain the monies they received.

**WHEREFORE**, Plaintiffs demand judgment against the Recipient Defendants, jointly and severally, for (i) full restitution, (ii) the imposition of a constructive trust over all monies received, (iii) compensatory, consequential, and special damages, (iv) attorney's fees and costs of suit, (v) prejudgment and post-judgment interest, and (vi) such other and further relief as the Court may deem just and equitable.

**NINTH COUNT**
**(Conversion)**
**(Against the Recipient Defendants)**

449.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

450.    As detailed above, the Recipient Defendants have wrongfully obtained substantial monies by virtue of the fraudulent scheme.

451.    The funds received by the Recipient Defendants properly belong to MLS.

452.    The Recipient Defendants have deprived MLS of its property rights by exercising dominion and control over the monies they received and, in many cases, refusing demands for immediate return of the funds and/or using or transferring the monies for the benefit of themselves or other defendants.

**WHEREFORE**, Plaintiff demands judgment against the Recipient Defendants, jointly and severally, for (i) full restitution, (ii) the imposition of a constructive trust for all monies received, (iii) compensatory, consequential, and special damages, (iv) punitive damages, (v) attorney's fees and costs of suit, (vi) prejudgment and post-judgment interest, and (vii) such other and further relief as the Court may deem just and equitable.

## FACTS COMMON TO THE TENTH, ELEVENTH, AND TWELFTH COUNTS

453.    Upon information and belief, Nanzo Holdings, Inc. and Nanzo LLC (collectively, "Nanzo") are investment vehicles for brothers Gil Kaplan and Erik Kaplan.  Nanzo, Gil Kaplan, and Erik Kaplan may be collectively referred to as the "Nanzo Defendants."

454.    Berkowitz met Gil Kaplan while they both attended the University of Florida and are close friends.

455.    On or about March 14, 2022, Nanzo and MLS entered into a Joint Venture Agreement (the "JVA"), pursuant to which Nanzo agreed to advance MLS the sum of $2,500,001 to finance the purchase of tin concentrate in connection with the 2022 Transaction in consideration for a share of any profits from only the 2022 Transaction.

456.    The JVA specifically provided that the monies loaned to MLS "shall not bear interest" and contained an express term providing that it would automatically renew for successive periods of one month until the loaned amount was repaid in full by MLS to Nanzo.

457.    From on or about November 15, 2021, to on or about June 21, 2022, Nanzo provided MLS with working capital for the purchase and sale of tin concentrate to Gerald in connection with the 2022 Transaction.

458.    Notwithstanding the fact that the JVA set forth that no interest would be paid to Nanzo, Nanzo charged and received interest at usurious rates from MLS.  Internal records

disclosed by Nanzo to the Trustee's counsel calculate interest charged at a rate of between 2 to 2.5% per week.

459.    Notwithstanding the fact that Nanzo provided the bulk of the financing in 2022, Nanzo demanded and received from MLS $1.5 million in proceeds from the 2023 Transaction.

460.    Upon information and belief, the $1.5 million in proceeds from 2023 Transaction was then distributed to and/or for the benefit of Gil Kaplan and Erik Kaplan.

461.    The JVA agreement does not provide for actual distribution of losses. MLS sustained a loss of over $50,000,000 from 2022 and 2023 transactions. As a JVA partner Nanzo and Gil Kaplan and Erik Kaplan must be responsible for 50% of the losses of the 2022 and 2023 transactions.

## TENTH COUNT
### (Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. § 550(a))
### (Against Nanzo Holdings, Inc., Nanzo, LLC, Gil Kaplan, and Erik Kaplan)

462.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

463.    Pursuant to 11 U.S.C. § 550(a), the Trustee may seek recovery of any fraudulent transfer from the initial transferee, the entity for whose benefit the transfer was made, and/or any immediate or mediate transferee.

464.    As detailed above, Nanzo Holdings, Inc., Nanzo, LLC, Gil Kaplan, and Erik Kaplan received at least $1.5 million in proceeds from the fraudulent scheme.

465.    Upon information and belief, these defendants knew, or should have known, that the funds they received were the product of an unlawful scheme.

466.    These defendants did not provide any goods, services, or other form of remuneration for the benefit of MLS or Gerald in connection with the 2023 Transaction.

94

467.    Pursuant to 11 U.S.C. § 550(a), Plaintiffs are entitled to an order nullifying the transfers to these defendants and compelling the immediate return of the monies they each received.

**WHEREFORE,** Plaintiff demands judgment against Nanzo Holdings, Inc., Nanzo, LLC, Gil Kaplan, and Erik Kaplan, jointly and severally, (i) declaring that the transfers to each of them are void *ab initio*, (ii) imposing a constructive trust for all monies received, (iii) compelling the immediate return of the monies they each received, (iv) awarding pre-judgment and post-judgment interest as allowed by law, (v) awarding reasonable counsel fees and costs, and (vi) such further relief as the Court finds to be fair and just.

