

Eric T. Kanefsky, Senior Partner
862.772.8149    eric@ck-litigation.com

November 18, 2024

**VIA ECF**
Honorable Georgette Castner, United States District Judge
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

    **Re:**  ***Edwin H. Stier, Esq., as Wind Down Trustee for MLS Berkowitz Investments, LLC v. Diego Possebon, et al.***, Case No. 3:24-cv-04647-GC-RLS

Dear Judge Castner:

  Plaintiff, Edwin H. Stier, Esq., as Wind Down Trustee for MLS Berkowitz Investments, LLC (the "Trustee"), writes in response to the November 11, 2024 letter (ECF No. 280) filed by Defendant Adukargo Transportes e Logistica e Servicos de Armazenagens Ltda., ("Adukargo"), requesting a conference concerning an anticipated motion to dismiss (the "Adukargo Letter").

**I.  RELEVANT BACKGROUND.**

  This case stems from the bankruptcy of MLS Berkowitz Investments, LLC ("MLS"), a New Jersey LLC, which was defrauded out of nearly $50 million by a scheme in which certain key defendants substituted worthless gravel dust for the tin concentrate that had been purchased. Not surprisingly, the Adukargo Letter grossly distorts the allegations in the Complaint in a feeble attempt to shield itself from liability. As the Complaint itself confirms, however, Adukargo was a central and indispensable participant in the fraudulent scheme.

  As alleged in the Complaint, it was represented to MLS and its customer, Gerald Metals SARL ("Gerald"), that Adukargo would perform critical tasks in connection with the transport of what supposed to be tin concentrate but Adukargo and its co-conspirators knew was worthless gravel dust. Specifically, it was falsely represented to MLS and Gerald that Adukargo would be responsible for: (i) picking up the tin concentrate, which was to be stored in sealed one-ton bags, from the mines and transporting it to its own "bonded" warehouse; (ii) storing the tin at its warehouse, where it would be removed from its original packaging, weighed, inspected, and chemically tested; (iii) if and when the tin was found to be satisfactory, placing the tin into new one-ton bags and stuffing those bags into export containers, both of which would be sealed with uniquely numbered seals; and (iv) delivering the sealed export containers filled with the sealed one-ton bags of tin to the Port of Manaus for international export. *Id.*, ¶¶ 6, 241-47, 310.

  Adukargo also engaged in certain deliberate acts to cover up the scheme. For example, when a Gerald representative visited Adukargo in April 2023 to view the tin concentrate being loaded for export, *id.*, ¶¶ 276-81, Francisco Bonates ("Bonates"), Adukargo's Director of Operations: (a) falsely told the Gerald representative that, because Adukargo was a bonded warehouse controlled by customs agents, the Gerald representative could not go in to the area where the tin was being removed from its original bags; and (b) showed the Gerald representative

ck-litigation.com    862.397.1796    One Newark Center    85 Broad Street
     862.902.5458    1085 Raymond Blvd., 14th Floor    Suite 17031
         Newark, NJ 07102    New York, NY 10004
        *Preferred Mailing Address*

a sample of tin concentrate that was purportedly from the containers holding the tin purchased by MLS but was, in fact, from containers of tin that had been brought to Adukargo for the specific purpose of deceiving the representative and that were removed from the premises after the representative left. *Id.*, ¶¶ 29, 6, 29, 277-81. Adukargo's knowing participation in the fraud is evidenced by alleged facts and circumstances in addition to Bonates' blatant lies and deceitful conduct, including, but not limited to, Adukargo's preparation and sending to MLS and Gerald documents falsely confirming that tin concentrate was being transported, stored, and shipped when, in fact, the only material being transported, stored, and shipped was gravel dust; Adukargo's preparation of official customs documents that were not shared with MLS or Gerald which confirmed that the material handled by Adukargo was gravel dust; Adukargo's admission that it had stopped warehousing tin long before the transaction with MLS and had been contracted to collect gravel dust and transfer it to export containers at the Adukargo warehouse; Adukargo's knowledge, as an industry participant, that gravel dust is never packaged in sealed bags and shipped internationally; and Adukargo's lack of a tin export license. *Id.*, ¶¶ 298-304.

## II.     ADUKARGO'S JURISDICTIONAL ARGUMENTS ARE MERITLESS.

Under the "effects test"—derived from *Calder v. Jones*, 465 U.S. 783 (1984)—a plaintiff may establish personal jurisdiction by showing: "'(1) The defendant committed an intentional tort;'" "'(2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;'" and "'(3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.'" *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007) (quoting *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998)). By satisfying these elements, "'the plaintiff can demonstrate a court's jurisdiction over a defendant even when the defendant's 'contacts with the forum alone . . . are far too small to comport with the requirements of due process' under [the] traditional analysis.'" *Id.* (quoting *IMO Indus.*, 155 F.3d at 259).

