# CALCAGNI KANEFSKY LLP
## LITIGATION / INVESTIGATIONS

ERIC T. KANEFSKY PARTNER

☎ 862.772.8149    ✉ eric@ck-litigation.com    🌐 ck-litigation.com

April 20, 2026

**VIA ECF**
Honorable Justin T. Quinn, U.S.M.J.
United States District Court, District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

> Re:    ***Edwin H. Stier, Esq. as Wind Down Trustee for MLS Berkowitz Investments, LLC v. Diego Possebon, et al.*, No. 3:24-cv-04647-RK-JTQ**

Dear Judge Quinn:

This firm is co-counsel for Plaintiff, Edwin H. Stier, Esq. as Wind Down Truste for MLS Berkowitz Investments, LLC ("Plaintiff" or the "Trustee"). We write pursuant to Your Honor's January 30, 2026 Letter Order (ECF 561) (the "Letter Order") and in response to the Defendants' submissions identifying purported grounds for dismissal based on lack of personal jurisdiction.[1] As set forth below, Defendants' arguments are, in many instances, based on an apparent misunderstanding of the law and are otherwise meritless. To the extent that there could be any uncertainty, the Trustee has identified jurisdictional discovery that will allow the Court to assess the validity of Defendants' assertions that they are not subject to personal jurisdiction.[2]

---

[1] The following Defendants filed submissions in response to the Letter Order: (i) Diego Possebon ("Possebon") and Larissa Carvalho Possebon ("Mrs. Possebon," and, with Possebon, the "Possebons") (ECF 581) (the "Possebon Ltr."); (ii) Fernanda Alves De Souza ("De Souza") (ECF 584) (the "De Souza Ltr."); (iii) Reag USA LLC ("Reag") (ECF 578) (the "Reag Ltr."); (iv) Beach House 8 & Condominium Association, Inc. ("Beach House") (ECF 579) (the "BH Ltr."); (v) Braga Exports Inc. ("Braga") (ECF 580) (the "Braga Ltr."); (vi) Astronauto Enterprise, Inc. ("Astronauto") (ECF 582) (the "Astronauto Ltr."); (vii) Adukargo Transportes e Logistica e Servivos de Armazenagens Ltda. ("Adukargo") (ECF 577) (the "Adukargo Ltr."); (viii) Iara Galdino Da Silva ("Da Silva") and Empire Strong Negocios Ltda. ("ESN," and, with Da Silva, the "ESN Defendants") (ECF 585) (the "ESN Ltr."); (ix) Lucas Giacomolli ("Giacomolli") (ECF 570) (the "Giacomolli Ltr."); and (x) Opus Entretenimento ("Opus") (ECF 583) (the "Opus Ltr.").

[2] The arguments herein are made without waiving the Trustee's right to assert other theories of jurisdiction that may apply based on any jurisdictional discovery ordered by the Court.

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 2 of 26

## I.        The Relevant Legal Standards

Rule 8(a) requires that a pleading must contain "a short and plain statement of the grounds for the court's jurisdiction[.]"   Courts have long recognized that Rule 8(a)'s reference to "jurisdiction" concerns subject matter jurisdiction rather than personal jurisdiction.  *See, e.g., Stirling Homex Corp. v. Homasote Co.*, 437 F.2d 87, 88 (2d Cir. 1971).  As such, "[a] plaintiff is not required to plead specific facts in its complaint to support a court's exercise of personal jurisdiction over the defendant." *Mega Constr. Corp. v. Tocci Com., LLC*, 2009 WL 10728619, at *2 (D.N.J. Mar. 24, 2009); *see also Shanks v. Wexner,* 2003 WL 1343018, at *2 (E.D. Pa. Mar. 18, 2003) ("When a complaint is filed there is no affirmative duty to plead personal jurisdiction because it is assumed that personal jurisdiction exists."); Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1206 (4th ed. 2026).

When a defendant challenges personal jurisdiction, the burden shifts to the plaintiff. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007).  "To demonstrate personal jurisdiction, the plaintiff may rely on the allegations in the complaint, affidavits, or other evidence." *Trainor v. McGibney*, 2026 WL 242263, at *3 (D.N.J. Jan. 29, 2026) (citing *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009)).  "It is well established that in deciding a motion to dismiss for lack of jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003).  If the district court does not elect to hold an evidentiary hearing, then the plaintiff "need only demonstrate a prima facie case of jurisdiction to defeat a motion to dismiss." *Trainor*, 2026 WL 242263 at *3 (citing *Metcalfe*, 566 F.3d at 330).  To present a prima facie case in this context, the plaintiff is required to "'establish[] with reasonable particularity sufficient contacts'" between the defendant and the forum.  *Mellon Bank*

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 3 of 26

*(E.) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (internal citation omitted).

As the Trustee alleged, *see* Compl., ¶¶ 219-20, the Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334 because it arises from the bankruptcy case for MLS Berkowitz Investments, LLC ("MLS").  *See* 28 U.S.C. § 1334(b) (district courts "shall have exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.").  The scope of "related to" jurisdiction under 28 U.S.C. § 1334(b) is "extremely broad, extending to any action the outcome of which 'could conceivably have any effect on the estate being administered in bankruptcy.'"  *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997) (internal citation omitted). This action falls within that broad scope as any recovery by the Trustee would impact the bankruptcy estate of MLS.

Given that the Court has subject matter jurisdiction over this case under 28 U.S.C. § 1334, any personal jurisdiction challenge must be evaluated under Rule 7004 of the Federal Rules of Bankruptcy Procedure.  Fed. Bank. R. 7004(d) authorizes nationwide service of process, and, as is relevant here, Fed. Bank. R. 7004(f) states:

> If exercising jurisdiction is consistent with the United States Constitution and laws, serving a summons or filing a waiver of service under this Rule 7004 or the applicable provisions of Fed. R. Civ. P. 4 establishes personal jurisdiction over a defendant … in a civil proceeding arising under the Code, or arising in or related to a case under the Code.[3]

Because the sovereign exercising jurisdiction is the United States, not a particular state, minimum contacts with the United States are sufficient to satisfy the constitutional due process requirement for personal jurisdiction.  *In re Hellas Telecommunications (Luxembourg) II SCA*, 547 B.R. 80, 97 (Bankr. S.D.N.Y. 2016).  Accordingly, whether the defendant had "minimum contacts" with a

---

[3] Fed. R. Civ. P 4(f)(1) and 4h(2) authorize service of people and business entities in foreign countries pursuant to the Hague Convention.