<u>**ELEVENTH COUNT**</u>
**(Breach of the JVA)**
**(Against Nanzo Holdings, Inc. and Nanzo LLC)**

468.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

469.    The JVA is a valid and enforceable agreement.

470.    Nanzo Holdings, Inc. and/or Nanzo, LLC breached the JVA by: (i) charging and receiving usurious interest on the amounts loaned to MLS; and (ii) receiving proceeds or purported "profits" from the 2023 Transaction.

471.    As a direct and proximate result of these breaches, Plaintiffs have suffered, and will continue to suffer, significant harm.

**WHEREFORE,** Plaintiff demands judgment against Nanzo Holdings, Inc. and Nanzo, LLC, jointly and severally, for (i) compensatory, consequential, and special damages, (ii) attorney's fees and costs of suit, (iii) prejudgment and post-judgment interest, and (iv) such other and further relief as the Court may deem just and equitable.

## TWELFTH COUNT
### (Violation of New York Civil and Criminal Usury Statutes)
### (Against Nanzo Holdings, Inc. Nanzo, LLC,
### Gil Kaplan, and Erik Kaplan)

472.    Plaintiff repeats re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

473.    This Twelfth Count is pled in the alternative to the Eleventh Count.

474.    The interest charged and received by the Nanzo Defendants is violative of the New York civil and criminal usury statutes.

475.    Because the Nanzo Defendants violated the New York civil and criminal usury statutes, they should be disgorged of all interest they received.

**WHEREFORE**, Plaintiff demands judgment against Nanzo Holdings, Inc. Nanzo, LLC, Gil Kaplan, and Erik Kaplan, jointly and severally, for (i) disgorgement and/or reimbursement all interest they received, (ii) attorney's fees and costs of suit, (iii) prejudgment and post-judgment interest, and (iv) such other and further relief as the Court may deem just and equitable.

## THIRTEENTH COUNT
### (Unjust Enrichment)
### (Against Nanzo Holdings, Inc., Nanzo, LLC,
### Gil Kaplan, and Erik Kaplan)

476.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

477.    This Thirteenth Count is pled in the alternative to the Eleventh Count.

478.    As detailed above, Nanzo Holdings, Inc., Nanzo, LLC, Gil Kaplan, and Erik Kaplan charged and received from MLS usurious interest and received $1.5 million in proceeds from the 2023 Transaction in contravention of the JVA, without a legal right to do so, and in violation of New York's civil and criminal usury statutes.

479.    To permit these defendants to retain the monies they received would be manifestly unjust.

480.    These defendants have no right in law or equity to retain the monies they received.

**WHEREFORE,** Plaintiff demands judgment against Nanzo Holdings, Inc., Nanzo, LLC,, Gil Kaplan, and Erik Kaplan, jointly and severally, for (i) full restitution, (ii) the imposition of a constructive trust, (iii) compensatory, consequential, and special damages, (iv) attorney's fees and costs of suit, (v) prejudgment and post-judgment interest, and (vi) such other and further relief as the Court may deem just and equitable.

## FACTS COMMON TO THE FOURTEENTH, FIFTEENTH, SIXTEENTH, AND SEVENTEENTH COUNTS

481.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

482.    In 2015, Possebon and M. Possebon approached Berkowtitz about the prospect of investing in M. Possebon's concert business, Hits Entretenimento Ltda.

483.    Upon information and belief, Hits Entertainment International LLC is a United States affiliate of Hits Entretenimento Ltda.  Hits Entretenimento Ltda. and Hits International LLC shall be collectively referred to as "Hits Entertainment."

484.    M. Possebon represented to Berkowitz that he and his partner, Lucas Giacomolli ("Giacomolli"), were in need of an investor for a Pink Floyd concert because another investor backed out at the last minute.

485.    To entice Berkowitz to make an investment, M. Possebon showed Berkowitz footage of successful concerts he and his partner had put on in Brazil and other parts of South America, including Beyoncé, Jack Johnson, and Kiss.

486.    On or about August 27, 2015, Berkowitz's father, Mark Berkowitz, entered into an "Investor Financing Agreement" with Hits Entertainment in which Mark Berkowitz invested $375,000 in the Pink Floyd concert.

487.    When it was time for Mark Berkowitz to recoup the benefit of his investment in the Pink Floyd concert, M. Possebon convinced Mark and Seth Berkowitz to reinvest the principal and profits from the Pink Floyd concert, along with additional capital, into an Aerosmith concert.

488.    On or about February 16, 2016, Seth Berkowitz entered into an "Investor Financing Agreement" with Hits Entertainment pursuant to which MLS invested a total of $808,000 in the Aerosmith concert.