The first two prongs are easily satisfied because the Complaint specifically alleges that Adukargo committed the intentional torts of fraud and aiding and abetting fraud against, and inflicted harm upon, MLS, a New Jersey entity. In other words, Adukargo "expressly aimed its tortious conduct" at this forum by targeting MLS, which it knew to be located in this forum. *See, e.g., Christie v. Nat'l Inst. for Newman Stud.*, 258 F. Supp. 3d 494, 506 (D.N.J. 2017) ("[B]ecause Defendants deliberately targeted a New Jersey resident—who Defendants knew was in New Jersey when they targeted him—with tortious conduct, Defendants should have reasonably anticipated being haled to court in New Jersey[.]"). There is thus no merit to Adukargo's assertions that it had no contacts with this forum. *See* (Adukargo Letter. at 2). Adukargo's complaints about fairness and burden are similarly unavailing. "[I]t is reasonable, fair, and foreseeable to hale [Adukargo] into this jurisdiction, because, as alleged, [Adukargo] expressly aimed their tortious conduct at Plaintiff in New Jersey." *Christie*, 258 F. Supp. 3d at 510.

If the Court is concerned about personal jurisdiction over Adukargo, jurisdictional discovery is the appropriate course. *See Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 283 (3d Cir. 1994) ("'discovery directed to personal jurisdiction" should "be freely permitted'") (internal citation omitted). Such discovery would reveal Adukargo's communications to MLS's principal in New Jersey and further establish Adukargo's awareness that it targeted a New Jersey entity.

### III. ADUKARGO'S ATTACKS ON THE COMPLAINT WILL FAIL.

While Rule 8 "imposes 'minimal burdens on the plaintiff at the pleading stage,'" *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (citation omitted), the 12(b)(6) movant's burden is "heavy." *United States v. Est. of Kelley*, 2017 WL 5714708, at *3 (D.N.J. Nov. 28, 2017). The court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012).

Adukargo's attacks on the fraud and aiding and abetting fraud claims, *see* (Adukargo Letter. at 2-3), do not withstand even minimal scrutiny. First, Adukargo's assertion that the Complaint fails to identify "any misrepresentation by Adukargo," (*id.* at 2), ignores, among other things, the extensive allegations concerning the fictitious display of tin concentrate orchestrated by Adukargo and hosted at Adukargo's warehouse.[1] Adukargo's argument that the Complaint does not allege reliance on Adukargo's misrepresentations is also hollow. *See* (*id.*), The Trustee specifically alleges that MLS issued payments totaling approximately $49 million for tin concentrate "[r]elying on" misrepresentations including Adukargo's "fictitious display of tin concentrate purportedly being warehoused, sampled, and transferred into containers for shipping[,]" Compl., ¶ 281. Finally, Adukargo's argument that the Complaint does not include "a single fact" suggesting Adukargo's awareness of, and assistance with, the fraud, *see* (Adukargo Letter at 3), is flatly refuted by the allegations in the Complaint, which singly and collectively demonstrate that Adukargo was well aware that it was collecting, storing, loading, and sampling gravel dust while representing to MLS and Gerald that the material was tin concentrate. *See* Compl., ¶¶ 209-309.

Adukargo's arguments concerning the adequacy of the RICO claims are also unpersuasive. First, the Trustee has asserted the RICO claims on behalf of MLS,[2] which suffered a domestic injury and thus is a proper plaintiff under *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325 (2016). *See Cevdet Aksut Ve Ogullari Koll.Sti v. Cavusoglu*, 756 F. App'x 119, 122 (3d Cir. 2018). Next, Adukargo's allegations that the Complaint fails to allege sufficient continuity ignores the allegations that Possebon first contacted MLS in 2021 and orchestrated a "setup transaction" to pull off the fraud. *See* Compl., ¶¶ 222-36. The laundering of the proceeds of the fraud also establish ongoing criminal conduct sufficient to establish open-ended continuity. *See, e.g., Metro. Transp. Auth. v. Contini*, 2005 WL 1565524 at *4 (E.D.N.Y. July 6, 2005). Adukargo's argument that the Complaint fails under *Reves*[3] given Adukargo's participation in the deception of Gerald's agent. In any event, this raises an issue of fact unsuitable for resolution at the pleading stage. *See, e.g., First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004). Finally, the Complaint, ¶¶ 6, 391, 401, 403-04, alleges that Adukargo engaged in the RICO predicates of mail and wire fraud.

---

[1] While Adukargo misleadingly suggests that Possebon translated for the Gerald representative during the deception at Adukargo's warehouse, *see* (Adu. Ltr. at 1), the allegations concerning Possebon translating relate to a meeting with a representative of Multivista, not Adukargo, *see* Compl., ¶¶ 274-75.

[2] Pursuant to his appointment by the Bankruptcy Court, the Trustee has the power to assert causes of action belonging to MLS. *See, e.g., Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356 (3d Cir. 2001)

[3] *See Reves v. Ernst & Young*, 507 U.S. 170 (1993), explaining that a RICO defendant must have participated in the "operation or management" of the RICO enterprise, *see In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 371 (3d Cir. 2010).

*　　　　　*　　　　　*

We thank the Court for its attention to this matter.

Respectfully submitted,

<u>*/s/ Eric T. Kanefsky*</u>

Eric T. Kanefsky, Esq., Senior Partner
Calcagni & Kanefsky LLP

cc (via ECF):  all counsel of record