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 4 of 26

particular state is "irrelevant" because "when an action is in federal court on 'related to' jurisdiction" pursuant to 28 U.S.C. § 1334(b), the "sovereign exercising authority is the United States, not the individual state where the federal court is sitting." *In re Celotex Corp.*, 124 F.3d 619, 630 (4th Cir. 1997).[4]

General jurisdiction exists when the defendant has continuous and systematic contacts with the forum. *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008). Specific jurisdiction is based on an "affiliation" between the forum and the underlying dispute. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Courts assessing a challenge to specific jurisdiction determine (1) whether the defendant purposefully directed its activities at the forum, (2) whether the litigation "arise[s] out of or relate[s] to" at least one of those activities, and (3) whether the exercise of personal jurisdiction comports with fair play and substantial justice. *See Caduceus, Inc. v. Univ. Physician Grp.*, 713 F. Supp. 3d 30, 35 (D.N.J. 2024) (quoting *O'Connor*, 496 F.3d at 317). "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 114 (1987). The Third Circuit has held that "if a subsidiary is merely the agent of a parent corporation, or if the parent corporation otherwise 'controls' the subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction (whether general or specific)

---

[4] *See also Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002) ("a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process."); *Double Eagle Energy Servs., L.L.C. v. MarkWest Utica EMG, L.L.C.*, 936 F.3d 260, 264 (5th Cir. 2019) ("With nationwide service, the forum is the United States. So minimum contacts with the United States (Fifth Amendment due process) suffice; minimum contacts with a particular state (Fourteenth Amendment due process) are beside the point."); *In re Trib. Co.*, 418 B.R. 116, 123 (Bankr. D. Del. 2009) ("State minimum contacts are not dispositive; instead, the sufficiency of the defendant's contacts with the United States are reviewed to determine the fairness of a court's exercise of personal jurisdiction in a bankruptcy related proceeding").

exists over the subsidiary." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018); *see also Int'l Playthings LLC v. Toy Teck Ltd., LLC*, 2013 WL 8184357, at *9 (D.N.J. July 23, 2013) (discussing agent-principal theory of jurisdiction); *In re BYJU'S Alpha, Inc.*, 2025 WL 659092 at *7 (Bankr. D. Del. Feb. 27, 2025) (discussing alter ago jurisdiction).

Under the "effects test"—derived from *Calder v. Jones*, 465 U.S. 783 (1984)—a plaintiff may establish personal jurisdiction by showing: "'(1) The defendant committed an intentional tort;'" "'(2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;'" and "'(3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.'" *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007) (quoting *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998)). By satisfying these elements, "'the plaintiff can demonstrate a court's jurisdiction over a defendant even when the defendant's 'contacts with the forum alone . . . are far too small to comport with the requirements of due process' under [the] traditional analysis.'" *Id.* (quoting *IMO Indus.*, 155 F.3d at 259). "Courts have held with near uniformity that they have personal jurisdiction to hear fraudulent transfer cases under the *Calder* analysis, even when the transfer is the only contact between the debtor and the foreign transferee." *In re Akbari–Shahmirzadi*, 2016 WL 6783245, at *3 (Bankr. D.N.M. Nov. 14, 2016) (collecting cases); *see also Gambone v. Lite Rock Drywall*, 288 F. App'x 9, 13-14 (3d Cir. 2008) (finding specific personal jurisdiction over a transferee of fraudulent conveyances under the "effects test"). Finally, the "conspiracy theory" of jurisdiction requires the plaintiff to allege "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *In re Firestar Diamond, Inc.*, 654

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 6 of 26

B.R. 836, 902 (Bankr. S.D.N.Y. 2023).[5]

When a defendant moves to dismiss for lack of personal jurisdiction, jurisdictional discovery should be "'freely permitted[.]'" *Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 283 (3d Cir. 1994) (citation omitted). Jurisdictional discovery should be denied only when the plaintiff's claim is "'clearly frivolous.'" *Toys "R" Us, Inc.*, 318 F.3d at 456. And, "jurisdictional discovery [is] particularly appropriate where the defendant is a corporation." *Metcalfe*, 566 F.3d at 336.

## II.    Defendants' Personal Jurisdiction Challenges Are Meritless

As required by the Letter Order, the Trustee below (a) identifies the jurisdictional bases for each Defendant who filed a pre-motion letter challenging personal jurisdiction, and (b) where appropriate, identifies the jurisdictional discovery that the Trustee believes is necessary to address their personal jurisdiction arguments.

### A.    The Possebons' Jurisdiction Arguments Are Thoroughly Deficient

According to the Possebons, the Court: (i) lacks subject matter jurisdiction because the Trustee's Complaint "is not the bankruptcy petition itself[;]" (ii) lacks personal jurisdiction over Possebon because the Trustee purportedly did not "allege a single meeting, negotiation, transaction, or any other act by Mr. Possebon in New Jersey or even in the United States[;]" and (iii) lacks personal jurisdiction over Mrs. Possebon because the Trustee does not allege that her purchase of a condominium in Miami, Florida and status as the manager of Celavi Investimentos e Participacoes Ltda. ("Celavi") have "any nexus to New Jersey." *See* (Possebon Ltr. at 2-3). These arguments appear to be made with the sole aim of hindering the progression of this action.

As explained above, the Court has subject matter jurisdiction over this case under 28 U.S.C.

---

[5] "Most federal jurisdictions apply some version of the [conspiracy theory] doctrine[,]" and "[o]nly the Fifth Circuit has rejected it outright in an unpublished decision." Naomi Price, Jason Jarvis, *Conspiracy Jurisdiction*, 76 Stan. L. Rev. 403, 423-24 (2024).

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 7 of 26

§ 1334 because it arises from the MLS bankruptcy case. *In re E. Orange Gen. Hosp., Inc.*, 587 B.R. 53, 70 (D.N.J. 2018), *see* (Possebon Ltr. at 2), merely explains the differences between "cases" and "civil proceedings" for purposes of Section 1334 and in no way calls into question the Court's subject matter jurisdiction over this action.