489.    Upon information and belief, M. Possebon received the money paid to Hits Entertainment pursuant to the 2016 "Investor Financing Agreement" through his company, MP Capital and Investments LLC ("MP Capital").

490.    Seth Berkowitz earned approximately $150,000 in profit from the Aerosmith concert but those profits were never paid to him.

491.    Soon after the Aerosmith concert, M. Possebon urged Seth Berkowitz to keep investing in Hits Entertainment because the company was becoming very profitable and he and his partner were going to sell it for hundreds of millions of dollars.

492.    Relying on these and other representations, Mark and Seth Berkowitz invested no less than $2,025,000 with M. Possebon, and Hits Entertainment pursuant to various Revenue Loan Agreements/Promissory Notes from August 2015 to April 2017.

493.    Mark and Seth Berkowitz have not been repaid the principal or any interest on the Revenue Loan Agreements/Promissory Notes.

98

494.   Upon information and belief, Hits Entertainment was purchased by Opus Entretenimento ("Opus") and Opus assumed all the debts and obligations of Hits Entertainment.

495.   Upon information and belief, M. Possebon was once reported to be an executive of Opus.

496.   Upon information and belief, Carlos Konrath, Jonathan Zaffari, and Giacomolli are currently executives of Opus.

497.   Mark Berkowitz and Seth Berkowitz both have assigned to MLS their rights, title and interest to all claims related to the foregoing investments and loans, including, but not limited to, all claims related to the 2016 "Investor Financing Agreement" and to the Revenue Loan Agreements/Promissory Notes.

498.   M. Possebon advised Berkowitz that he was unable to repay the loans/investments because he had incurred huge gambling losses.

499.   Plaintiff has since discovered that M. Possebon and Possebon are subject to numerous unpaid civil judgments for casino debt, including: (i) a judgment entered in the matter of *Inversiones Y Entret Enimiento v. Matheus Possebon*, Case No.: ATL-L-002837-18, Superior Court of New Jersey, in the amount of $1,559,060.55 against M. Possebon for signing a countercheck, drawn on his bank and made payable to the Plaintiff in exchange for chips and/or cash at the Hard Rock Punta Cana Resort & Casino in Coral Gables, Florida, which were unpaid; (ii) a judgment entered in the matter of *Inversiones Y Entret Enimiento v. Diego Possebon*, Case No.: ATL-L-001873-19, Superior Court of New Jersey in the amount of $717,018.77 against Possebon for executing promissory notes to the Plaintiff in exchange for chips and/or cash at the Hard Rock Punta Cana Resort & Casino in Coral Gables, Florida which were unpaid; and (iii) a judgment entered in the matter of *Mohegan Tribal Gaming Authority v. Diego Possebon*, Case No.:

KNL-CV20-6049264-S, in the Superior Court of Connecticut in the amount of $483,175.77 against Possebon for casino credit applications and drafts to the Plaintiff in exchange for chips and/or cash at the Mohegan Sun in Uncasville, Connecticut, which were unpaid.

500.    Plaintiff has also discovered that, in June 2019, M. Possebon was charged in a six (6) count felony indictment in Las Vegas for writing $2,900,000 in fraudulent checks to three different casinos and has since pled guilty to lesser charges for that fraud.

## FOURTEENTH COUNT
### (Breach of 2016 "Investor Financing Agreement")
### (Against Hits Entertainment and Opus)

501.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

502.    The 2016 "Investor Financing Agreement" is a valid and enforceable contract.

503.    Pursuant to the 2016 "Investment Financing Agreement," Hits Entertainment owes MLS profits of at least $150,000.

504.    Opus has assumed this obligation.

505.    Hits Entertainment and Opus have breached the 2016 "Investment Financing Agreement" by failing to pay MLS profits totaling $150,000.

506.    As a direct and proximate result of this breach, MLS has suffered, and will continue to suffer, damages.

**WHEREFORE**, Plaintiff demands judgment against Hits Entertainment and Opus, jointly and severally, for (i) compensatory, consequential, and special damages, (ii) attorney's fees and costs of suit, (iii) prejudgment and post-judgment interest, and (iv) such other and further relief as the Court may deem just and equitable.

## FIFTEENTH COUNT
### (Breach of the Revenue Loan Agreements/Promissory Notes)

100

**(Against Hits Entertainment and Opus)**

507.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

508.    The Revenue Loan Agreements/Promissory Notes are valid and enforceable contracts.

509.    Pursuant to the Revenue Loan Agreements/Promissory Notes, Hits Entertainment owes MLS principal and interest totaling more than $2 million.