Equally unavailing are the Possebons' personal jurisdiction arguments. The Trustee understandably could not address in the Complaint the circumstances under which the Possebons would be served with process. While they challenge personal jurisdiction, the Possebons neglect to mention that they were both personally served with process while they were visiting the Universal Epic Universe theme park in Orlando, Florida. *See* (ECF 413 and 414). That alone makes them subject to the Court's jurisdiction. When, as here, the "relevant forum is the United States as a whole, rather than a particular state, service of process on the defendant anywhere in the United States confers jurisdiction over the defendant without regard to the defendant's particular contacts with the state where the court is located or the burden imposed on the defendant in litigating in that forum." *In re DBSI, Inc.*, 467 B.R. 309, 314 (Bankr. D. Del. 2012). Because the Possebons were served in Florida, the Court has jurisdiction over them. *See id.* ("there is no dispute that the Moving Defendants were served while physically present in the United States. No further inquiry is required. This Court has jurisdiction over the Moving Defendants").[6]

Based on the Complaint, the Possebons' personal jurisdiction arguments are also doomed. As the Trustee has alleged, Possebon had a longstanding relationship with MLS, a New Jersey

---

[6] In cases where the forum is a particular state and not the United States, courts have determined that individuals personally served in the forum are subject to the court's general jurisdiction. *See, e.g., Singh v. A&H Logistics Corp.*, 2024 WL 4880312, at *2 (D.N.J. Nov. 22, 2024) ("Service of process on an individual physically present in the forum state—sometimes called 'tag' jurisdiction—confers general jurisdiction"); *Glob. Gaming Philippines, LLC v. Razon*, 2022 WL 836716, at *4 (S.D.N.Y. Mar. 21, 2022) ("Tag jurisdiction also permits a court to exercise 'personal jurisdiction over an individual who is served, and thus 'tagged,' while physically present in the forum.'") (internal citation omitted).

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 8 of 26

limited liability company engaged in the raw metals trade that was formed in 2016 by Seth

Berkowitz ("Berkowitz"), who, during prior employment, had developed industry contacts in

Brazil including Possebon, a Brazilian national who had access to miners, distributors, and other

such business partners in Brazil. *See* Compl., ¶¶ 1, 15-16, 223. In 2021, after having previously

collaborated with Possebon on a Venezuelan tin concentrate deal, MLS commenced efforts to

procure tin concentrate from Brazil and bought a limited quantity of tin concentrate that was

sourced by Possebon from a mine owned and operated by Costa Company. *See id.*, ¶¶ 222-27.

After testing indicated that the tin supplied by Possebon had concentration levels above 75%, MLS

was comfortable with Possebon's tin source and, in early 2022, entered into a contract with Gerald

Metals SARL ("Gerald') to supply tin concentrate to Gerald (the "2022 Transaction"). *See id.*, ¶¶

228-30. The 2022 Transaction was a success, and Possebon managed the supply of tin concentrate

from Brazil for the 2022 Transaction, from contract negotiations between the miners and MLS

through the export of the tin concentrate from Brazil. *See id.*, ¶¶ 2, 230-36.

Following the successful 2022 transaction, Possebon induced MLS to enter into a much

larger transaction (the "2023 Transaction") with Possebon in which MLS agreed to purchase 129

containers of what was represented to be tin concentrate but, as MLS and Gerald learned when the

containers began to arrive to Gerald's customers in Asia, was actually worthless gravel dust. *Id.*

In furtherance of the conspiracy, Possebon, among other acts directed at the United States:

> (i)　　provided MLS with a host of phony documents intended to convince MLS that Possebon and his co-conspirators had sourced and were in the process of supplying tin concentrate and thereby induce MLS into making provisional payments and other transfers believing that the money was to pay for tin that would ultimately be supplied to Gerald's customers, *see id.*, ¶¶ 261-71 , 293-97, 314-16;

> (ii)　　directed MLS to enter into a purported loan agreement with Metalsur, a Brazilian shell company formed by a close friend of Possebon, to justify the movement from MLS's United States bank account with Chase Bank of

approximately $20 million in payments which MLS was led to believe by Possebon would be disbursed at Possebon's direction from Metalsur to the appropriate parties who had to be compensated for services they had provided in connection with the 2023 Transaction, *see id.*, ¶¶ 325-36;

(iii)    directed MLS to enter into a phony consulting agreement with Empire Strong (the "Empire Strong Services Agreement") that Possebon prepared with De Souza and used to create the false impression that subsequent transfers from MLS to Empire Strong would represent payment for labor and other professional services provided by Empire Strong in connection with the tin concentrate transaction, *see id.*, ¶¶ 337-46, 382(e);

(iv)    directed MLS to issue more than two dozen wire transfers totaling approximately $21.7 million from MLS's Chase Bank account to Empire Strong between March and May of 2023, *see id.*, ¶ 347;

(v)    directed MLS to wire $1,135,322.30 to Monique Levy, Possebon's sister, that was used to fund Mrs. Possebon's purchase of a luxury beachfront condominium in Miami, Florida, *see id.*, ¶¶ 352-58; and

(vi)    directed MLS to wire substantial sums of money to other Florida entities such as Wave Tech Corp., Mix Enterprises LLC, and Braz Center Services, Inc., *see id.*, ¶¶ 79, 97-98, 375, 377-78.

These activities by Possebon make clear that he had far more than the minimum contacts with the United States necessary for this Court to establish specific personal jurisdiction over him. *See O'Connor*, 496 F.3d at 317. Alternatively, the Court has personal jurisdiction over Possebon under the "effects" test given that he "expressly aimed [his] tortious conduct" at this forum by targeting MLS, which, by virtue of his longstanding business relationship with MLS and Berkowitz, he clearly knew to be located in the United States. *See, e.g., Christie v. Nat'l Inst. for Newman Stud.*, 258 F. Supp. 3d 494, 506 (D.N.J. 2017) ("[B]ecause Defendants deliberately targeted a New Jersey resident—who Defendants knew was in New Jersey when they targeted him—with tortious conduct, Defendants should have reasonably anticipated being haled to court in New Jersey[.]"). Finally, conspiracy jurisdiction would apply to Possebon as the Trustee has alleged the existence of conspiracy in which Possebon participated and overt acts by co-conspirators such as De Souza

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 10 of 26

and Empire Strong with sufficient connections with the United States. *See* Compl., ¶¶ 407-16.