510.    Opus has assumed this obligation.

511.    Hits Entertainment and Opus have breached the Revenue Loan Agreements/Promissory Notes by failing to pay MLS the principal and interest that is due and owing.

512.    As a direct and proximate result of these breaches, MLS has suffered, and will continue to suffer, damages.

**WHEREFORE**, Plaintiff demands judgment against Hits Entertainment and Opus, jointly and severally, for (i) compensatory, consequential, and special damages, (ii) attorney's fees and costs of suit, (iii) prejudgment and post-judgment interest, and (iv) such other and further relief as the Court may deem just and equitable.

### SIXTEENTH COUNT
**(Fraud)**
**(Against M. Possebon, Giacomolli, and Hits Entertainment)**

513.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

101

514.   As previously detailed, M. Possebon, Giacomolli, and Hits Entertainment knowingly and intentionally made false and fraudulent statements of material facts, directly and indirectly, to Seth Berkowitz and Mark Berkowitz regarding investments in Hits Entertainment.

515.   M. Possebon, Giacomolli, and Hits Entertainment knew, or recklessly disregarded, that the misrepresentations were false at the time they were made.

516.   M. Possebon, Giacomolli, and Hits Entertainment each had superior knowledge of the facts that they mispresented, concealed, and/or failed to disclose.

517.   M. Possebon, Giacomolli, and Hits Entertainment intentionally made these false and fraudulent statements, and concealed these material facts, to induce Mark Berkowitz and Seth Berkowitz to invest in Hits Entertainment.

518.   Mark Berkowitz and Seth Berkowitz reasonably, justifiably, and detrimentally relied on the misrepresentations and omissions in, among other things, investing in Hits Entertainment.

519.   Had the truth about these material facts been accurately disclosed and represented, Mark Berkowitz and Seth Berkowitz would not have invested in Hits Entertainment.

520.   As a direct and proximate result of these intentional and deliberate acts, Mark Berkowitz and Seth Berkowitz have suffered, and will continue to suffer, significant damages.

521.   Mark Berkowitz and Seth Berkowitz have assigned to MLS their rights, interest, and claims related to their investments in Hits Entertainment.

**WHEREFORE,** Plaintiff demands judgment against M. Possebon, Giacomolli, and Hits Entertainment, jointly and severally, for (i) compensatory, special, consequential, and incidental damages, plus interest, (ii) punitive damages, (iii) pre-judgment and post-judgment interest as

allowed by law, (iv) reasonable counsel fees and costs, and (v) such further relief as the Court finds to be fair and just.

### SEVENTEENTH COUNT
### (Aiding and Abetting Fraud)
### (Against Opus and MP Capital)

522.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

523.    Opus and MP Capital substantially assisted M. Possebon, Giacomolli, and Hits Entertainment Possebon in carrying out the foregoing fraudulent scheme.

524.    Opus and MP Capital had actual knowledge of the fraud by virtue of, among other things, their long-standing business and personal relationships with M. Possebon and their direct participation in the fraud.

525.    The fraudulent scheme could not have been perpetrated, in whole or in part, without the substantial assistance provided by Opus and MP Capital.

526.    Through these and other intentional and knowing acts, Opus and MP Capital caused direct and substantial harm to Mark Berkowitz and Seth Berkowitz.

**WHEREFORE,** Plaintiff demands judgment against Opus and MP Capital, jointly and severally, for (i) compensatory, special, consequential, and incidental damages, plus interest, (ii) punitive damages, (iii) pre-judgment and post-judgment interest as allowed by law, (iv) reasonable counsel fees and costs, and (v) such further relief as the Court finds to be fair and just.

### EIGHTEENTH COUNT
### (Accounting)

527.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

528.    The amounts due and owing to Plaintiff are unknown.

103

529.    The information necessary to determine all sums owed to Plaintiff are within the sole possession, custody, and control of each of the Defendants.

530.    Accordingly, each defendant should be compelled to provide a full accounting for all monies received and subsequent transfer thereof.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, for (i) a full accounting, (ii) attorneys' fees and costs, and (iii) such other and further relief as the Court may deem just and equitable.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury for all claims on which a jury trial is available as a matter of law.

**GENOVA BURNS LLC**

*/s/ Daniel M. Stolz*
Daniel M. Stolz, Esq.
440 Broad Street
Newark, New Jersey 07102
DStolz@genovaburns.com
(973) 533-0777

**CALCAGNI & KANEFSKY LLP**

*/s/ Eric T. Kanefsky*
1085 Raymond Blvd., 14th Floor
One Newark Center
Newark, New Jersey 07102
eric@ck-litigation.com
(862) 397-1796

*Attorneys for Plaintiff,*
   *Edwin H. Stier, Esq., as Wind Down Trustee*
   *for MLS Berkowitz Investments, LLC*

Dated:  April 8, 2024

104