Any doubt that the Court can exercise personal jurisdiction over Possebon can be resolved by jurisdictional discovery including: (i) interrogatories and document demands concerning Possebon's communications and interactions with individuals and entities present in or connected to the United States such as Berkowitz, De Souza, Monique Levy, and Empire Strong, and any other individuals and entities in the United States who received funds originating from MLS at Possebon's direction; and (ii) a sworn deposition of Possebon concerning the foregoing topics.

Mrs. Possebon's jurisdictional arguments are likewise fatally flawed given the allegations in the Complaint. The bulk of the money stolen from MLS and Gerald was disbursed by Possebon to his family and friends, and Mrs. Posssebon was one of the primary beneficiaries. Compl., ¶ 348. On Possebon's instructions, Diego Possebon's sister and Empire Strong paid more than $5.37 million in funds delivered by MLS for the purchase of tin to fund the purchase of a luxury beachfront condominium in Miami, Florida pursuant to a contract between Mrs. Possebon and Miami Waterfront Ventures, LLC ("Miami Waterfront"), the condominium's developer. *See id.*, ¶¶ 352-60. The funds transferred by MLS to Empire and Levy were subsequently transferred, at the direction of the Possebons, to Fidelity National Title Insurance Co. ("Fidelity"), a Florida corporation that served as the title company and escrow agent for Mrs. Possebon's condominium purchase. *See id.*, ¶¶ 76, 356-60, 376. In addition, Celavi, Mrs. Possebon's entity in Brazil, received $47,525.50 from MLS, again intended for the purchase of tin, through ESN, Empire Strong's affiliate in Brazil, in connection with the fraud. *Id.*, ¶ 349.

By entering into a contract to purchase real estate in Florida and then using the proceeds of her husband's fraud against MLS, a New Jersey entity, to make the deposit payments under that contract—funds that were transferred from MLS and Empire Strong (both within the United

States) to Monique Levy and Fidelity (also both within the United States)—Mrs. Possebon had sufficient minimum contacts with the United States to support the Court's exercise of personal jurisdiction over her. In that regard, (a) Mrs. Possebon availed herself of the United States forum by directing her activities here, (b) the Trustee's claims to recover the fraudulent transfers made for the benefit of Mrs. Possebon arise out of her activities in the United States, and (c) the Court's exercise of personal jurisdiction comports with fair play and substantial justice. *See O'Connor*, F.3d at 317. That Mrs. Possebon omits "fair play" arguments is understandable given that she is apparently comfortable with litigating in the United States with respect to her entitlement to the $3,337,500 that Fidelity had held in escrow in connection with the Miami condominium purchase. *See* (ECF 473) (Mrs. Possebon's answer to Fidelity's interpleader cross-claim asserting that she has a "superior interest" to the escrowed funds). It must be stressed that all funds which are the subject matter of this litigation were initially paid out of the MLS bank account in New Jersey.

Finally, any potential doubt as to personal jurisdiction over Mrs. Possebon can be resolved by jurisdictional discovery including: (i) interrogatories and document demands concerning Mrs. Possebon's purchase of the condominium in Miami, Florida, any related visits to the United States, and her communications and interactions with individuals and entities present in or connected to the United States such as De Souza, Monique Levy, Empire Strong, Fidelity, and Miami Waterfront; and (ii) a sworn deposition of Mrs. Possebon concerning the foregoing topics.

**B.      De Souza is Subject to Personal Jurisdiction in the United States**

Not to be outdone by the Possebons, De Souza unconvincingly argues that: (i) the Court lacks general jurisdiction over her because her the "center of [her] business, domestic, social, and civic life is in Brazil[;]" (ii) her facilitation of wire transfers to and from the United States and execution of the Empire Strong Services Agreement are insufficient to establish specific personal

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 12 of 26

jurisdiction; and (iii) there is no personal jurisdiction because she is yet to be served with process. *See* (De Souza Ltr. at 2-3).[7] Her arguments are futile.

To start, De Souza has submitted a declaration, *see* (ECF 584-1) (the "De Souza Decl."), stating that she has a residence in Miami, Florida. In the context of this case arising under the Bankruptcy Code, De Souza's residence in Florida is sufficient grounds for the Court to exercise personal jurisdiction over her. *See In re Capmark Fin. Grp. Inc.*, 479 B.R. 330, 341 (Bankr. D. Del. 2012) ("Even if Lin's primary residence is in Japan, he has neither denied nor furnished evidence to dispute that he also has a residence in Washington. This United States residence constitutes sufficient minimum contacts for this Court to exercise personal jurisdiction over him.");[8] *In re All. Sec., Inc.*, No. AP 19-01021, 2019 WL 5420085, at *3 (Bankr. D.R.I. Oct. 23, 2019) ("resident of Connecticut" had sufficient contacts with the United States to establish the Rhode Island court's personal jurisdiction under Bankruptcy Rule 7004(f)); *In re Coram Healthcare Corp.*, 2003 WL 22948234, at *2 (Bankr. D. Del. Dec. 12, 2003) (a "resident of California" had "sufficient minimum contacts with the United States").

De Souza's declaration also indicates that the Court has general jurisdiction over her based on her domicile.[9] In addition to acknowledging a residence in Florida, De Souza states that she is the principal of Empire Strong International Business Intermediation, LLC and Empire Strong International Business Intermediation One LLC (together, "Empire Strong"), *see* (De Souza Decl.,

---

[7] De Souza also argues that the "action against her should be transferred to Delaware" based on the forum selection clause in the Empire Strong Services Agreement, and that any claims against Empire Strong should also be transferred to Delaware. *See* (De Souza Ltr. at 1, 3 n.1). Given that the Letter Order directed the Defendants to file pre-motion letters with respect to anticipated motions to dismiss on personal jurisdiction grounds only, Plaintiff does not address those arguments at this time.

[8] As the court noted in *In re Capmark Fin. Grp. Inc.*, 479 B.R. at 340-41, "a person may have more than one residence."

[9] *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) (an individual is subject to general jurisdiction in the forum in which she is domiciled).

¶ 1), both of which are Delaware limited liability companies with principal places of business in Miami, Florida, Compl., ¶¶ 35-36.[10]  An individual's "house of residence, and place of business" are among the factors considered by courts to establish an individual's domicile.  *Washington v. Hovensa LLC*, 652 F.3d 340, 344 (3d Cir. 2011) (internal citation and quotation marks omitted).  And, while De Souza asserts in conclusory fashion that she was "primarily living in Brazil" between February and January of 2023, and that she votes in Brazil and has family and friends there, *see* (De Souza Decl., ¶¶ 2-3), that only highlights the importance of jurisdictional discovery on this topic given the contrary indications of De Souza's domicile discussed above.  See *Korn v. Korn*, 398 F.2d 689, 691 (3d Cir. 1968) (noting the "infirmity of any self-serving declaration" and explaining that such a declaration "cannot prevail to establish domicile when it is contradicted or negatived by an inconsistent course of conduct.").

De Souza's attacks on the Court's specific jurisdiction depend on ignoring the bulk of the Trustee's allegations concerning the integral role played by De Souza in the massive fraud against MLS and Gerald.  In that regard, the Complaint alleges numerous activities within or directed to the United States by De Souza including her:

(i)     direct and indirect misrepresentations to MLS that "Empire Strong and Metalsur were 'licensed' intermediaries for the trade of noble metals that could assist in facilitating the transfer of the provisional payments from MLS to persons who, and entities which, provided goods and services in connection with the 2023 Transaction[,]" Compl., ¶ 381(d);

(ii)    preparation of the Empire Strong Services Agreement between MLS and Empire Strong that created the false impression that transfers from MLS to Empire Strong were to pay for legitimate services in connection with the 2023 Transaction as a sham justification for the movement of monies to Possebon and the other beneficiaries of the fraud against MLS, *id.*, ¶¶ 341-45, 382(e), 391(i);

---

[10] Florida government records indicate that De Souza is Empire Strong's registered agent and manager with a listed address in Miami, Florida.

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 14 of 26

(iii)    structuring of incoming and outgoing wire transfers to avoid detection by banking authorities and other regulators, *id.*, ¶ 382(e);

(iv)    receipt through Empire Strong of $21.7 million from MLS that was sent via twenty-six separate carefully structured wire payments across a multitude of many (and, in some cases, consecutive) days from March through May of 2023, *id.* ¶ 347;[11]

(v)    disbursement of the funds received from MLS to participants in the fraud and other undeserving recipients including transfers to Fidelity and Monique Levy in connection with Mrs. Possebon's purchase of a condominium in Miami and numerous transfers to people and entities in the United States, *id.* ¶¶, 344, 358, 360, 376, 382(h), (i); and

(vi)    personal receipt of cash payments from the fraud and transfer to herself and Coinbase, Inc., a cryptocurrency exchange, of $196,012 and $790,300, respectively, of the funds sent by MLS to Empire Strong in connection with the 2023 Transaction, *id.* ¶¶ 368, 376.

These allegations reflect activities by De Souza purposefully directed at the United States, and this action relates to at least one of those activities, *see O'Connor*, 496 F.3d at 317, and De Souza understandably does not argue that this Court's exercise of jurisdiction over her would not comport with notions of fair play and substantial justice.[12]  Finally, while De Souza is correct that she has not yet been served with process, that is because the Brazilian Federal Court is yet to complete service pursuant to the Hague Convention, s*ee* (ECF 587), a circumstance that is out of the

---

[11] These transfers were made to two United States bank accounts maintained by Empire Strong with Truist Bank ("Truist") in Miami, Florida.  *See* (ECF 535-13).  Documents produced by Truist in response to a bankruptcy subpoena issued by the Trustee suggested that De Souza may have made several of those transfers while physically present at a Truist location in Florida.

[12] The authority cited by De Souza to argue that she lacks the required minimum contacts with the United States, *see* (De Souza Ltr. at 2), is clearly distinguishable.  In *Dollar Sav. Bank v. First Sec. Bank of Utah, N.A.*, 746 F.2d 208, 214-15 (3d Cir. 1984), the court concluded that wire transfers by the defendant *to* Pennsylvania were an insufficient basis for personal jurisdiction.  Here, as discussed above, De Souza initiated and managed dozens of fraudulent wire transfers *from* the United States.  *See Kyko Glob., Inc. v. Prithvi Info. Sols. Ltd.*, 2020 WL 1159439, at *28 (W.D. Pa. Mar. 10, 2020) (distinguishing *Dollar Sav. Bank* because "the fraudulent wire transfers here were initiated *in*, and managed *from*, this forum") (emphasis in original).  And, while the court in *Associated Bus. Tel. Sys. Corp. v. Danihels*, 829 F. Supp. 707, 711 (D.N.J. 1993) indicated that contracting with a forum resident would not "automatically establish" sufficient contacts for personal jurisdiction, De Souza obviously directed more activities at the United States than just signing a contract with MLS.

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 15 of 26

Trustee's control but will hopefully be rectified in the near term.

Finally, any potential doubt that the Court can appropriately exercise personal jurisdiction over De Souza can be resolved by jurisdictional discovery including: (i) a sworn deposition of De Souza concerning the topics addressed in the De Souza Decl, her operation of the Empire Strong entities in the United States, the transfers of funds alleged the Complaint, her dealings and interactions with Possebon, Mrs. Possebon, Monique Levy, MLS or any representatives of MLS, and the recipients of the funds from Empire Strong alleged in the Complaint, and whether she has attempted to evade service of process in Brazil or the United States; and (ii) document demands and interrogatories concerning the foregoing topics.  The Trustee submits that a sworn deposition of De Souza is particularly important given that the De Souza Decl. appears, at best, to be inconsistent with assertions she made concerning her contacts with MLS in a verified complaint filed in Florida in July 2023.

C.      **United States Entities Are Undeniably Subject to Personal Jurisdiction**

Reag argues that it is not subject to general jurisdiction in New Jersey as a Florida limited liability company, that it is not subject to "specific jurisdiction in New Jersey" because it "has not purposefully directed any activities at New Jersey[,]" and that the Court's exercise of jurisdiction over Reag would offend notions of fair play and substantial justice.  (Reag Ltr. at 1-3).  Beach House and Braga echo Reag's first two points, asserting that the Court lacks general jurisdiction because they are both Florida corporations and lacks specific jurisdiction because they did not purposefully direct activities at New Jersey.  *See* (BH Ltr. at 2-3; Braga Ltr. at 1-3).  These arguments are entirely misguided.  Tellingly, Reag, Beach House, and Braga have not even attempted to address the Trustee's arguments, made in response to prior pre-motion letters and motions to dismiss filed by Reag and Beach House, *see* (ECF 170, 326, 387), that the extent of

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 16 of 26

their contacts with New Jersey are irrelevant because they were served in the United States under Fed. R. Civ. P. 4 and that as entities formed under Florida law with principal places of business in Florida, they have sufficient minimum contacts with the United States to be subject to the personal jurisdiction of the Court in this action where the Court's subject matter jurisdiction is based on Section 1334 of the Bankruptcy Code. *See, e.g., In re Celotex Corp.*, 124 F.3d at 630 (in case where the federal court's jurisdiction was based on Section 1334, there was "no doubt" that a "Delaware corporation with its principal place of business in New York" had "minimum contacts with the United States such that subjecting it to personal jurisdiction does not offend the Due Process Clause of the Fifth Amendment[.]").

While in the same boat as Reag, Beach House, and Braga as a Florida corporation with a principal place of business in Florida, *see* Compl., ¶ 89, Astronauto at least attempts to address the Trustee's position that the Court's personal jurisdiction inquiry must focus on whether the defendant has sufficient minimum contacts with the United States. *See* (Astronauto Ltr. at 1-3). However, the authority cited by Astronauto to support its argument that the Court's exercise of personal jurisdiction "would not be reasonable," *see* (*id.* at 3), actually undermines its position. Indeed, in *Busch v. Buchman, Buchman & O'Brien, L. Firm*, 11 F.3d 1255, 1256-58 (5th Cir. 1994), where personal jurisdiction was "predicated on 15 U.S.C. § 78aa, which grants nationwide service of process[,]" the Court held that a district court in Texas had personal jurisdiction over a New York law firm, explaining that "[g]iven that the relevant sovereign is the United States, it does not offend traditional notions of fair play and substantial justice to exercise personal jurisdiction over a defendant residing within the United States." The same reasoning applies

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 17 of 26

here.[13]  Finally, Astronauto misses the mark with its contention that the Supreme Court in *Fuld v. PLO*, 606 U.S. 1 (2025), held that the due process inquiry under the Fifth Amendment involves an inquiry "along the lines of the 14th Amendment's minimum contacts inquiry."  *See* (Astronauto Ltr. at 3).  In fact, the Supreme Court "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment" and explained that "the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority."  *Fuld*, 606 U.S. at 16.

## D.    The Court Can Appropriately Exercise Personal Jurisdiction Over Adukargo

Adukargo devotes much of its submission to arguing that a 14th Amendment due process analysis must apply.  It ignores that the Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334 because it arises from the bankruptcy case for MLS, *see* Compl., ¶¶ 219-20, and that, as a result, personal jurisdiction is established over Adukargo under Fed. Bank. R. 7004(f) by "filing a waiver of service under . . .the applicable provisions of Fed. R. Civ. P. 4" if "exercising jurisdiction is consistent with the United States Constitution and laws."  Adukargo waived service on August 16, 2024 (ECF 177), so the Fifth Amendment due process analysis applies.  Similarly misguided is Adukargo's contention that the Court lacks personal jurisdiction over Adukargo with respect to the Trustee's RICO claims "because the RICO statute does *not* authorize international service" (Adukargo Ltr. at 3) (emphasis in original and citing 18 U.S.C. § 1965(b)).[14]  Fed. R. Civ. P. 4(k)(2) provides that when a claim arises under federal law (like the RICO claims here), "filing a waiver of service establishes personal jurisdiction over a defendant if:  (A) the defendant is not

---

[13] Reag, Beach House, Braga, and Astronauto apparently do not dispute that they were properly served in the United States under Rule 4.

[14] Adukargo's personal jurisdiction arguments based on 18 U.S.C. § 1965(a), RICO's venue provision, are clearly misplaced.  Regardless, venue is proper in this Court under 28 U.S.C. § 1409.

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 18 of 26

subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."  Adukargo waived service and appears to contend that it is not subject to general jurisdiction in any U.S. state, so Fed. R. Civ. P. 4(k)(2) again indicates that the Fifth Amendment due process analysis applies.

In any event, regardless of whether Fifth or Fourteenth Amendment due process analysis applies, the Court can exercise personal jurisdiction over Adukargo.  At the outset, Adukargo's email communications with MLS concerning the 2023 Transaction will establish the propriety of this Court's exercise of specific personal jurisdiction.  *See, e.g.*, *King v. Bon Charge,* 2025 WL 3764039, at *5 (D. Del. Dec. 30, 2025) (noting that, by contacting or sending anything to the forum, a defendant can create jurisdictionally relevant contacts).

Moreover, the Court has jurisdiction over Adukargo pursuant to *Calder*.  As the Complaint alleges, Adukargo was a central and indispensable participant in the fraudulent scheme against MLS.  It was represented to MLS and Gerald that Adukargo would perform critical tasks in connection with the transport of what supposed to be tin concentrate but Adukargo and its co-conspirators knew was worthless gravel dust. Specifically, it was falsely represented to MLS and Gerald that Adukargo would be responsible for:

(i)    picking up the tin concentrate, which was to be stored in sealed one-ton bags, from the mines and transporting it to its own "bonded" warehouse;

(ii)   storing the tin at its warehouse, where it would be removed from its original packaging, weighed, inspected, and chemically tested;

(iii)   if and when the tin was found to be satisfactory, placing the tin into new one-ton bags and stuffing those bags into export containers, both of which would be sealed with uniquely numbered seals; and

(iv)   delivering the sealed export containers filled with the sealed one-ton bags of tin to the Port of Manaus for international export.

Compl., ¶¶ 6, 241-47, 310.

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 19 of 26

Adukargo also engaged in certain deliberate acts to cover up the scheme. For example, when a Gerald representative visited Adukargo in April 2023 to view the tin concentrate being loaded for export, *id.*, ¶¶ 276-81, Francisco Bonates ("Bonates"), Adukargo's Director of Operations: (a) falsely told the Gerald representative that, because Adukargo was a bonded warehouse controlled by customs agents, the Gerald representative could not go in to the area where the tin was being removed from its original bags; and (b) showed the Gerald representative a sample of tin concentrate that was purportedly from the containers holding the tin purchased by MLS but was, in fact, from containers of tin that had been brought to Adukargo for the specific purpose of deceiving the representative and that were removed from the premises after the representative left. *Id.*, ¶¶ 29, 6, 29, 277-81.

Adukargo's knowing participation in the fraud is evidenced by additional alleged facts and circumstances, including, but not limited to, Adukargo's preparation and sending to MLS and Gerald documents falsely confirming that tin concentrate was being transported, stored, and shipped when, in fact, the only material being transported, stored, and shipped was gravel dust; Adukargo's preparation of official customs documents that were not shared with MLS or Gerald which confirmed that the material handled by Adukargo was gravel dust; Adukargo's admission that it had stopped warehousing tin long before the transaction with MLS and had been contracted to collect gravel dust and transfer it to export containers at the Adukargo warehouse; Adukargo's knowledge, as an industry participant, that gravel dust is never packaged in sealed bags and shipped internationally; and Adukargo's lack of a tin export license. *Id.*, ¶¶ 298-304.

Based on the above, and contrary to Adukargo's contention that its conduct does not connect it to the United States "in a meaningful way," *Walden v. Fiore*, 571 U.S. 277, 290 (2014), all three prongs of the effects test are satisfied, given that: (i) Adukargo committed intentional torts

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 20 of 26

against MLS; (ii) Adukargo expressly aimed its tortious conduct at the United States by targeting MLS, which it would have known to be located in the forum; and (iii) thus should have reasonably anticipated being haled into court in the United States. *See Marten*, 499 F.3d at 297. Finally, conspiracy jurisdiction would also apply as the Trustee has alleged the existence of conspiracy in which Possebon participated and overt acts by co-conspirators such as De Souza and Empire Strong with sufficient connections with the United States. *See* Compl., ¶¶ 407-16.

While the Trustee is confident that the above allegations are sufficient establish the Court's personal jurisdiction over Adukargo, any hesitation the Court may have will be resolved by jurisdictional discovery that should include: (i) production of any communications between and among (a) Seth Berkotwitz and/or any representatives of MLS or Gerald and (b) any employees or agents of Adukargo or its affiliates; (ii) interrogatories and document demands concerning all visits to Adukargo's facilities by Seth Berkotwitz and/or any representatives of MLS or Gerald; and (iii) a sworn deposition of Francisco Bonates, Adukargo's Direction of Operations Manager.[15]

**E.      The ESN Defendants Are Subject to the Court's Personal Jurisdiction**

The ESN Defendants argue that Da Silva is not subject to specific jurisdiction because she has not "availed herself of the jurisdiction of the United States" and that it would be unfair to force her to defend against this action in the United States because she has not visited the United States and does not speak English; that specific jurisdiction is lacking as to ESN because the Complaint does not allege ESN received or sent funds "directly from the United States" and it would be unfair to require ESN to defend itself in this case because it does not do business in the United States; and that the allegations in the Complaint should not entitle the Trustee to jurisdictional discovery.

---

[15] Recognizing that its current position would be entirely undermined by any form of jurisdictional discovery, Adukargo has nothing to say on the topic other than a snide aside concerning the professional fees incurred in connection with MLS's bankruptcy. *See* (Adukargo Ltr. at 1 n.1).

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 21 of 26

*See* (ESN Ltr. at 3).  The Trustee submits that the Court has jurisdiction over the ESN Defendants under the effects test, all three prongs of which are satisfied here.

*First*, the Complaint specifically alleges that Defendants committed intentional torts targeted against MLS.  In that regard, the Complaint alleges that the ESN Defendants committed fraud against MLS and also aided and abetted Possebon's fraud against MLS by facilitating the transfer of the illicit proceeds, obtained in the first instance by wire transfers issued from MLS's United States bank account to Empire Strong, to family members, friends, and business associates of Possebon in Brazil, and that the ESN Defendants were specifically engaged to funnel the proceeds of the fraud overseas and in a manner designed to avoid detection by the authorities.  *See Compl.* ¶¶ 337-40, 349, 381, 391.  In that regard, Empire Strong is a company that uses an "intermediation" system to make unlicensed currency transfers and foreign exchange between the United States and countries like Brazil, and ESN, managed by Da Silva, is ESN's Brazilian partner that, operating at De Souza's direction, issues payments to recipients in Brazil.  *Id.*, ¶¶ 337-40.

*Second*, MLS clearly felt the brunt of the harm from the ESN Defendants' tortious conduct—i.e., their fraud against MLS and aiding and abetting Possebon's fraud—in the United States, in connection with which MLS, a New Jersey entity, transferred almost $50 million to numerous undeserving recipients from its United States bank account, received nothing of value in return, and was ultimately forced into bankruptcy in the United States.

*Third*, the ESN Defendants expressly aimed their tortious conduct at the United States.  *See Marten*, 499 F.3d at 297.  As Empire Strong's partners charged with the distribution of proceeds of the fraud obtained by Empire Strong from MLS in the United States, *see* Compl, ¶¶ 347-49, the ESN Defendants were undoubtedly aware that they were disbursing and laundering the proceeds of a fraud committed against a United States entity, particularly given that they worked at De

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 22 of 26

Souza's direction and made numerous substantial wire transfers following Empire Strong's receipt of funds from MLS, *see id.*, ¶¶ 338, 349.  And, a key role played by the ESN Defendants was precisely to make the stolen funds "extremely difficult to trace and recoup."  *Id.*, ¶ 382(i).  For similar reasons, conspiracy jurisdiction would apply as the Trustee has alleged the existence of conspiracy in which the ESN Defendants participated and overt acts by co-conspirators such as De Souza and Empire Strong with sufficient U.S. connections.  *See* Compl., ¶¶ 407-16.

The ESN Defendants' purported "fairness" concerns are misplaced.  Given their conduct in furtherance of the multimillion-dollar fraud against MLS, at the center of which were their United States partners who likely issued directions to them from the United States, the ESN Defendants should reasonably have anticipated being haled into court in the United States.  *Cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985).[16]

In light of the above allegations, the Trustee is at least entitled to jurisdictional discovery to explore the ESN Defendants' contacts with the United States, such as: (i) document demands and interrogatories concerning communications between and among De Souza and Da Silva and/or any representatives of Empire Strong and ESN concerning the transfers identified in paragraph 349 of the Complaint, any communications or interactions between Possebon and the ESN Defendants concerning the transfers identified in paragraph 349 of the Complaint, and the nature of ESN's "intermediation" business and the relationships between ESN and Da Silva on one hand and Empire Strong and De Souza on the other; and (ii) sworn depositions of De Souza and Da Silva concerning the foregoing topics.  In light of (a) the Trustee's allegation that De Souza directed the operations of ESN in Brazil and that ESN is engaged by wrongdoers such as Possebon

---

[16] Their fairness concerns are also undermined by the fact that they are being represented by the same international law firm that represents their US affiliate, Empire Strong, and De Souza.

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 23 of 26

to avoid official financial channels, Compl., ¶¶ 337-40, and (b) the concession by the defaulted Empire Strong Defendants that they are subject to personal jurisdiction, *see* (De Souza Ltr. at 1), and De Souza's residence and extensive conduct in the United States, jurisdictional discovery concerning the relationships between the United States and Brazilian entities and individuals is particularly important to assess whether the ESN Defendants are subject to jurisdiction under alter ego or agent-principal theories.

F.      **Opus Is Subject To Jurisdiction Based On Hits' Contracts**

Opus fails to convince with its arguments that the Court lacks specific jurisdiction because Opus did not "inherit" the "jurisdictional contacts" of Hits Entretenimento Ltda. ("Hits") and the promissory notes and agreements pursuant to which Berkowitz, his father (Mark Berkowitz), and MLS invested more than $2 million with Hits are insufficient to satisfy due process concerns that would arise from exercising personal jurisdiction over Opus. *See* (Opus Ltr. at 1-3).

Between August 2015 and April 2017, Seth and Mark Berkowitz, individually and through MLS, invested more than $2 million with Hits, pursuant to a series of promissory notes and loan agreements. Matheus Possebon ("M. Possebon") and Giacomolli were partners in Hits. *See* Compl., ¶¶ 482-84, 492-93. To induce the investments, M. Possebon told Mark and Seth Berkowitz that Hits was "becoming very profitable," and that he was going to sell it "for hundreds of millions of dollars." *Id.*, ¶¶ 491, 517.  Mark and Seth assigned to MLS their rights, title, and interest to the investments and loans made individually. *Id.*, ¶ 497. Hits was purchased by Opus, which assumed Hits' debts and obligations. *Id.*, ¶¶ 494, 504, 505, 510. None of the principal and interest owed pursuant to the loans/investments was ever repaid by Hits. M. Possebon told Seth Berkowitz that this was because he had incurred massive gambling losses. *Id.*, ¶ 494, 510. M. Possebon and Giacomolli are believed to be former and current Opus executives, respectively. *Id.*, ¶¶ 495-96.

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 24 of 26

Opus's contentions that it never merged with Hits, (Opus Ltr. at 2), raise a factual issue that should be explored in jurisdictional discovery given that there were news reports in the Brazilian press announcing a merger between the two entities and Opus's own website touted an alliance, strategic partnership, and combination of portfolios with Hits and a renaming of the company, all of which are at odds with Opus's contentions that it merely contracted with Ampla Enventos Ltda., an affiliate of Giacomolli, *see* (*id.*).[17]

Contrary to Opus's argument (*id.* at 2-3), the agreements between Hits, Seth and Mark Berkowitz, and MLS are sufficient to establish specific jurisdiction. *First*, Forming and executing a contractual relationship "centered" in the forum is an act by which a defendant avails itself of conducting activities in the forum. *Caduceus, Inc.*, 713 F. Supp. 3d at 35. A court considering whether the relationship is "centered" in the forum takes into account factors, including: where the contract was signed, the "back-and-forth" between the forum and the defendant, the time spent by the defendant interacting with the forum plaintiff, and whether performance of the contract involved "meaningful connections" to the forum. *Id.* at 38. Here, as can be established in jurisdictional discovery if necessary, the contracts were executed by Mark and Seth Berkowitz in New Jersey, M. Possebon negotiated the agreements via phone and internet communications with Seth and Mark Berkowitz in New Jersey, the agreements called for the application of the law of a U.S. jurisdiction (New York), and performance under the agreements required Hits to remit repayments to a New Jersey bank account. *Second*, for the same reasons, the Trustee's claims against Opus "arise" out of Hits' contacts with the forum. *See, e.g., Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 130 (3d Cir. 2020) (litigation arises out of the defendant's

---

[17] Jurisdictional discovery concerning the Opus-Hits relationship could include a sworn deposition of an Opus representative, interrogatories, and document demands.

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 25 of 26

contacts with the forum when the defendant's contacts with the forum state were instrumental in contract's formation or breach). *Third*, given Hits' extensive contacts with New Jersey, Opus cannot establish that it should not have reasonably anticipated being haled into court in New Jersey *See Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992).

### G.    At Best, Giacomolli's Arguments Necessitate Jurisdictional Discovery

The Complaint, ¶¶ 514-18, alleges that Giacomolli made false statements of material fact to Berkowitz, Mark Berkowitz, and MLS to induce them to make the investments with Hits referenced above. These allegations provide grounds for jurisdiction under the effects test as well as based on Giacomolli's contacts with the United States. Moreover, those allegations must be accepted as true at this stage, and any disputed facts must be construed in the Trustee's favor. *See Toys "R" Us*, 318 F.3d at 457. Giacomolli's challenge to specific jurisdiction, *see* (Giacomolli Ltr. at 2), simply seeks to dispute the Trustee's factual allegations. At the very least, the Trustee's allegations warrant jurisdictional discovery, including a sworn deposition of Giacomolli and document demands and interrogatories concerning his contacts with Seth and Mark Berkowitz and MLS and Giacomolli's involvement in the loans they made to hits. Giacomolli's argument that jurisdictional discovery would not be appropriate because ethe Complaint does not allege facts "suggesting the possible existence of forum contacts by Mr. Giacomolli," (*id.* at 3), depends upon ignoring the salient allegations in the Complaint referenced above.

*      *      *

For the reasons above, the Trustee submits that the Defendants' challenges to personal jurisdiction will fail, and that any possible doubts can appropriately be resolved by jurisdictional discovery consistent with Third Circuit precedent.

Letter to Honorable Justin T. Quinn, Monday, April 20, 2026
Page 26 of 26

Respectfully submitted,

Eric T. Kanefsky
Calcagni & Kanefsky LLP


cc (via ECF):   all counsel of record